Mindy Davis Nokes (SBN 167787)
WEITZ & LUXENBERG, P.C.
1880 Century Park East, Suite 700
Los Angeles, CA 90067
Telephone: (310)247-0921
Facsimile: (310) 786-9927

Attorney for Plaintiff J.C. proceeding under pseudonym

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

J.C., AN INDIVIDUAL,

                Plaintiff

      -against-

CHOICE HOTELS INTERNATIONAL, INC.;
HILTON WORLDWIDE HOLDINGS, INC;
MARRIOTT INTERNATIONAL, INC;
              Defendants.

CASE NO:

**COMPLAINT FOR DAMAGES:**

   1. **18 U.S.C §1595**
   2. **CAL. CIV. CODE §52.5**

**DEMAND FOR JURY TRIAL**

## COMPLAINT

COMES NOW the Plaintiff J.C., by and through the undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

## INTRODUCTION

1. For years, sex trafficking ventures have brazenly operated in and out of hotels throughout this country. Criminals parade their misconduct openly on hotel properties throughout the United States while the hotels and hospitality industry remain willfully blind to the criminal misconduct to continue earning a profit at the expense of human life, human rights, and human dignity.

2. Choice Hotels International, Hilton Worldwide Holdings, and Marriott International (collectively the "Defendants") know and have known for more than a decade that sex trafficking repeatedly occurs under their flag throughout the country.  Rather than taking timely and effective measures to thwart this epidemic, Choice Hotels International, Hilton Worldwide Holdings, and Marriott International have

instead ignored the open and obvious presence of human trafficking on their properties, enjoying the profit from rooms rented for the explicit and apparent purpose of sex trafficking.

3. This action for damages is brought by the Plaintiff, a survivor of sex trafficking hereinafter identified by her initials J.C., under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA").

4. J.C. became familiar with her trafficker because she would often see him at a gas station near her college campus. He was friendly and would occasionally flirt with her, making her feel both special and desirable. However, in 2008 J.C. was abducted by her trafficker under the guise that he was taking her on a friendly drive around the neighborhood. Instead, J.C. drove toward San Francisco declaring that J.C. was going to, in sum and substance, "make [him] a lot of money." For the next four (4) years J.C. was required by her trafficker to sexually service paying strangers while enduring brutal physical assaults, psychological torment, verbal abuse, and false imprisonment at the Defendants' hotels.

5. J.C. was tortured and exploited at hotels in Santa Cruz and Fremont, California and Alexandria, Virginia, including the Comfort Inn®, Marriott®, and Embassy Suites® by Hilton.

6. The Plaintiff now brings this action for damages against the Defendants listed herein. Each of the Defendants, in violation of 18 U.S.C. § 1595, knowingly benefited from participation in a venture that they knew, or at the very least should have known, to be engaging in sex trafficking in violation of 18 U.S.C. § 1591(a).

7. As a direct and proximate result of Defendants' Choice Hotels International, Hilton Worldwide Holdings, and Marriott International consistent failures to prevent human trafficking on their hotel properties, J.C. was trafficked, sexually exploited, and repeatedly victimized at Choice, Hilton, and Marriott Hotels.

8. The Plaintiff brings the instant action pursuant to the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595, against Defendants who enabled, harbored, held, facilitated, and financially benefited from the sex trafficking venture in which J.C. was exploited and brutally

victimized in direct violation of 18 U.S.C. § 1591 (a).

**PARTIES**

9. The Plaintiff, having moved to proceed anonymously,[1] and thus herein identified by her initials J.C., was sold for sex throughout California and Virginia for four (4) years. The Plaintiff is a victim of trafficking pursuant to 22 U.S.C. §7102 (15) and 18 U.S.C. §1950, and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C §7102 (14). She resides in the state of Idaho.

10. Defendant Choice Hotels International, Inc. ( hereinafter "Choice Hotels") is one of the largest hotel companies in the world offering public lodging services directly or through its affiliates, subsidiaries, and franchisees. It is a Delaware corporation with its principle place of business located at 1 Choice Hotels Circle in Rockville, Maryland. Choice Hotels is registered with the Secretary of State to conduct business in the State of California.

    a. Comfort Inn® brand hotels are Choice Hotels.

    b. As a hotel operator, Defendant Choice Hotels controls the training and policies for its hotels including the Comfort Inn® hotel where J.C. was trafficked.

    c. Defendant Choice Hotels maintains that it considers guest safety and security important and requires the hotels in its portfolio to comply with Choice Hotels brand standards and all local, state, and federal laws.[2]

    d. Through its relationship with the staff at the Comfort Inn® hotel where J.C. was trafficked and the hotel guest perpetrator who trafficked J.C. at the Comfort Inn® hotel, Defendant Choice Hotels knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known to engage in sex trafficking.

---

[1] Contemporaneously with the Complaint, Plaintiff J.C. filed, pursuant to a Motion to Permit Plaintiff to Proceed Anonymously as J.C. based upon the nature of the allegations in the instant Complaint, which are of an inherently intimate and personal nature. That motion is pending. Undersigned Counsel will provide her identity to counsel for the Defendants upon proper effectuation of service.
[2] Choice Hotels, Corporate Responsibility: Human Rights Policy, https://www.choicehotels.com/about/responsibility/human-rights-policy

e. Choice Hotels receive a percentage of the gross room revenue from the money generated by the operations of all Comfort Inn® hotels, including a percentage of the rate charged for the rooms in which the Plaintiff was trafficked.

f. Choice Hotels owns, supervises, and/or operates the Comfort Inn® - Santa Cruz Beach located at 110 Plymouth Street, in Santa Cruz, California under its Comfort Inn® brand.

g. Choice Hotels is subject to the jurisdiction of this Court because it regularly transacts business in California, operates dozens of hotels in California including the Comfort Inn® contracts to supply services in California, caused indivisible injuries to the Plaintiff in California, and knowingly profited from an illegal sex trafficking venture at the Comfort Inn® located at 110 Plymouth Street, in Santa Cruz, California.

11. Defendant Hilton Worldwide Holdings, Inc. is another of the largest hotel companies in the world offering public lodging services directly or through its affiliates, subsidiaries, and franchisees. It is a Delaware corporation with its principle place of business located at 7930 Jones Branch Drive in McClean, Virginia.

a. Embassy Suites® by Hilton brand hotels are Hilton hotels.

b. As a hotel operator, Defendant Hilton controls the training and policies for its hotels including the Embassy Suites® hotel where J.C. was trafficked.

c. Defendant Hilton maintains that it considers guest safety and security important and requires the hotels in its portfolio to comply with Hilton brand standards and all local, state, and federal laws.[3]

d. Through its relationship with the staff at the Embassy Suites® hotel where J.C. was trafficked and the hotel guest perpetrator who trafficked J.C. at the Embassy Suites® hotel, Defendant Hilton knowingly benefited or received something of value from its

---

[3] Hilton Worldwide Holdings, Inc., Slavery and Human Trafficking Statement (Financial Year 2017) available at https://ir.hilton.com/~/media/Files/H/Hilton-Worldwide-IR-V3/committee-composition/slavery-and-trafficking-statement-2018.pdf (last visited Nov. 20, 2019).

facilitation of or participation in a venture which it knew or should have known to engage in sex trafficking.

e.  Hilton receives a percentage of the gross room revenue from the money generated by the operations of all Embassy Suites® hotels, including a percentage of the rate charged for the rooms in which the Plaintiff was trafficked.

f.  Hilton owns, supervises, and/or operates the Embassy Suites® by Hilton – Alexandria Old Towne located at 1900 Diagonal Road, in Alexandria, Virginia.

g.  Hilton is subject to the jurisdiction of this Court because it regularly transacts business in California, operates dozens of hotels in California including numerous Embassy Suites®, and contracts to supply services in California, and caused indivisible injuries to a vulnerable Plaintiff by participating in a sex trafficking venture that arose out of a common course of conduct occurring in the state of California.

12. Defendant Marriott International, Inc. is again one of the largest hotel companies in the world offering public lodging services directly or through its affiliates, subsidiaries, and franchisees. It is a Delaware corporation incorporated in the State of Delaware with its principle place of business located at 10400 Fernwood Road in Bethesda, Maryland.  Marriott is registered with the Secretary of State to conduct business in the State of California.

a.  Marriott® brand hotels are Marriott hotels.

b.  As a hotel operator, Defendant Marriott controls the training and policies for its hotels including the Marriott® hotel where J.C. was trafficked.

c.  Defendant Marriott maintains that it considers guest safety and security important and requires the hotels in its portfolio to comply with Marriott brand standards and all local, state, and federal laws.[4]

---

[4] Marriott International Inc., Human Rights Policy Statement (July 2017) available at https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsStatement.pdf (last visited Nov. 20, 2019).

COMPLAINT FOR DAMAGES

d. Through its relationship with the staff at the Marriott® hotel where J.C. was trafficked and the hotel guest perpetrator who trafficked J.C. at the Marriott® hotel, Defendant Marriott knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known to engage in sex trafficking.

e. Marriott receives a percentage of the gross room revenue from the money generated by the operations of all Marriott® hotels, including a percentage of the rate charged for the rooms in which the Plaintiff was trafficked.

f. Marriott owns, supervises, and/or operates the Fremont Marriott Silicon Valley located at 46100 Landing Parkway in Fremont, California under its Marriott brand.

g. Marriott is subject to the jurisdiction of this Court because it regularly transacts business in California, operates dozens of hotels in California including the Freemont Marriott® Silicon Valley, contracts to supply services in California, caused indivisible injuries to the Plaintiff in California, and knowingly profited from an illegal sex trafficking venture at the Fremont Marriott® Silicon Valley located at 46100 Landing Parkway in Fremont, California.

13. Whenever reference is made in this Complaint to any act, deed or conduct of Defendants, the allegation is that Defendants engaged in the act, deed or conduct by or through one or more of their officers, directors, agents, employees or representatives who was actively engaged in the management, direction, control or transaction of the ordinary business and affairs of Defendants.

## SEX TRAFFICKING UNDER FEDERAL LAW

14. Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion." This

definition combines the three (3) elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

15.   To better understand the mechanism by which sex trafficking is prohibited by the federal criminal law, it would be best to address these elements in the reverse.  Sex trafficking is slavery for the *purpose* of commercial sex.  It is only a lens on the already existing crime prohibited by 18 U.S.C. § 1589 and §1590.  The crime of slavery can then be divided into the two (2) elements remaining: the act and the means.   The *act* is the "harboring, transporting, providing, or obtaining," of forced labor, codified as a violation of 18 U.S.C. §1590. While the *means* is labor "obtained or provided by force, fraud or coercion" and is codified as a violation of 18 U.S.C. §1589.

16.   Thus, while the complete definition of 'sex trafficking' is found in the TVPRA under 22 U.S.C. § 7102 it is a long recognized criminal violation of 18 U.S.C. § 1589 and 1590 more commonly referred to as slavery.

17.   All who knowingly provide *or* obtain commercial sex that was provided or obtained through force fraud and coercion are guilty of sex trafficking in violation of 18 U.S.C. § 1589 and 1590.  This includes **_both_** the 'traffickers' who recruit, harbor, transport, and provide individuals for forced commercial sex work **_and_** the 'Johns' or 'buyers' who obtain, solicit, or patronize forced commercial sex work.[5]

## FACTUAL ALLEGATIONS

### A.  THE HOSPITALITY INDUSTRY'S PARTICIPATION IN THE SEX TRAFFICKING INDUSTRY

*"75% of survivors responding to Polaris's survey reported coming into contact with hotels at some point during their exploitation…Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff."*

*-   The Polaris Project* [6]

---

[5] While the 'pimps' or 'providers' are often referred to as the 'traffickers' and the purchasers are referenced as the 'Johns', 'tricks', or 'buyers' [and such nomenclature is used herein], under federal law **_both_** categories are 'traffickers'.

[6] Recommendations for Hotels and Motels, The Polaris Project, https://polarisproject.org/hotels-motels-recommendationshhh

18.   Human trafficking is the world's fastest growing crime.[7]   While the term 'human trafficking' incorporates all forced labor, the sex trafficking industry alone pulls in an estimated $99 billion each year making it the second largest illicit crime industry behind only the sale of **all** illegal drugs.[8]

19.   Sex traffickers, or 'pimps', use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

20.   The hospitality industry plays a crucial role in the sex trade.[9]   The trope of the "no-tell, motel" is certainly not a new one.  Hotels have long profited from their reputations as havens of privacy and discretion for the offending.  Hotels offer anonymity and non-traceability, making them ideal venues for crime and sex trafficking in particular.

21.   According to National Human Trafficking Hotline statistics, hotels are the top reported venue where sex trafficking acts occur.[10]   Traffickers and buyers alike frequently use hotel rooms to exploit victims.

22.   Traffickers use hotels as the hub of their operations. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex.  This is referred to as an 'in call'.

23.   Hotels are also the venue of choice for buyers seeking an 'out call,' wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction. Unsurprisingly, those on the demand side of this transaction (i.e. those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels.

---

[7] Human Trafficking is the World's Fastest Growing Crime, The Advisory Board (May 22, 2017, 9:30 AM), https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking
[8] Profits and Poverty: The Economics of Forced Labor, International Labor Organization (May 24, 2014), http://www.ilo.org/global/publications/ilo-bookstore/order-online/books/WCMS_243391/lang--en/index.htm
[9] Giovanna L. C. Cavagnaro, Sex Trafficking: The Hospitality Industry's Role and Responsibility, Cornell University School of Hotel Administration (2017), http://scholarship.sha.cornell.edu/honorstheses/3
[10] National Human Trafficking Hotline Statistics, The Polaris Project (2016), https://polarisproject.org/resources/2016-hotline statistics

In New York City alone, 45% of all reported sexual exploitation took place in hotels, including the Ritz Carlton and the Plaza.[11]

24.   The problem is industry wide.  In the United States, as much as 63% of all trafficking incidents happen in hotels ranging from luxury to economy.[12]

25.   Due to the overall complacency of the hospitality industry on addressing the issue, hotels are *the* venue of choice for sex trafficking.[13]   Traffickers and buyers capitalize on the hotel industry's general refusal to adopt and enforce companywide anti-trafficking policies from the corporate to the property level, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for those at the point of sale.

26.   Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation.  Thus, the hospitality industry has the greatest reach to prevent, identify, and thwart sexual exploitation where it is most likely to occur.

27.   But aside from their unique position in this epidemic, hotels and motels have the highest obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation, and should be held accountable when they fail to comply.  As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."[14]

28.   Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal obligation for the hospitality industry.  The presence of sex trafficking and sexual exploitation in a hotel is frequently an obvious occurrence and, although unutilized, underutilized, or

---

[11] Giovanna L. C. Cavagnaro, <u>Sex Trafficking: The hospitality Industry's Role and Responsibility</u>, Cornell University, School of Hotel Administration (2017) http://scholarship.sha.cornell.edu/honorstheses/3
[12] Michele Sarkisian, <u>Adopting the Code: Human Trafficking and the Hospitality Industry</u>, Cornell Hospitality Report, 15(15), 3-10 (2015).
[13] <u>Hotels Initiative</u>, The Polaris Project, https://polarisproject.org/initiatives/hotels
[14] Giavanna L. C. Cavagnaro, <u>Sex trafficking: The Hospitality Industry's Role and Responsibility</u>, Cornell University, School of Hotel Administration (2017), http://scholarship.sha.cornell.edu/honorstheses/3

COMPLAINT FOR DAMAGES

ineffectively utilized, numerous well-researched trainings and toolkits have been published over the last decade to help hotel staff in every position to identify the signs.[15]

29.  From check-in to check-out there are a number of indicators that traffickers and their victims exhibit during their stay at a hotel.  With proper training and the implementation of reasonable security measures, hospitality companies could prevent regular sex trafficking under their flag.

30.  Obvious signs of sex trafficking at a hotel may include: an excess of condoms in rooms, individuals carrying or flashing large amounts of cash, excessive amounts of cash stored in the room, renting two rooms next door to each other, declining room service for several consecutive days, significant foot traffic in and out of room(s), men traveling with multiple women who appear unrelated, women known to be staying in rooms without leaving, women with physical injuries or signs of fear and anxiety, guests checking in with little or no luggage, hotel guests who prevent another individual from speaking for themselves, or a guest controlling another's identification documents.[16]

31.  Obviously, hotel staff who have undergone training are more aware of sex trafficking when it happens and are more willing to report it than hotel staff who have not been trained.[17] Thus hospitality companies are obligated to adopt policies and procedures related to sex trafficking and to enforce these policies and procedures as brand standard through to the property level.

32.  Hospitality companies can and should mandate that *all* staff working at *all* hotel properties across their brand complete sex trafficking training. [18] The hospitality industry has been cognizant of their role and responsibilities in the sex trafficking industry for years.

33. In  2011,  Wyndham  Hotels  trained  only  some  of  its  employees  to  look  for  signs  of

---

[15] Department of Homeland Security, Blue Campaign Toolkit, attached as "Exhibit A." Available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

[16] Id. See also, Shea M. Rhodes, Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees, The Institute to Address Criminal Sexual Exploitation, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf

[17] Giavanna L. C. Cavagnaro, Sex Trafficking: The Hospitality Industry's Role and Responsibility, Cornell University, School of Hotel Administration (2017), http://scholarship.sha.cornell.edu/honorstheses/3

[18] Shea M. Rhodes, Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees, The Institute to Address Criminal Sexual Exploitation, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf

COMPLAINT FOR DAMAGES

trafficking.[19]

34. In 2012, an anti-trafficking coalition alerted and instructed Accor, Best Western, British Airways, Carlson, Choice Hotels, Hilton, Hyatt, Intercontinental Hotels Group, Marriott, Starwood, Thomas Cook, Whitbread, and Wyndham of the likelihood of sex trafficking during the London Olympics, and inquired about the companies anti-trafficking policies, while urging immediate action regarding trafficking.[20]

35. Marriott claims it has supported the anti-trafficking group Polaris since 2010 and in a partnership with EPCAT ((End Child Prostitution, Pornography and Trafficking of Children for Sexual Purposes)) developed a training module in 2010 for hotel management and staff.[21]

36. Marriott claims it amended its Human Rights Policy as early as 2006 to reflect growing concerns regarding human trafficking and reviews the policy annually. To date the policy merely states "Marriott supports the elimination of all forms of forced, bonded or compulsory labor and provides associate training on human trafficking awareness and prevention." [22]

37. In 2013, IHG commissioned an external assessment of human rights risks most relevant for the travel and hospitality sector globally and regionally working with external human rights experts, Maplecroft. The risks identified included human trafficking.[23]

38. In 2015 and 2016 IHG identified the modern slavery risks most relevant to IHG across four different areas of risk: (I) risks of modern slavery affecting their organization including IHG hotels, (ii) risks of modern slavery occurring in IHG corporate or hotel supply chains, (iii) risks of modern slavery

---

[19] Katie Lobosco, *Super 8 workers trained to spot sex trafficking*, CNN BUSINESS (Nov. 18, 2014), https://money.cnn.com/2014/11/18/news/companies/days-inn-sex-trafficking/.

[20] *Corporate Strategy to Address Human Trafficking: Investor Recommendations for London Olympic Sponsors and Hospitality Companies, Christian Brothers Investment Services*, CBIS, http://cbisonline.com/us/wp-content/uploads/sites/2/2012/09/FINAL_OlympicsReport_9_28.pdf (last visited June 19, 2019).

[21] *Human Rights Policy*, MARRIOTT, https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited June 6, 2019).

[22] Our Commitment to Human Rights, MARRIOTT INTERNATIONAL INC. available at https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsCommitment.pdf (last visited Nov. 20, 2019) citing Marriott International, Inc.'s Human Rights Policy Statement available at https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsStatement.pdf (last visited Nov. 20, 2019).

[23] Inter-Continental Hotel Group, Modern Slavery Statement 2017 available at https://www.ihgplc.com/-/media/ihg/Files/pdf/modern-slavery-statement-2017-ihg-010318.ashx?la=en&hash=B688F42E878C145EC5C8C9DF02ABC227 (last visited Nov. 22, 2019).

such as human trafficking occurring in or around IHG branded hotels, (iv) risks of modern slavery occurring at different stages of the hotel lifecycle.  IHG represents that its various risk assessment mechanisms have helped them to identify higher risk locations since 2013.

39. Choice Hotels has supported the anti-trafficking group Polaris since 2010 and in a partnership with EPCAT ((End Child Prostitution, Pornography and Trafficking of Children for Sexual Purposes)) developed a training module in 2010 for hotel management and staff.[24]

40. Further, nationwide campaigns recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue, and took initiative as early as 1997 with the United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[25]   These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released online resources and toolkits publicly accessible to any entity concerned with human trafficking.[26]

41. Hospitality companies have both the power and responsibility to make sex trafficking difficult for the offenders. Yet, they either repeatedly fail to heed the call or repeatedly failed to execute their own policies.  Instead, each continues to facilitate these crimes at their hotels, content to direct their efforts solely to profit and the bottom line.

## B.    THE DEFENDANTS CONTROL THE HOSPITALITY INDUSTRY

42. Hotel brands or flags lend their name and likeness to third party owners, while the building and operations are run by a franchisee or a third party management company under the brands' control. In return, the parent brand exchanges the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a contract or franchise agreement and still profits from putting heads in beds.

43. The average consumer does not see this relationship.  The parent brand gives the local property

---

[24] *Human Rights Policy*, CHOICE HOTELS, https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited June 6, 2019).
[25] *DHS Blue Campaign Five Year Milestone*, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.
[26] *Human Trafficking and the Hospitality Industry*, DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited June 19, 2019).

its identity.  It provides signage on and in front of the building that assures customers that if they check into that hotel they can expect the standards consistent with the parent hotel brand.  The same brand is emblazoned on everything in the hotel, from the pens in the bedside tables to the staff uniforms at the front desk.

44. In addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, the brand provides the local hotel with access to its brand wide central reservation system, 800 number, revenue management tools, world-class loyalty programs and a website.  Thus, booking and room reservations are controlled by the corporate parent brand.[27]

45. The local hotel typically pays around 10% of their total revenue back to the parent hotel brand and is required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreement.

46. The parent brand may enforce these standards through periodic inspections and even terminate the contract or franchise agreement if the local hotel is found to be inadequate.  This right of the parent hotel brand to enforce their brand standards is also their responsibility.

47.   At the time of the incidents alleged herein:

        a.   Defendant Choice Hotels owned and controlled the Comfort Inn® brand.

        b.   Defendant Hilton owned and controlled the Embassy Suites®, by Hilton brand.

        c.   Defendant Marriott International owned and controlled the Marriott® brand.

48.   Parent hotel brands may kick delinquent hotels out of their system but it is at the expense of terminating their royalty payments.

**THE DEFENDANTS' WILLFUL BLINDNESS TO SEX TRAFFICKING AT THEIR HOTELS**

49. Defendants Choice Hotels International, Hilton Worldwide Holdings, and Marriott International, have been on notice of repeated incidences of sex trafficking occurring at their Comfort Inn®, Embassy

---

[27] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, Lodging Magazine (April 10, 2018) https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/.

Suites® by Hilton, and Marriott hotels yet the brands failed to take the necessary action to prevent sex trafficking and still persist in failing to take the necessary action to prevent sex trafficking at their hotels.

50. CHOICE HOTELS INTERNATIONAL, INC. ("Choice Hotels")

    a.   COMFORT INN®

        i.   Defendant Choice Hotels owns, supervises, or operates the Comfort Inn® located at110 Plymouth Street, in Santa Cruz, California.

       ii.   Choice Hotels failed to implement and enforce any of its own policy or policies and protect Plaintiff J.C. from being sex trafficked.

      iii.   Founded in 1937, Choice was the joint-venture of seven (7) independent hotel owners specifically looking to join forces to share trade knowledge and better determine best practices. Choice represents that they have more than eighty-two (82) years of experience in managing successful brands. From all of their hotels, Defendant Choice receives an application fee, a lump sum payment, royalties, and other ongoing financial benefits.

      iv.   Choice Hotels knew or should have known that the Comfort Inn® hotels where Plaintiff J.C. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotels' premises, including when Plaintiff J.C. was trafficked.[28]

       v.   Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant Choice Hotels has repeatedly failed to take reasonable measures to prevent or thwart human trafficking at its hotels.

      vi.   Defendant Choice Hotels may exercise control over Comfort Inn® hotels by:

---

[28] According to neighborhoodscout.com, Santa Cruz is safer than just 2% of American cities. *See* https://www.neighborhoodscout.com/ca/santa-cruz/crime (accessed December 8, 2019).

1. distributing information to assist employees in identifying human trafficking;

2. providing a process for escalating human trafficking concerns within the organization;

3. requiring employees to attend training related to human trafficking;

4. providing new hire orientation on human rights and corporate responsibility;

5. providing training and education to Comfort Inn® hotels through webinars, seminars, conferences, and online portals;

6. developing and holding ongoing training sessions on human trafficking; or

7. providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

vii. Choice Hotels was in an actual and/or apparent agency relationship with Comfort Inn® hotels offering public lodging services in the hotel. This agency relationship was created through Defendant Choice Hotel's exercise of an ongoing and systemic right of control over Comfort Inn® hotels by Defendant Choice Hotel's operations, including the means and methods of how Comfort Inn® hotels conduct daily business through one or more of the following actions:

1. hosting online bookings on Defendant Choice Hotels' domain;

2. requiring Comfort Inn® branded hotels to use Defendant Choice Hotels' customer rewards program;

3. setting employee wages;

4. making employment decisions;

5. advertising for employment;

6. sharing profits;

7. standardized training methods for employees;

8. building and maintaining the facility in a manner specified by the owner;

9. standardized or strict rules of operation;

10. regular inspection of the facility and operation by owner;

11. fixing prices; or

12. other actions that deprive Comfort Inn® hotels of independence in business operations.

viii. An apparent agency also exists between Defendant Choice Hotels and Comfort Inn® hotels. Defendant Choice Hotels held out Comfort Inn® branded hotels to the public as possessing authority to act on its behalf.

ix. Given Defendant Choice Hotel's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its branded hotels, including Comfort Inn® hotels, Defendant Choice Hotels breached its duties in the following ways:

1. Failed (altogether or adequately) to distribute information to assist employees in identifying human trafficking;

2. Failed (altogether or adequately) to provide a process for escalating human trafficking concerns within the organization;

3. Failed (altogether or adequately) to mandate managers, employees, or owners attend training related to human trafficking;

4. Failed (altogether or adequately) to provide new hire orientation on human rights and corporate responsibility;

5. Failed (altogether or adequately) to provide training and education on

human trafficking through webinars, seminars, conferences, and online portals;

6. Failed (altogether or adequately) to develop and hold or require ongoing training sessions on human trafficking; or

7. Failed (altogether or adequately) to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

x. For years, Defendant Choice Hotels has failed to adequately address the rampant sex trafficking which tragically occurs throughout its Comfort Inn® hotels across the country and continues to amass such failures. This entrenched, pervasive willful blindness to sex trafficking facilitated the sex trafficking of Plaintiff J.C. at the Comfort Inn® Santa Cruz that forms the basis of this complaint.

1. In November 2019, a couple was arrested for trafficking a seventeen (17) year old girl for commercial sex out of a Comfort Inn® in Ventura, California.[29]

2. In July 2014, the General Manager of a Comfort Inn® in Wethersfield, Connecticut was arrested after a year-long investigation for abetting sex trafficking at the hotel and allowing it to occur openly on the hotel's fourth floor.[30]

3. In August 2016, three (3) people were indicted for trafficking two (2) teenagers, a young woman, and a juvenile out of a Comfort Inn® in College Park, Maryland.[31]

---

[29] https://www.vcstar.com/story/news/local/communities/ventura/2019/11/22/girl-forced-into-prostitution-helped-hotel-desk-ventura/4273164002/
[30] http://www.courant.com/community/wethersfield/hc-xpm-2014-07-11-hc-wethersfield-prostitution-0711-20140710-story.html
[31] https://www.wbaltv.com/article/3-people-indicted-in-maryland-based-human-trafficking-scheme/7102314

4. In October 2014, two (2) women were arrested for trafficking a sixteen (16) year old girl out of a Comfort Inn® in West Nashville.[32]

5. In June 2018, a man was found guilty for the September 2009 murder of a 5 year old girl who was sold to the man by her mother to satisfy a $200 debt. The man trafficked the child for commercial sex out of a Comfort Inn® in Sanford, North Carolina before murdering her in the same location.[33]

6. In July 2016, a man was arrested for trafficking a woman for commercial sex out of a Comfort Inn® in Macon, Georgia. The man was found guilty of sex trafficking in June of 2018.[34]

7. In June 2015, a gang member was arrested for trafficking a sixteen (16) year-old for commercial sex out of a Comfort Inn® in El Paso, Texas from August until October 2012.[35]

51. MARRIOTT INTERNATIONAL, INC. ("Marriott")

a. MARRIOTT®

i. Defendant Marriott controls, owns, supervises, or operates the Fremont Marriott® Silicon Valley located at 46100 Landing Parkway in Fremont, California.

ii. Marriott failed to implement and enforce any of their own policies and protect Plaintiff J.C. from being trafficked.

iii. Founded in 1927, Marriott represents that they have more than Ninety-two (92) years of experience in managing successful brands. From all of their Marriott

---

[32] https://clarksvillenow.com/local/2-women-arrested-for-allegedly-sex-trafficking-a-minor/
[33] https://www.fayobserver.com/news/20180608/nc-supreme-court-upholds-death-sentence-in-shaniya-davis-murder
[34] https://www.justice.gov/usao-mdga/pr/central-georgia-individuals-plead-guilty-offenses-related-human-trafficking-enterprise; https://www.macon.com/news/local/crime/article90349972.html
[35] https://archives.fbi.gov/archives/elpaso/press-releases/2014/indictment-unsealed-charging-el-paso-county-juvenile-probation-officer-with-federal-sex-trafficking-charges

hotels, Defendant Marriott receives an application fee, a lump sum payment, royalties, and other ongoing financial benefits.

iv. Defendant Marriott knew or should have known that the Fremont Marriott® Silicon Valley hotel where Plaintiff J.C. was trafficked for commercial sex was in an area prone to sex trafficking activity on and around the hotel premises, including when Plaintiff J.C. was trafficked.

v. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at hotels and specifically their hotels, Defendant Marriott has repeatedly failed to thwart these activities.

vi. Defendant Marriott can exercise control over their hotels by:

1. distributing information to assist employees in identifying human trafficking;

2. providing a process for escalating human trafficking concerns within the organization;

3. requiring all employees to attend training related to human trafficking;

4. providing new hire orientation on human rights and corporate responsibility;

5. providing training and education to Marriott® hotels through webinars, seminars, conferences, and online portals;

6. developing and holding ongoing training sessions on human trafficking;

7. conducting audits of training protocols; or

8. providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

vii. Defendant Marriott is in an apparent and/or actual agency relationship with the

Fremont Marriott® Silicon Valley. This agency relationship was created and is maintained through Defendant Marriott's exercise of an ongoing and systemic right of control over the Fremont Marriott® Silicon Valley  by Defendant Marriott's operations, including the means and methods of how the Fremont Marriott® Silicon Valley conducts daily business including:

1.  hosting online bookings on Defendant Marriott's domain;

2.  requiring Fremont Marriott® Silicon Valley to use Defendant Marriott's customer rewards program;

3.  setting parameters on employee wages;

4.  making employment decisions;

5.  advertising for employment;

6.  sharing profits;

7.  standardized training methods for employees;

8.  building and maintaining the facility in a manner specified by  Marriott;

9.  standardized or strict rules of operation;

10. regular inspection of the facility and operation by Marriott;

11. fixing prices; or

12. other actions that deprive Marriott hotels of any independence in their business operations.

viii.  Apparent agency also exists between Defendant Marriott and the Fremont Marriott® Silicon Valley. Defendant Marriott holds out Fremont Marriott® Silicon Valley to the public as its direct alter-ego -- each possessing authority to act on the other's behalf.

ix.  Given Defendant Marriott's public statements on behalf of its brand and the control it assumed in educating, implementing, and directing its hotels,

COMPLAINT FOR DAMAGES

Defendant Marriott breached its duties in the following ways:

1. Failed (altogether or adequately) to distribute information to assist employees in identifying human trafficking;

2. Failed (altogether or adequately) to provide a process for escalating human trafficking concerns within the organization;

3. Failed (altogether or adequately) to mandate managers, employees, or owners attend training related to human trafficking;

4. Failed (altogether or adequately) to provide new hire orientation on human rights and corporate responsibility;

5. Failed (altogether or adequately) to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

6. Failed (altogether or adequately) to develop and hold or require ongoing training sessions on human trafficking; or

7. Failed (altogether or adequately) to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

b. For years, Defendant Marriott has demonstrated willful blindness to the rampant sex trafficking occurring at its Marriott® hotels across the country. This entrenched apathy to the real risk of sex trafficking allowed the exploitation of Plaintiff J.C. at the Fremont Marriott® Silicon Valley that forms the basis for this complaint.

i. In August of 2017, data from Houston's Police Department shows that some of Houston's highest rated hotels have topped a list of locations where prostitution arrests were made. This data included addresses for all prostitution arrests made at Houston, Texas hotels from Jan. 1, 2012, through July 7, 2017. The Marriott

came in second with 48 arrests.[36]

    ii.  In April of 2012, a woman sued a Marriott Hotel in Boston, Massachusetts after a man responded to a craigslist advertisement soliciting sex and killed her daughter within the hotel in a violent attack.[37]

52. HILTON WORLDWIDE HOLDINGS, INC. ("HILTON")

    a.  EMBASSY SUITES®

      i.  Defendant Hilton owns, supervises, and/or operates the Embassy Suites® by Hilton Alexandria Old Town located at 1900 Diagonal Road, in Alexandria, Virginia.

      ii.  Hilton failed to implement and enforce any of its own policies and protect Plaintiff J.C. from being sex trafficked.

      iii.  Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant Hilton has repeatedly failed to stop these actions.

      iv.  Defendant Hilton may exercise control over Embassy Suites® hotels by:

        1.  distributing information to assist employees in identifying human trafficking;

        2.  providing a process for escalating human trafficking concerns within the organization;

        3.  requiring employees to attend training related to human trafficking;

        4.  providing new hire orientation on human rights and corporate responsibility;

        5.  providing training and education to Embassy Suites® hotels through

---

[36] "Houston's Most Popular Hotels for Prostitution Busts," 8/10/2017, Houston Chronicle, https://www.chron.com/news/houston-texas/houston/article/Houston-s-most-popular-hotels-for-prostitution-11744958.php (accessed 12/9/2019).
[37] "Mother of Craigslist victim sues Marriott," 4/3/2012, Boston Globe, https://www3.bostonglobe.com/metro/2012/04/13/mother-woman-slain-craigslist-killer-sues-marriott-hotel-chain/LxuP2jZtY59DsxMTZXJ09H/story.html?arc404=true (accessed 12/9/2019).

webinars, seminars, conferences, and online portals;

    6.  developing and holding ongoing training sessions on human trafficking; or

    7.  providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

    v.  Hilton was in an actual and/or apparent agency relationship with Embassy Suites® by Hilton hotels offering public lodging services in the hotel. This agency relationship was created through Defendant Hilton's exercise of an ongoing and systemic right of control over Embassy Suites® by Hilton hotels by Defendant Hilton's operations, including the means and methods of how Embassy Suites® by Hilton hotels conducted daily business through one or more of the following actions:

    1.  hosting online bookings on Defendant Hilton's domain;

    2.  requiring Embassy Suites® hotels to use Defendant Hilton's customer rewards program;

    3.  setting employee wages;

    4.  making employment decisions;

    5.  advertising for employment;

    6.  sharing profits;

    7.  standardized training methods for employees;

    8.  building and maintaining the facility in a manner specified by the owner;

    9.  standardized or strict rules of operation;

    10. regular inspection of the facility and operation by owner;

    11. fixing prices; or

12. other actions that deprive Embassy Suites® hotels of independence in business operations.

c.   An actual agency also exists between Defendant Hilton and Embassy Suites® hotels. Defendant Hilton held out Embassy Suites® hotels to the public as possessing authority to act on its behalf.

d.   Given Defendant Hilton's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its hotels, including Embassy Suites® hotels, Defendant Hilton breached its duties in the following ways:

   i.   Failed (altogether or adequately) to distribute information to assist employees in identifying human trafficking;

   ii.   Failed (altogether or adequately) to provide a process for escalating human trafficking concerns within the organization;

   iii.   Failed (altogether or adequately) to mandate managers, employees, or owners attend training related to human trafficking;

   iv.   Failed (altogether or adequately) to provide new hire orientation on human rights and corporate responsibility;

   v.   Failed (altogether or adequately) to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

   vi.   Failed (altogether or adequately) to develop and hold or require ongoing training sessions on human trafficking; or

   vii.   Failed (altogether or adequately) to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

e.   For years, Defendant Hilton has failed to address the rampant culture of sex trafficking which tragically occurs throughout its Embassy Suites® hotels across the country. This

COMPLAINT FOR DAMAGES

entrenched apathy to the real risk of sex trafficking and pervasive willful blindness to the role Embassy Suites® hotels play in sex trafficking facilitated the sex trafficking of Plaintiff J.C. at Embassy Suites® hotels that forms the basis of this complaint.

i. In July 2017, a convicted felon was arrested for prostituting a woman at an Embassy Suites® in Birmingham, Alabama. The victim was repeatedly beaten by her trafficker when she tried to stop working for him. Over the course of several months, the man beat the victim with his fists, bit her on the face, struck her with a handgun and pushed her down stairs. Physical violence and verbal threats were routinely used to force the woman to comply with his wishes, and to punish her when she did not.[38]

ii. In March 2011, a pimp was arrested at an Embassy Suites® in Lombard, Illinois for trafficking three (3) women for the purposes of commercial sex.[39]

### C. THE SEX TRAFFICKING OF J.C.

53. The facts alleged herein stem from a human trafficking and prostitution ring originating out of California. While victimized by traffickers, J.C. was subject to repeated instances of rape, physical abuse, verbal abuse, exploitation, psychological torment, kidnapping, and false imprisonment at the Defendants' hotels from 2008 through 2019.

54. In 2008, J.C. encountered her trafficker at a gas station they both frequented near her college in Sacramento. Their conversations grew flirtatious, and after one particular encounter he asked J.C. to accompany him for a quick drive. J.C. did not realize that she was being abducted until she noticed him turn onto the freeway and her trafficker declared that she was going to make him a lot of money.

55. J.C.'s trafficker picked up another young woman he had been exploiting and drove to various hotels so that he could "network" with other sex traffickers. J.C.'s trafficker then took both women to the Comfort Inn® - Santa Cruz Beach where the other woman dressed J.C. and gave her instructions on

---

[38] https://www.al.com/news/birmingham/2016/09/man_beat_bit_girlfriend_for_11.html
[39] https://www.dailyherald.com/article/20110317/news/703179820/

how to sexually service buyers and abide by her trafficker's rules. The three (3) individuals checked into the hotel together and J.C. was prohibited from speaking and presented with absolutely no luggage. J.C.'s trafficker would pay for the room in cash and would stay there for two (2) weeks at a time.

56. J.C.'s trafficker took her I.D. from her when he first kidnapped her and threatened to physically harm her family if she ran from him or disobeyed his demands.

57. J.C was forced to walk the track of hotels directly outside the Comfort Inn® - Santa Cruz Beach that was known for sex trafficking and exploitation. J.C had to then instruct buyers to meet her at the Comfort Inn® - Santa Cruz Beach where she was kept by her trafficker. She was required to repeat this process numerous times a night until she met her trafficker's quota for the day. The volume of foot traffic through the hotel's front doors was constant and voluminous and consisted entirely of single men.

58. At the Comfort Inn® - Santa Cruz Beach the hotel staff knew J.C's trafficker and the women he victimized by their face and names. Room service frequently came to the room to change out sheets and towels, and inside they observed paraphernalia indicative of commercial sex including used condoms and wrappers.

59. J.C. was assaulted by one of the other women who worked for her trafficker. With a bloody lip, J.C. went to the hotel's security staff distraught and frazzled with a bloodied lip seeking help. No action was taken.

60. J.C.'s trafficker would always come to the hotel and take all of the money J.C. and his other victims that he was harboring at the Comfort Inn® - Santa Cruz Beach had been paid.

61. J.C. was frequently forcibly raped by her trafficker. On a number of occasions the room was left damaged because of physical altercations.

62. J.C.'s stayed at these hotels over a long period of time, her trafficker always renting the room for a number of weeks, paying in smaller increments, and requesting an inordinate amount of sheets and

towels. For weeks J.C. was held up in the room, unable to leave and visibly deteriorating. Then they would leave and the same would happen at another of the hotels. J.C's trafficker returned to these hotels numerous times.

63. J.C.'s trafficker similarly harbored her at the Fremont Marriott® Silicon Valley. J.C. and other victims were frequently housed at Fremont Marriott® Silicon Valley for around 3-4 days a week, approximately every two (2) weeks.

64. When checking into the hotel numerous rooms were requested for various women, none of whom could provide identification had they been asked. The women also presented with few personal belongings, and with either no luggage or very little. J.C.'s trafficker typically paid for the rooms in cash increments.

65. On a number of occasions there were violent altercations involving the victims in public areas of the Fremont Marriott® Silicon Valley that the hotel staff should have noticed and recognized as sign of human trafficking but did not.

66. While at the Fremont Marriott® Silicon Valley J.C. would sexually service a constant stream of buyers to satisfy her trafficker's demands. Each buyer of commercial sex entered and left the Fremont Marriott® Silicon Valley through the lobby and front doors of the hotel. Each also went directly to the room where J.C. was being harbored and none were registered guests at the hotel. Each woman being trafficked for commercial sex by J.C.'s trafficker brought the same pattern of obvious foot traffic through the public, well-staffed areas of the Fremont Marriott® Silicon Valley.

67. For years, J.C.'s trafficker forced her to sexually service buyers in a similar fashion across the entire country. One of J.C.'s longest stays was at the Embassy Suites® by Hilton – Alexandria Old Town in Alexandria, Virginia for a total of eight (8) months in approximately 2012.

68. J.C. displayed indicia of being trafficked and again presented with few personal belongings. J.C.'s trafficker checked in for irregular spans of time and would pay in increments of cash.

69.  J.C. was harbored at the Embassy Suites® by Hilton – Alexandria Old Town by her trafficker and forced to service buyers of commercial sex there 3-6 days a week.

70. At the Embassy Suites® by Hilton – Alexandria Old Town J.C. was again required to sexually service a constant stream of buyers to appease her trafficker. The buyers came to the hotel for the purpose of purchasing sex obtained through force, fraud, and coercion.  Despite not being registered guests of the hotel, the large supply of male buyers would regularly enter and leave the hotel through the lobby and front door.

71. The constant foot traffic was cumbersome enough that J.C.'s trafficker was asked to leave the hotel with his retinue on multiple occasions. However, further action was never taken and J.C. and her trafficker repeatedly remained and returned despite the hotel's awareness.

72. Prior to, during, and following the incidents described herein, the Defendants had actual and/or constructive notice of drug dealing, prostitution, and/or general safety concerns at their hotels, including, but not limited to, video surveillance of their hotels, as well as oral or written complaints regarding said suspicious activity. The Defendants failed to take any actions to curtail these activities.

73. Had the Defendants been paying attention to the activities being conducted at their hotels and on their properties, and the apparent red flags outlined above, it would have been impossible for them not to notice the victimization of J.C.

### THE DEFENDANTS FACILITATED THE TRAFFICKING OF J.C.

74.  Defendants' profited from the sex trafficking of J.C. and aided and engaged with her trafficker in his sex trafficking venture. The Defendants leased rooms to J.C.'s traffickers, when they knew, or should have known, that their rooms were being used to imprison J.C. and subject her to repeated exploitation in sexual servitude.

75. The Defendants knew, or should have known, that J.C. was being trafficked because J.C.'s trafficker frequented the Defendants' hotels, and they knew that they were benefiting financially from her stay despite the obvious exploitation.

76. The Defendants knew, or should have known, that J.C. was being trafficked because of the constant male foot traffic she entertained to appease her traffickers' quotas, her trafficker's apparent control of her behavior, and the totality of irregular behaviors that indicated the hotel was being used as a tool and venue in his illegal sex trafficking venture.

77. The Defendants actively participated in this illegal endeavor by knowingly or negligently providing lodging to J.C.'s trafficker in which to harbor J.C. while he was trafficking her.

78. The Defendants profited from the sex trafficking of J.C. and knowingly or negligently aided and participated with J.C.'s trafficker in his criminal venture. The Defendants took no action as J.C. repeatedly visited the hotel, often with different guests, without any luggage, and avoiding all eye contact.

79. Defendants actively participated in this illegal endeavor by knowingly or negligently providing lodging or safe harbor to those who purchased sex from J.C. that was obtained through force, fraud or coercion.

80. The Defendants all had the opportunity to stop J.C.'s trafficker and offenders like him from victimizing J.C. and others like her.  Instead, every Defendant failed to take reasonable measures to stop sex trafficking from occurring in their hotels.

81. The Defendants all financially benefited from the sex trafficking of J.C., and other victims like her, and developed and maintained business models that attract and foster the commercial sex market for traffickers and buyers alike.

82. Defendants financially benefit from their ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

83. The Defendants failed to take any steps to alert the authorities, properly intervene in the situation, take reasonable security steps to improve awareness of sex trafficking, prevent sexual exploitation on their properties, or prevent themselves from profiting from a sex trafficking endeavor.

84. The Defendants maintained their deficiencies to maximize profits by:

a. Reducing the cost of training employees and managers of how to spot the signs of human trafficking and sexual exploitation and what steps to take;

b. Not refusing room rentals, or reporting guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

c. Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers to actively combat human trafficking and sexual exploitation;

85. As a direct and proximate result of these egregious practices on the part of the Defendants, J.C. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## CAUSES OF ACTION

### A.  COUNT ONE – 18 U.S.C §1595 ("TVPRA")

86. The Plaintiff J.C. incorporates each foregoing allegation.

87. J.C. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

88. The Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, the Defendants had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage in violations of 18 U.S.C. §1591 (a).  At all relevant times, the Defendants breached this duty by participating in, and facilitating, the harboring and providing of J.C. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

89. The Defendants have financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade.  Moreover, the Defendants directly benefitted

from the trafficking of J.C. on each occasion they received payment for rooms that she was being kept in at the Defendants' hotels. The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of J.C.'s injuries and damages.

90. J.C. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' hotels and properties in violation of 18 U.S.C. §1591 (a).

## B.  COUNT  – TWO CAL. CIV. CODE §52.5

91.   The Plaintiff J.C. incorporates each foregoing allegation.

92.   J.C. is a victim of sex trafficking within the meaning of California Penal Code §236.1 and is therefore entitled to bring a civil action under Cal. Civ. Code §52.5.

93.   The Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of Cal. Civ. Code §52.5. At all relevant times, the Defendants breached their duties by participating in, and facilitating, the harboring and providing of J.C. for the purposes of commercial sex induced by malice, oppression, force, fraud, duress, and/or coercion, by their acts, omissions, and commissions.

94.   The Defendants have financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade.  Moreover, the Defendants directly benefitted from the trafficking of J.C. on each occasion they received payment for rooms that she was being kept in at the Defendants' hotels. The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of J.C.'s injuries and damages.

95. J.C. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' hotels and properties in violation of Cal. Civ. Code §52.5.

96. J.C. is also entitled to punitive damages under Cal. Civ. Code §52.5.

### PRAYER FOR RELIEF

WHEREFORE based on the forgoing the Plaintiff seeks injunctive relief in the form of a judgement requiring the Defendants to institute sufficient audits, policies, rules, and requirements of their employees, agents, franchisees, contractors, and/or all others operating under their flag, logo, trademark, or advertising umbrella to insure that the actions and activities outlined above no longer occur and may not serve in the future to jeopardize the health and safety of individuals similarly situated to the Plaintiff herein.

AND WHEREFORE on the basis of the foregoing, the Plaintiff requests that a jury be selected to hear this case and render a verdict for the Plaintiff, and against the Defendant, and that the jury selected award damages to the Plaintiff in an amount which will effectively prevent other similarly caused acts and adequately reflects the enormity of the Defendant's wrongs and injuries to the Plaintiff due to the Defendant's faulty conduct, including but not limited to:

    a.  All available compensatory damages for the described losses with respect to each cause of action;

    b.  past and future medical expenses, as well as the costs associated with past and future life care;

    c.  past and future lost wages and loss of earning capacity;

    d.  past and future emotional distress;

    e.  consequential and/or special damages;

    f.  all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

    g.  punitive damages with respect to each cause of action;

    h.  reasonable and recoverable attorneys' fees;

    i.  costs of this action; and

    j.  pre-judgment and all other interest recoverable

COMPLAINT FOR DAMAGES

1

2

3

Further, the Plaintiff requests that the Court enter judgment consistent with the jury's verdict, and prays for any other damages and equitable relief the Court or jury deems appropriate under the circumstances.

4

5

## **DEMAND FOR JURY TRIAL**

The Plaintiff demands a trial by jury on all issues so triable in this civil action.

6

Dated:  January 7, 2020

7

8

**RESPECTFULLY SUBMITTED,
PLAINTIFF, by Her Attorneys,**

9

10

/s/ *Melinda Davis Nokes*
Melinda Davis Nokes (SBN 167787)
mnokes@weitzlux.com

11

12

13

14

**WEITZ & LUXENBERG, P.C.**
*Attorneys for Plaintiff*
1880 Century Park East, Suite 700
Los Angeles, CA 90067
Telephone: (310) 247-0921
Facsimile: (310) 786-9927

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DAMAGES