Melinda Davis Nokes Bar No.: 167787
mnokes@weitzlux.com
**WEITZ & LUXENBERG, P.C.**
1880 Century Park East, Suite 700
Los Angeles, CA 90067
Telephone: (310) 247-0921
Facsimile: (310) 786-9927

Lori E. Andrus, Bar No.: 205816
lori@andrusanderson.com
**ANDRUS ANDERSON LLP**
155 Montgomery Street, Suite 900
San Francisco, CA 94104
Telephone: (415) 986-1400
Facsimile: (415) 986-1474

*Attorneys for Plaintiff, J.C. proceeding under pseudonym*

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.C., an individual, | Case No.: 3:20-cv-00155-WHO |
| Plaintiff, | |
| vs. | **SECOND AMENDED COMPLAINT FOR DAMAGES:** |
| | 1. **18 U.S.C. § 1595** |
| Choice Hotels International, Inc.; Hilton Worldwide Holdings, Inc.; Marriott International, Inc.; | 2. **CAL. CIV. CODE § 52.5** |
| Defendants. | **DEMAND FOR JURY TRIAL** |

## SECOND AMENDED COMPLAINT

COMES NOW, Plaintiff J.C., by and through her undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

## INTRODUCTION

1. For years, sex trafficking ventures have openly operated in and out of Defendants' hotels throughout the United States.  Defendants, as defined below, and their hotels remain willfully blind to

1    the criminal misconduct to continue earning a profit from sex trafficking, including the trafficking of

2    Plaintiff.

3        2. Choice Hotels International, Inc. (hereinafter "Choice"), Hilton Worldwide Holdings, Inc.

4    (hereinafter "Hilton"), and Marriott International, Inc. (hereinafter "Marriott") (collectively

5    "Defendants"), knew and have known for more than a decade that sex trafficking repeatedly occurs

6    under their brand flag.

7        3.  Defendants failed to take timely and effective measures to thwart sex trafficking at their brand

8    hotels.  Instead, Choice, Hilton, and Marriott ignored the open and obvious presence of sex trafficking

9    at their brand hotels and derived profit from rooms rented and used for this specific purpose.

10       4. This action for damages is brought by Plaintiff, (hereinafter "Plaintiff" or "J.C.") a victim under

11   the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008

12   (hereinafter "TVPRA") and California law.

13       5. J.C. first became familiar with her trafficker because she would often see him at a gas station near

14   her school, Kaplan College in Sacramento, CA.  He was friendly, would flirt with her, and sometimes

15   give her gifts.  One day in 2008, he kidnapped J.C. under the guise of going for a friendly drive.  As he

16   drove her to San Francisco, he told her, "You're going to make me a lot of money."  For the next 11

17   years, J.C. was required to sexually service paying strangers while enduring brutal physical assaults,

18   psychological torment, verbal abuse, and false imprisonment at Defendants' brand hotels.

19       6. Plaintiff now brings this action for damages against Defendants listed herein.  Each of the

20   Defendants, in violation of 18 U.S.C. § 1595, knowingly benefited from facilitating a venture that they

21   knew, or at the very least should have known, to be engaging in sex trafficking in violation of 18 U.S.C.

22   § 1591(a).

23       7. J.C. was forced against her will, physically tortured and sexually exploited under such duress at

24   hotels in Santa Cruz and Fremont, California and Alexandria, Virginia, including the Comfort Inn®,

**SECOND AMENDED COMPLAINT**

Marriott®, Embassy Suites® by Hilton, DoubleTree® by Hilton, and the Hilton Sacramento Arden West.

8. As a direct and proximate result of Choice, Hilton, and Marriott's consistent refusals to prevent human trafficking for commercial sex on their brand hotel properties, J.C. was trafficked, sexually exploited, and repeatedly victimized at the Comfort Inn®, Marriott®, Embassy Suites® by Hilton, DoubleTree® by Hilton, and the Hilton Sacramento Arden West.

9. Plaintiff brings this action pursuant to the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595, against Defendants who enabled, harbored, held, facilitated, and financially benefited from sex trafficking ventures in which J.C. was trafficked for the purpose of commercial sex, sexually exploited, and brutally victimized in violation of 18 U.S.C. § 1591(a).

10. Each of the above captioned Defendants knowingly profited from the sex trafficking venture that compelled and sustained Plaintiff in sexual servitude and are therein liable for the injuries inflicted upon J.C. by her traffickers because of their marked failure as innkeepers to exercise diligence consistent with a duty of care, let alone a heightened duty of care.  Diligence that would have led Defendants to discover the horrific acts that were being committed.  Thus, Defendants conspired, enabled, and otherwise worked together in the abuse and exploitation of Plaintiff in keeping her invisible.

## **PARTIES**

11. Plaintiff J.C. ("Plaintiff" or "J.C."), having moved to proceed anonymously,[1] and thus herein identified by her initials J.C., was sold for sex throughout California and Virginia for eleven (11) years. Plaintiff is a victim of trafficking pursuant to 22 U.S.C. § 7102(15) and 18 U.S.C. § 1950, and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C § 7102(14).  Plaintiff resides in Idaho.

12. Defendant Choice Hotels International, Inc. is a Delaware corporation with its principle place of business in Rockville, Maryland.  Choice is a hospitality company that, at the time of the incidents

---

[1] Contemporaneously with the Complaint [ECF No. 1], Plaintiff J.C. filed, pursuant to a Motion to Permit Plaintiff to Proceed Anonymously [ECF No. 2] as J.C. based upon the nature of the allegations in the instant Complaint, which are of an inherently intimate and personal nature.  The Motion is pending.  Undersigned Counsel will provide her identity to Counsel for the Defendants upon proper entry of a Protective Order.

alleged herein, directly and through its agents, affiliates, and subsidiaries, offered public lodging services at the Comfort Inn located at 110 Plymouth Street, in Santa Cruz, California under its Comfort Inn® brand:

a. Comfort Inn®, is a Choice brand hotel.

b. As a hotel operator, Choice controls the training and policies for its brand hotels, including the Comfort Inn® hotel where J.C. was trafficked.

c. Choice maintains that it considers guest safety and security important, and requires the hotels in its portfolio to comply with Choice brand standards and all local, state, and federal laws.[2]

d. Through its relationship with the staff at the Comfort Inn®, hotel where J.C. was trafficked and the hotel guest perpetrator who trafficked J.C. at the Comfort Inn® hotel, Choice knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known to engage in sex trafficking.

e. Choice receive a percentage of the gross room revenue from the money generated by the operations of all Comfort Inn® hotels, including a percentage of the rate charged on the rate charged for the rooms in which J.C. was trafficked.

f. Choice owns, supervises, and/or operates the Comfort Inn® located at 110 Plymouth Street, in Santa Cruz, California under its Comfort Inn® brand.

g. Choice is subject to the jurisdiction of this Court because it regularly transacts business in California, operates dozens of hotels in California including the Comfort Inn® contracts to supply services in California, caused indivisible injuries to Plaintiff in California, and knowingly profited from an illegal sex trafficking venture at the Comfort Inn® Santa Cruz located at 110 Plymouth Street, in Santa Cruz, California.

---

[2] https://www.choicehotels.com/about/responsibility/human-rights-policy.

**SECOND AMENDED COMPLAINT**

13. Defendant Hilton Worldwide Holdings, Inc. is a Delaware corporation with its principle place of business located in McClean, Virginia.  Hilton is a hospitality company that, at the time of the incidents alleged herein, directly and through its agents, affiliates, and subsidiaries, offered public lodging services at Embassy Suites by Hilton Alexandria Old Town located at 1900 Diagonal Road, in Alexandria, Virginia under its Embassy Suites® by Hilton brand, at the DoubleTree® by Hilton, located at 2001 Point W. Way, Sacramento, CA 95815 and at the Hilton Sacramento Arden West, located at 2200 Harvard St., Sacramento, CA 95815:

   a. Embassy Suites®, DoubleTree® by Hilton, and the Hilton Sacramento Arden West are all Hilton brand hotels.

   b. As a hotel operator, Hilton controls the training and policies for its brand hotels including the Embassy Suites®, DoubleTree®, and the Hilton Sacramento Arden West hotels where J.C. was trafficked.

   c. Hilton maintains that it considers guest safety and security important, and requires the brand hotels in its portfolio to comply with Hilton brand standards and all local, state, and federal laws.[3]

   d. Through its relationship with the staff at the Embassy Suites®, DoubleTree®, and the Hilton Sacramento Arden West hotels where J.C. was trafficked and the hotel guest perpetrator who trafficked J.C. at those hotels, Hilton knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known to engage in sex trafficking.

   e. Hilton receives a percentage of the gross room revenue from the money generated by the operations of all Embassy Suites®, DoubleTree®, and the Hilton Sacramento Arden West hotels including a percentage of the rate charged on the rate charged for the rooms in which Plaintiff was trafficked.

---

[3]  https://ir.hilton.com/~/media/Files/H/Hilton-Worldwide-IR-V3/committee-composition/slavery-and-trafficking-statement-2018.pdf.

**SECOND AMENDED COMPLAINT**

f.  Hilton owns, supervises, and/or operates the Embassy Suites® by Hilton Alexandria Old Town located at 1900 Diagonal Road, in Alexandria, Virginia.

g.  Hilton owns, supervises, and/or operates the DoubleTree® by Hilton located at 2001 Point W Way, Sacramento, CA 95815.

h.  Hilton owns, supervises, and/or operates the Hilton Sacramento Arden West located at 2200 Harvard St, Sacramento, CA 95815.

i.  Hilton is subject to the jurisdiction of this Court because it regularly transacts business in California, operates dozens of hotels in California including Embassy Suites®, DoubleTree®, and Hilton Arden West, contracts to supply services in California, caused indivisible injuries to Plaintiff in a common course of conduct arising in California.

14. Defendant Marriott International, Inc. is a Delaware corporation with its principle place of business located in Bethesda, Maryland.  Marriott is a hospitality company that, at the time of the incidents alleged herein, directly and through its agents, affiliates, and subsidiaries, offered public lodging services at the Fremont Marriott Silicon Valley located at 46100 Landing Parkway in Fremont, California under its Marriott brand:

a.  Marriott® is a Marriott brand hotel.

b.  As a hotel operator, Marriott controls the training and policies for its hotels including the Marriott® hotel where J.C. was trafficked.

c.  Marriott maintains that it considers guest safety and security important, and requires the hotels in its portfolio to comply with Marriott brand standards and all local, state, and federal laws.[4]

d.  Through its relationship with the staff at the Comfort Inn® hotel where J.C. was trafficked and the hotel guest perpetrator who trafficked J.C. at the Comfort Inn® hotel,

---

[4]   Marriott International Inc., Human Rights Policy Statement (July 2017) available at https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsStatement.pdf (last visited Nov. 20, 2019).

Marriott knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known to engage in sex trafficking.

e. Marriott receives a percentage of the gross room revenue from the money generated by the operations of all Comfort Inn® hotels, including a percentage of the rate charged on the rate charged for the rooms in which Plaintiff was trafficked.

f. Marriott owns, supervises, and/or operates the Fremont Marriott® Silicon Valley located at 46100 Landing Parkway in Fremont, California under its Marriott brand.

g. Marriott is subject to the jurisdiction of this Court because it regularly transacts business in California, operates dozens of hotels in California including the Fremont Marriott® Silicon Valley, contracts to supply services in California, caused indivisible injuries to Plaintiff in California, and knowingly profited from an illegal sex trafficking venture at the Fremont Marriott® Silicon Valley located at 46100 Landing Parkway in Fremont, California under its Marriott brand.

15. Whenever reference is made in this Complaint to any act, deed or conduct of Defendants, the allegation is that Defendants engaged in the act, deed or conduct by or through one or more of their officers, directors, agents, employees or representatives who was actively engaged in the management, direction, control or transaction of the ordinary business and affairs of Defendants.

## JURISDICTION AND VENUE

16. This Honorable Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 because this action arises under the Constitution, laws, or treaties of the United States (with an amount in controversy that exceeds $75,000.), based upon federal claims asserted pursuant to 18 U.S.C. § 1595.

17. This is a civil action alleging, *inter alia*, violations of 18 U.S.C. § 2421 and 18 U.S.C. § 1595.

18. This Court has supplemental jurisdiction over J.C.'s state law claims pursuant to 28 U.S.C. § 1367, as the state law claims are so related to J.C.'s federal law claims that the claims form part of the same case or controversy.

19. Venue is proper within this District Court as this District Court is a judicial district where Defendants are subject to personal jurisdiction in accordance with 28 U.S.C. § 1391(b)(2), as well as the California Long-Arm statute.

20. Venue is proper in this district pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action, including Defendants' misconduct and omissions, occurred in the judicial district where this action is brought.

21. Defendants have consensually submitted to the jurisdiction California and have purposefully availed themselves of the privilege of conducting acts in California through Choice, Hilton and Marriott's dominion and control over their respective brands with franchisor subsidiaries, franchisee subsidiaries and operating hotels, and day-to-day operation of the hotels, and, thus, invoking the benefits and protections of the laws in California; California has an equally strong interest in protecting and assuring the safety of persons within its State.

22. Defendants have consensually submitted to the jurisdiction California and have purposefully availed themselves of the privilege of conducting acts in California which is imputed through the conduct of franchisor subsidiaries, franchisee subsidiaries and operating hotels as a result of Choice, Hilton, and Marriott's dominion and control over its brand, thus, invoking the benefits and protections of the laws in California; California has an equally strong interest in protecting and assuring the safety of persons within its State.

### SEX TRAFFICKING UNDER FEDERAL LAW

23. Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion."  This

**SECOND AMENDED COMPLAINT**

definition combines the three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

24. While the complete definition of 'sex trafficking' is found in the TVPRA under 22 U.S.C. § 7102, and it is specifically prohibited under 18 U.S.C. § 1591, it is nevertheless a long-recognized and familiar atrocity.

25. Pursuant to 18 U.S.C. § 1591(a), all who knowingly provide or obtain commercial sex that was provided or obtained through force, fraud, and coercion are guilty of sex trafficking.  This includes, at a minimum, both the 'traffickers' who recruit, harbor, transport, and provide individuals for forced commercial sex work and the buyers who obtain, solicit, and/or patronize forced commercial sex work. Both the 'traffickers' and buyers therefore trafficked Plaintiff and paid for rooms from which Defendants profited.[5]

## FACTUAL ALLEGATIONS

### A.  THE HOSPITALITY INDUSTRY'S PARTICIPATION IN THE SEX TRAFFICKING INDUSTRY

26. "75% of survivors responding to Polaris's survey reported coming into contact with hotels at some point during their exploitation…  Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff." *See* The Polaris Project.[6]

27. Reports by The Polaris Project were received and reviewed by the executives, directors and managers of Choice, Hilton, and Marriott.

28. Upon information and belief, other publically available information regarding trafficking in hotels was received and reviewed by Defendants during the time period 2008 to 2019.

29. Upon information and belief, between at least 2008 and 2019, Defendants held meetings among their executives, directors and managers at which sex trafficking in hotels was discussed.

---

[5] While the 'pimps' or 'providers' are often referred to as the 'traffickers' and the purchasers are referenced as the 'Johns', 'tricks', or 'buyers' [and such nomenclature is used herein], under federal law ***both*** categories are 'traffickers'.
[6] *Recommendations for Hotels and Motels*, THE POLARIS PROJECT, https://polarisproject.org/hotels-motels-recommendations (last visited June 19, 2019).

**SECOND AMENDED COMPLAINT**

30. Upon information and belief, during at least the 2008 to 2019 time period, emails were exchanged by employees of Defendants that related to sex trafficking in hotels including Defendants' brand hotels.

31. Defendants played a crucial role in the sex trade, as do all hotels.[7]

32. Defendants permitted anonymity to the buyers and non-traceability, making them ideal venues for sex traffickers to sell Plaintiff for sex.

33. Defendants knew or should have known that the anonymity for buyers and non-traceability of their presence at its hotels made their hotels ideal venues that were indeed used for sex trafficking.

34. Defendants, prior to the information being known publically, knew or should have known, that hotels are the top-reported venue where sex trafficking acts occur.[8]

35. Choice knew or should have known that trafficking was taking place from at least 2008 through 2019 at the Comfort Inn® Santa Cruz.

36. Hilton knew or should have known that trafficking was taking place from at least 2008 through 2019 at the Embassy Suites® by Hilton Alexandria Old Town.

37. Hilton knew or should have known that trafficking was taking place from at least 2009 through 2010 at the DoubleTree® Sacramento and the Hilton Sacramento Arden West.

38. Marriott knew or should have known that trafficking was taking place from at least 2008 through 2019 at the Fremont Marriott® Silicon Valley.

39. Choice knew that traffickers used its brand hotels, including the Comfort Inn® Santa Cruz as hubs of operations.  Inside, the victims, including Plaintiff, were harbored, raped, assaulted, and forced to service buyers who came to the hotel solely to purchase sex.

40. Hilton knew that traffickers used its brand hotels, including the Embassy Suites® by Hilton Alexandria Old Town, DoubleTree® Sacramento, and the Hilton Sacramento Arden West as hubs of

---

[7] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[8] *National Human Trafficking Hotline Statistics*, THE POLARIS PROJECT (2016), https://polarisproject.org/resources/2016-hotline statistics.

**SECOND AMENDED COMPLAINT**

operations. Inside, the victims, including Plaintiff, were harbored, raped, assaulted, and forced to service buyers who came to the hotel solely to purchase sex.

41.  Marriott knew that traffickers used its brand hotels, including the Fremont Marriott® Silicon Valley as hubs of operations. Inside, the victims, including Plaintiff, were harbored, raped, assaulted, and forced to service buyers who came to the hotel solely to purchase sex.

42. Defendants knew or should have known that this is referred to as an "in call."

43. Choice knew or should have known that its hotels, including the Comfort Inn® Santa Cruz, are also venues of choice for buyers seeking a so-called "out call," wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction.  Unsurprisingly, those on the demand side of this transaction (*i.e.* those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels.

44. Hilton knew or should have known that its brand hotels, including Embassy Suites® by Hilton Alexandria Old Town, DoubleTree® Sacramento, and the Hilton Sacramento Arden West, are also venues of choice for buyers seeking a so-called "out call," wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction.  Unsurprisingly, those on the demand side of this transaction (*i.e.* those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels.

45. Marriott knew or should have known that its brand hotels, including Fremont Marriott® Silicon Valley, are also venues of choice for buyers seeking a so-called "out call," wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction. Unsurprisingly, those on the demand side of this transaction (*i.e.* those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels.

46. At all relevant times herein,  Defendants knew or should have known that sex trafficking in hotels was industry wide, included its hotels, and that a significant portion of all sex trafficking was

**SECOND AMENDED COMPLAINT**

taking place at its brand hotels.[9]

47. Due to the complacency of Defendants on addressing the issue, hotels are *the* venue of choice for sex trafficking.[10]

48. From at least 2008 through 2019 and to date, traffickers and buyers used and use hotel rooms, including those rented by Defendants, due to Defendants' failures and/or refusals to adopt and enforce companywide anti-trafficking policies from the corporate to the property level, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for those at the point of sale.

49. Upon information and belief, prior to 2019, despite a duty to do so, Choice took inadequate measures to prevent sex trafficking at its brand hotels and profiting from sex trafficking at its brand hotels.

50. Upon information and belief, prior to 2019, despite a duty to do so, Hilton took inadequate measures to prevent sex trafficking at its brand hotels and profiting from sex trafficking at its brand hotels.

51. Upon information and belief, prior to 2019, despite a duty to do so, Marriott took inadequate measures to prevent sex trafficking at its brand hotels and profiting from sex trafficking at its brand hotels.

52. Upon information and belief, prior to 2019, Choice, through its employees, including executives, directors and managers, knowingly failed to take measures to prevent sex trafficking at its brand hotels or profiting from sex trafficking at its brand hotels, including the Comfort Inn® Santa Cruz.

53. Upon information and belief, prior to 2019, Hilton, through its employees, including executives, directors and managers, knowingly failed to take measures to prevent sex trafficking at its brand hotels or profiting from sex trafficking at its brand hotels, including the Embassy Suites® by Hilton Alexandria Old Town, DoubleTree® Sacramento, and the Hilton Sacramento Arden West .

---

[9] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).
[10] *Hotels Initiative*, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited June 19, 2019).

54. Upon information and belief, prior to 2019, Marriott, through its employees, including executives, directors and managers, knowingly failed to take measures to prevent sex trafficking at its brand hotels or profiting from sex trafficking at its brand hotels, including the Fremont Marriott® Silicon Valley.

55. Upon information and belief, Defendants, through their employees, including executives, directors and managers, decided not to take any measures to prevent sex trafficking at their brnad hotels in order to conceal the fact that sex trafficking was occurring at their brand hotels.

56. Upon information and belief, each year, from at least 2008 until 2019, Choice received information indicating that sex trafficking had occurred at one of its brand hotels.

57. Upon information and belief, each year, from at least 2008 until 2019, Hilton received information indicating that sex trafficking had occurred at one of its brand hotels.

58. Upon information and belief, each year, from at least 2008 until 2019, Marriott received information indicating that sex trafficking had occurred at one of its brand hotels.

59. Upon information and belief, each year, from 2008 until 2019, Choice received information from media reports and/or law enforcement indicating that sex trafficking had occurred at one of its brand hotels.

60. Upon information and belief, each year, from 2008 until 2019, Hilton received information from media reports and/or law enforcement indicating that sex trafficking had occurred at one of its brand hotels.

61. Upon information and belief, each year, from 2008 until 2019, Marriott received information from media reports and/or law enforcement indicating that sex trafficking had occurred at one of its brand hotels.

62. At all relevant times, Choice had the financial resources to train hotel staff to identify the signs of sex trafficking.

63. At all relevant times, Hilton had the financial resources to train hotel staff to identify the signs

**SECOND AMENDED COMPLAINT**

of sex trafficking.

64. At all relevant times, Marriott had the financial resources to train hotel staff to identify the signs of sex trafficking.

65. At all relevant times, Choice had the authority to require that training of hotel staff to identify the signs of sex trafficking take place at its brand hotels, including at the Comfort Inn® Santa Cruz.

66. At all relevant times, Hilton had the authority to require that training of hotel staff to identify the signs of sex trafficking take place at its brand hotels, including at the Embassy Suites® by Hilton Alexandria Old Town, DoubleTree® Sacramento, and the Hilton Sacramento Arden West .

67. At all relevant times, Marriott had the authority to require that training of hotel staff to identify the signs of sex trafficking take place at its brand hotels, including at the Fremont Marriott® Silicon Valley.

68. From check-in to check-out, there are a number of indicators that traffickers and their victims exhibit during their stay at a hotel.  With proper training and the implementation of reasonable security measures, Defendants could have prevented and identified regular sex trafficking under its respective brand flag.

69. Obvious signs of sex trafficking at Defendants' brand hotels included: an excess of condoms in rooms, individuals carrying or flashing large amounts of cash, excessive amounts of cash stored in the room, renting multiple rooms next door to each other, declining room service for several consecutive days, significant foot traffic in and out of room(s), men traveling with multiple women who appear unrelated, women known to be staying in rooms without leaving, women displaying physical injuries or signs of fear and anxiety, guests checking in with little or no luggage, hotel guests who prevent another individual from speaking for themselves, or a guest controlling another's identification documents.[11]

70. Obviously, hotel staff who have undergone training are more aware of sex trafficking when it

---

[11] *Id. See also*, Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

happens and are more willing to report it than hotel staff who have not been trained.[12]  For this reason, hospitality companies, including Choice, Hilton, and Marriott, are obligated to adopt policies and procedures related to sex trafficking and to enforce these policies and procedures as brand standard through to the operating hotel level.

71. Hospitality companies, including Choice, Hilton, and Marriott, can and should mandate that *all* staff working at *all* hotel properties across their brands complete sex trafficking training.[13]

72. In 2008, 18 U.S.C. § 1595 effectively required all companies with a peculiar proximity to human trafficking for commercial sex, including Choice, Hilton, and Marriott, to use reasonable measures and conduct proactive audits to ensure that they were not profiting from what they *should know* are human trafficking ventures.

73. The hospitality industry, including Choice, Hilton, and Marriott, have been cognizant of their role and responsibilities in the sex trafficking industry for years.

74. In 2012, an anti-trafficking coalition alerted Choice Hotels, Accor, Best Western, Hilton, Hyatt, Intercontinental Hotels Group, Marriott, Starwood, and Wyndham of the likelihood of sex trafficking during the London Olympics, and inquired about the companies anti-trafficking policies, while urging immediate action regarding trafficking.[14]

75. Marriott knew, as of at least early 2006, that human trafficking for commercial sex was occurring in its hotels and across its brand.  Because of this, Marriott amended its Human Rights Policy as early as 2006 to require annual review of its policy.  To date the policy merely states "Marriott supports the elimination of all forms of forced, bonded or compulsory labor and provides associate

---

[12] Giavanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[13] Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, The Institute to Address Criminal Sexual Exploitation, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.
[14]   *Corporate Strategy to Address Human Trafficking: Investor Recommendations for London Olympic Sponsors and Hospitality Companies, Christian Brothers Investment Services*, CBIS, http://cbisonline.com/us/wp-content/uploads/sites/2/2012/09/FINAL_OlympicsReport_9_28.pdf (last visited June 19, 2019).

**SECOND AMENDED COMPLAINT**

training on human trafficking for commercial sex awareness and prevention." [15]

76. Further, nationwide campaigns that Defendants were the target of, and subject to, recognized the issue of human trafficking for commercial sex in the hotel industry and the lack of internal policies to address the issue, and took initiative as early as 1997 with the United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign. [16]  These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking for commercial sex, including the hospitality industry and both campaigns released online resources and toolkits publicly accessible to any entity concerned with human trafficking for commercial sex. [17]

77. The presence of sex trafficking and exploitation in hotels is an obvious occurrence and although unutilized, underutilized, or ineffectively utilized, numerous well-researched trainings and toolkits have been published for the hotel industry over the last decade to help hotel staff in every position to identify the signs. [18]

78. Choice has been aware of and monitored the anti-trafficking activities of the hospitality industry as a whole and that of specific competitors, including those discussed above for years.

79. Hilton has been aware of and monitored the anti-trafficking activities of the hospitality industry as a whole and that of specific competitors, including those discussed above for years.

80. Marriott has been aware of and monitored the anti-trafficking activities of the hospitality industry as a whole and that of specific competitors, including those discussed above for years.

81. For years, Choice has participated in meetings and discussions with competitors and others in the hospitality industry about the prevalence of human trafficking for commercial sex in its brand hotels and the most effective means in which that sex trafficking could be stopped.

---

[15] *Our Commitment to Human Rights*, MARRIOTT INTERNATIONAL INC. available at https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsCommitment.pdf (last visited Nov. 20, 2019) citing Marriott International, Inc.'s Human Rights Policy Statement available at https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsStatement.pdf (last visited Nov. 20, 2019).
[16] *DHS Blue Campaign Five Year Milestone*, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.
[17] *Human Trafficking and the Hospitality Industry*, DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited June 19, 2019).
[18] DEPARTMENT OF HOMELAND SECURITY, *Blue Campaign Toolkit*, attached as "Exhibit A." Available at: https://www.dhs.gov/sites/default/files/publications/blue- campaign/toolkits/hospitality-toolkit-eng.pdf.

**SECOND AMENDED COMPLAINT**

82. For years, Hilton has participated in meetings and discussions with competitors and others in the hospitality industry about the prevalence of human trafficking for commercial sex in its brand hotels and the most effective means in which that sex trafficking could be stopped.

83. For years, Marriott has participated in meetings and discussions with competitors and others in the hospitality industry about the prevalence of human trafficking for commercial sex in its brand hotels and the most effective means in which that sex trafficking could be stopped.

84. Despite its knowledge of sex trafficking in its brand hotels and efforts undertaken or laid out by others to stop such trafficking, Choice did nothing to stop the sex trafficking at its hotels.

85. Despite its knowledge of sex trafficking in its brand hotels and efforts undertaken or laid out by others to stop such trafficking, Hilton did nothing to stop the sex trafficking at its hotels.

86. Despite its knowledge of sex trafficking in its brand hotels and efforts undertaken or laid out by others to stop such trafficking, Marriott did nothing to stop the sex trafficking at its hotels.

87. When Choice eventually began to adopt policies and public statements to combat sex trafficking, it did so in appearance only but utterly lacking in substance.

88. When Hilton eventually began to adopt policies and public statements to combat sex trafficking, it did so in appearance only but utterly lacking in substance.

89. When Marriott eventually began to adopt policies and public statements to combat sex trafficking, it did so in appearance only but utterly lacking in substance.

90. Hospitality companies, including Choice, Hilton, and Marriott, have both the power and responsibility to make sex trafficking difficult for the offenders.  Yet, Choice, Hilton, and Marriott either repeatedly fail to heed the call or repeatedly failed to execute their own policies.  Instead, they continue to facilitate these crimes at their hotels, content to direct their efforts solely to profit and the bottom line.

### B. DEFENDANTS CONTROL THEIR LOCAL HOTELS

91. Hotel brands or flags, including Choice, Hilton, and Marriott, lend their name and likeness to third party owners, while a franchisee or third party management company under the brands' direction

**SECOND AMENDED COMPLAINT**

and control runs the building and operations.  In return, the parent brand company exchanges the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a contract or franchise agreement, and profits from room rentals.

92. The average consumer does not see this relationship.  The brand hotel, including Choice, Hilton, and Marriott, gives the property its identity.  It provides signage on and in front of the building assuring customers checking into the hotel that they can expect the standards consistent with the brand hotel, including Defendants.  The same brand is emblazoned on everything in the hotel from the pens in the bedside tables to the staff uniforms at the front desk.

93. In addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, the brand hotel provides the operating hotel with access to its brand wide central reservation system, 800 number, revenue management tools, world-class loyalty programs and a website.  Thus, booking and room reservations are controlled by the brand hotel, including Defendants.[19]

94. Upon information and belief, the Comfort Inn® Santa Cruz pays around 10% of their total revenue back to Choice and is required to develop and maintain the property in accordance with Choice's brand standards as are included in the franchise agreement.

95. Upon Information and belief, per the contract or franchise agreement, Choice may enforce these brand standards through periodic inspections and even termination of the franchise agreement if the operating hotel, including the Comfort Inn® Santa Cruz, is found to be inadequate.  The right of Choice, as the brand hotel, to enforce their brand standards is also its own responsibility.

96. Upon information and belief, the Embassy Suites® by Hilton Alexandria Old Town, DoubleTree® Sacramento, and the Hilton Sacramento Arden West pay around 10% of their total revenue back to Hilton and are required to develop and maintain the property in accordance with Hilton's brand standards as are included in the franchise agreement.

---

[19] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (April 10, 2018) https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/.

97. Upon information and belief, per the contract or franchise agreement, Hilton may enforce these brand standards through periodic inspections and even termination of the franchise agreement if the operating hotel, including the Embassy Suites® by Hilton Alexandria Old Town, DoubleTree® Sacramento, and the Hilton Sacramento Arden West are found to be inadequate.  The right of Hilton, as the brand hotel, to enforce their brand standards is also its own responsibility.

98. Upon information and belief, the Fremont Marriott® Silicon Valley pays around 10% of their total revenue back to Marriott and is required to develop and maintain the property in accordance with Marriott's brand standards as are included in the franchise agreement.

99. Upon Information and belief, per the contract or franchise agreement, Marriott may enforce these brand standards through periodic inspections and even termination of the franchise agreement if the operating hotel, including the Fremont Marriott® Silicon Valley, is found to be inadequate.  The right of Marriott, as the brand hotel, to enforce their brand standards is also its own responsibility.

100. At the time of the incidents alleged herein, Choice owned and controlled the Comfort Inn® Santa Cruz.[20]

101. Choice could have terminated the Comfort Inn® Santa Cruz out of its system as delinquent but it would have been done at the expense of terminating royalty payments and room rental profits, so it was not done.

102. At the time of the incidents alleged herein, Hilton owned and controlled the Embassy Suites® by Hilton Alexandria Old Town, DoubleTree® Sacramento, and the Hilton Sacramento Arden West.

103. Hilton could have kicked the Embassy Suites® by Hilton Alexandria Old Town, DoubleTree® Sacramento, or the Hilton Sacramento Arden West out of their system as delinquent but it would have been done at the expense of terminating their royalty payments and room rental profits, so it was not done.

104. At the time of the incidents alleged herein, Marriott owned and controlled the Fremont

---

[20] Starwood Hotels and Resorts, LLC f/k/a Starwood Hotels and Resorts, Inc. is now a wholly owned subsidiary of Marriott International Inc.

**SECOND AMENDED COMPLAINT**

Marriott® Silicon Valley.

105. Marriott could have kicked the Fremont Marriott® Silicon Valley out of their system as delinquent but it would have been done at the expense of terminating their royalty payments and room rental profits, so it was not done.

## C. DEFENDANTS' WILLFUL BLINDNESS TO SEX TRAFFICKING AT THEIR HOTELS

106. Defendants Choice, Hilton, and Marriott, have been on notice of repeated incidences of sex trafficking occurring at their Comfort Inn®, Embassy Suites® by Hilton, and Marriott hotels, yet the hotel failed to take the necessary action to prevent sex trafficking and still persist in failing to take the necessary action to prevent sex trafficking at their hotels.

107. Choice Hotels International, Inc.:

    a. Choice owns, supervises, or operates the Quality Inn® located at 1101 Ocean St., Santa Cruz, CA 95060.

    b. Choice failed to implement and enforce any of its own policy or policies and protect J.C. from being sex trafficked.

    c. Choice knew or should have known that the Quality Inn® hotels where J.C. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotels' premises, including when J.C. was trafficked.[21]

    d. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Choice has repeatedly failed to take reasonable measures to prevent or thwart human trafficking for commercial sex at its hotels.

    e. Choice may exercise control over Quality Inn® hotels by:

        i. distributing information to assist employees in identifying human trafficking for commercial sex;

---

[21] According to neighborhoodscout.com, Santa Cruz is safer than just 2% of American cities. *See* https://www.neighborhoodscout.com/ca/santa-cruz/crime (accessed December 8, 2019).

ii.  providing a process for escalating human trafficking for commercial sex concerns within the organization;

iii.  requiring employees to attend training related to human trafficking for commercial sex;

iv.  providing new hire orientation on human rights and corporate responsibility;

v.  providing training and education to Quality Inn® hotels through webinars, seminars, conferences, and online portals;

vi.  developing and holding ongoing training sessions on human trafficking for commercial sex; or

vii.  providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking for commercial sex prevention.

f.  Choice Hotels was in an agency relationship with Quality Inn® hotels offering public lodging services in the hotel.  This agency relationship was created through Choice's exercise of an ongoing and systemic right of control over Quality Inn® hotels by Choice's operations, including the means and methods of how Quality Inn® hotels conduct daily business through one or more of the following actions:

i.  hosting online bookings on Choice's domain;

ii.  requiring Quality Inn® branded hotels to use Choice's customer rewards program;

iii.  setting employee wages;

iv.  making employment decisions;

v.  advertising for employment;

vi.  sharing profits;

vii.  standardized training methods for employees;

**SECOND AMENDED COMPLAINT**

viii.  building and maintaining the facility in a manner specified by the owner;

ix.  standardized or strict rules of operation;

x.  regular inspection of the facility and operation by owner;

xi.  fixing prices; or

xii.  other actions that deprive Quality Inn® branded hotels of independence in business operations.

g.  An apparent agency also exists between Choice and Quality Inn® hotels.  Choice held out Quality Inn® branded hotels to the public as possessing authority to act on its behalf.

h.  Given Choice's public statements on behalf of its hotel brands and the dominion and control it assumed in educating, implementing, and directing its branded hotels, including Quality Inn® branded hotels, Choice breached its duties in the following ways:

i.  did not adequately distribute information to assist employees in identifying human trafficking for commercial sex;

ii.  failed to provide a process for escalating human trafficking for commercial sex concerns within the organization;

iii.  failed to mandate managers, employees, or owners attend training related to human trafficking for commercial sex;

iv.  failed to provide new hire orientation on human rights and corporate responsibility;

v.  failed to provide training and education on human trafficking for commercial sex through webinars, seminars, conferences, and online portals;

vi.  failed to develop and hold or require ongoing training sessions on human trafficking for commercial sex; or

**SECOND AMENDED COMPLAINT**

vii.  failed to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking for commercial sex prevention.

i.  For years, Choice has failed to adequately address the rampant sex trafficking which tragically occurs throughout its Quality Inn® hotels across the country.  This entrenched, pervasive willful blindness to sex trafficking facilitated the sex trafficking of J.C. at the Quality Inn® Santa Cruz that forms the basis of this Complaint.

   i.  In September of 2016, police responded to a Quality Inn® in Oak Grove, Kentucky where a young girl was being held against her will and forced to solicit sexual acts.  The hotel staff had knowledge of the sex trafficking.[22]

   ii.  In January of 2019, two women were rescued from a Quality Inn® hotel in Battle Creek, Michigan.  The men who trafficked these women forced the women to prostitute themselves through the use of drugs and physical violence. [23]

   iii.  In March of 2018, police responded to a call at the Quality Inn® in Camarillo, California where a 51-year-old woman was found being held against her will and trafficked for commercial sex.  Through a criminal investigation, authorities learned the hotel was aware of the trafficking and aided in its occurrence.[24]

   iv.  In January of 2017, a man was arrested for trafficking a woman for the purposes of commercial sex at a Quality Inn® in Dothan, Alabama.[25]

---

[22] *Oak Grove Police sergeant, 2 others arrested during prostitution investigation*, WKRN, (Sept. 28, 2016) https://clarksvillenow.com/local/oak-grove-police-sergeant-2-others-arrested-during-prostitution-investigation/.
[23] Trace Christenson, *2 Lansing Men Arrested in Battle Creek on Human Trafficking Charges*, BATTLE CREEK ENQUIRER,https://www.battlecreekenquirer.com/story/news/2019/01/14/lansing-battle-creek-human-trafficking-quality-inn/2570625002/.
[24] Jeremy Child, *One Arrested in Human Trafficking Attempt in Camarillo*, VC Star, https://www.vcstar.com/story/news/local/communities/camarillo/2018/04/05/one-arrested-human-trafficking-attempt-camarillo/492228002/.
[25] Lance Griffin, *Website, Hotel, Assailant All Being Sued As A Result of Dothan Sex Trafficking Case*, DOTHAN EAGLE,https://www.dothaneagle.com/news/crime_court/website-hotel-assailant-all-being-sued-as-a-result-of/article_eef1d91c-e3fd-11e6-a872-1bdefa8794b3.html.

**SECOND AMENDED COMPLAINT**

v.   In January of 2017, two trafficked women were rescued during a police sting at a Quality Inn® in Stroudsburg, Pennsylvania.  The women told detectives they feared for their life as they were physically abused and threatened by the man who forced them to solicit sex through backpage.com.[26]

vi.   In February of 2015, a 17 year-old girl was being held, drugged and used as a sex servant at a Quality Inn® in Raynham, Massachusetts.[27]

vii.   In May of 2017, a man targeted and recruited heroin addicts to have commercial sex with strangers to pay off their drug debts at a Quality Inn® in Jacksonville, Florida.  Their services were advertised on bulletin board websites and physical abuse was used against the women as a way to keep them in the trafficker's possession.[28]

viii.   In April of 2018, a man was arrested for sex trafficking at a Quality Inn® in Woodbridge, Virginia.[29]

ix.   In July of 2013, a man and a woman recruited and harbored a 16 year-old girl for the purpose of commercial sex at a Quality Inn® in Columbia, South Carolina. They lured her in with promises of food, clothing and a place to stay.[30]

x.   In February of 2016, police officials arrested a man for human trafficking for commercial sex three adults and a minor at a Quality Inn®, in Bakersfield, California.[31]

---

[26] Manuel Gamiz, *Two Sex Workers Rescued; Alleged Pimps and Johns Arrested in Poconos Sting*, THE MORNING CALL, http://www.mcall.com/news/breaking/mc-poconos-sex-sting-trafficking-arrests-20170117-story.html.
[27] Marc Larocque, *Police Arrest Alleged Pimp in Sex Trafficking Sting in Raynham*, WICKED LOCAL(Nov.7,2019)https://raynham.wickedlocal.com/article/20150212/NEWS/150218308.
[28] Garrett Pelican, Jacksonville Man, 43, *Arrested On Human Trafficking Charges, The Florida Times Union*,(NMov.7,2019) https://www.jacksonville.com/news/public-safety/2017-05-31/jacksonville-man-43-arrested-human-trafficking-charges.
[29] Hooker Patrol: Human Trafficking Arrest of Alleged Pimp Maurice Cotton Charged for Running Hookers in Quality Inn, THE CHESAPEAKE SPEAK TODAY, (Nov.7,2019),  https://www.thechesapeaketoday.com/2018/04/08/hooker-patrol-human-trafficking-arrest-of-alleged-pimp-maurice-cotton-charged-for-running-hookers-in-quality-inn/.
[30] Two in Columbia Netted in Nationwide Child Sex Trafficking Bust, WIS NEWS,(Nov,7,2019) https://www.wistv.com/story/22961765/two-in-columbia-netted-in-nationwide-child-sex-trafficking-bust/.
[31] BPD Arrests Man for Human Trafficking,TURNTO23, (Nov,7,2019), https://www.turnto23.com/news/local-news/bpd-arrests-man-for-human-trafficking-in-central-bakersfield.

xi.   In September of 2015, a trafficker was arrested, after a woman escaped from his custody.  The man was found to be holding two more women captive at the Quality Inn® in North Charleston, South Carolina.[32]

xii.  In July of 2018, a man was arrested at a Quality Inn® in Murfreesboro, Tennessee for prostituting a 23 year-old woman he had been keeping there.[33]

xiii. In January of 2015, a man was arrested for the trafficking a 15 year-old out of a Quality Inn® in Miami, Florida.[34]

108. Marriott International, Inc.:

a.  Marriott controls, owns, supervises, or operates the Fremont Marriott Silicon Valley located at 46100 Landing Parkway in Fremont, California.

b.  Marriott failed to implement and enforce any of their own policies and protect J.C. from being trafficked.

c.  Founded in 1927, Marriott represents that they have more than Ninety-two (92) years of experience in managing successful brands.  From all of their Marriott hotels, Marriott receives an application fee, a lump sum payment, royalties, and other ongoing financial benefits.

d.  Marriott knew or should have known that the Fremont Marriott Silicon Valley hotel where J.C. was trafficked for commercial sex was in an area prone to sex trafficking activity on and around the hotel premises, including when J.C. was trafficked.

e.  Despite having knowledge of the extensive prostitution and sex trafficking that occurs at hotels and specifically their hotels, Marriott has repeatedly failed to

---

[32] Melissa Boughton, *Nightmare of Sex Trafficking FBI: More Resources Needed to Target Trafficking Online*, THE POST AND COURIER (Nov.7,2019) https://www.postandcourier.com/news/special_reports/nightmare-of-sex-traffickingfbi-more-resources-needed-to-target-trafficking/article_1d44549d-37cb-5c3e-860e-4c318500646e.html.
[33] Prostitution Investigation Lands Two in Jail, WGNS, (Nov.7,2019), https://www.wgnsradio.com/prostitution-investigation-lands-two-in-jail-cms-46351.
[34] William Shepard, *Alleged Pimp for Runaway Teen Facing Sex* Trafficking Charge: MIAMI-DADE POLICE, NBC MIAMI,(Nov.7,2019), https://www.nbcmiami.com/news/local/Alleged-Pimp-for-Runaway-Teen-Facing-Sex-Trafficking-Charge-Miami-Dade-Police-289338451.html.

**SECOND AMENDED COMPLAINT**

thwart these activities.

f.  Marriott can exercise control over Fremont Marriott Silicon Valley hotel by:

　　i.  distributing information to assist employees in identifying human trafficking for commercial sex;

　　ii.  providing a process for escalating human trafficking for commercial sex concerns within the organization;

　　iii.  requiring all employees to attend training related to human trafficking for commercial sex;

　　iv.  providing new hire orientation on human rights and corporate responsibility;

　　v.  providing training and education to Marriott hotels through webinars, seminars, conferences, and online portals;

　　vi.  developing and holding ongoing training sessions on human trafficking for commercial sex;

　　vii.  conducting audits of training protocols; or

　　viii.  providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking for commercial sex prevention.

g.  Marriott is in an agency relationship with the Fremont Marriott Silicon Valley hotel. This agency relationship was created and is maintained through Marriott's exercise of an ongoing and systemic right of control over Fremont Marriott Silicon Valley hotel by Marriott's operations, including the means and methods of how the Fremont Marriott Silicon Valley hotel conducts daily business including:

　　i.  hosting online bookings on Marriott's domain;

**SECOND AMENDED COMPLAINT**

ii.  requiring Fremont Marriott Silicon Valley to use Marriott's customer rewards program;

iii.  setting parameters on employee wages;

iv.  making employment decisions;

v.  advertising for employment;

vi.  sharing profits;

vii.  standardized training methods for employees;

viii.  building and maintaining the facility in a manner specified by  Marriott;

ix.  standardized or strict rules of operation;

x.  regular inspection of the facility and operation by Marriott;

xi.  fixing prices; or

xii.  other actions that deprive Marriott hotels of any independence in their business operations.

h. Apparent agency also exists between Marriott and the Fremont Marriott Silicon Valley hotel.  Marriott holds out Fremont Marriott Silicon Valley hotel to the public as its direct alter-ego -- each possessing authority to act on the other's behalf:

i. Given Marriott's public statements on behalf of its brand and the dominion and control it assumed in educating, implementing, and directing its brand hotels, Marriott breached its duties in the following ways:

i.  did not adequately distribute information to employees on identifying human trafficking for commercial sex;

ii.  failed to provide a process for escalating human trafficking for commercial sex concerns within the organization;

iii.  failed to mandate all managers, employees, or owners attend training on

**SECOND AMENDED COMPLAINT**

identifying human trafficking for commercial sex;

    iv.  failed to provide new hire orientation on human rights and corporate responsibility;

    v.  failed to provide training and education on human trafficking for commercial sex through webinars, seminars, conferences, and online portals;

    vi.  failed to develop, hold, and require ongoing training sessions on human trafficking for commercial sex; or

    vii.  failed to provide checklists, escalation protocols and information to property management staff, or tracking performance indicators and key metrics on human trafficking for commercial sex prevention.

j. For years, Marriott has demonstrated willful blindness to the rampant sex trafficking occurring at its Marriott hotels across the country. This entrenched apathy to the real risk of sex trafficking allowed the exploitation of J.C. at the Fremont Marriott Silicon Valley that forms the basis for this Complaint.

    i.  In August of 2017, data from Houston's Police Department shows that some of Houston's highest rated hotels have topped a list of locations where prostitution arrests were made. This data included addresses for all prostitution arrests made at Houston, Texas hotels from Jan. 1, 2012, through July 7, 2017. Marriott came in second with 48 arrests.[35]

    ii.  In April of 2012, a woman sued a Marriott Hotel in Boston, Massachusetts after a man responded to a craigslist advertisement soliciting sex and killed

---

[35] "Houston's Most Popular Hotels for Prostitution Busts," 8/10/2017, Houston Chronicle, https://www.chron.com/news/houston-texas/houston/article/Houston-s-most-popular-hotels-for-prostitution-11744958.php (accessed 12/9/2019).

**SECOND AMENDED COMPLAINT**

her daughter within the hotel in a violent attack.[36]

109. Hilton Worldwide Holdings, Inc.:

    a. Hilton owns, supervises, and/or operates the Embassy Suites by Hilton Alexandria Old Town located at 1900 Diagonal Road, in Alexandria, Virginia.

    b. Hilton owns, supervises, and/or operates the DoubleTree by Hilton located at 2001 Point W Way, Sacramento, CA 95815.

    c. Hilton owns, supervises, and/or operates the Hilton Arden West Sacramento located at 2200 Harvard St, Sacramento, CA 95815.

    d. Hilton failed to implement and enforce any of its own policy or policies and protect J.C. from being sex trafficked.

    e. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Hilton has repeatedly failed to stop these actions.

    f. Hilton may exercise control over Embassy Suites®, DoubleTree®, and Hilton Arden West hotels by:

      i. distributing information to assist employees in identifying human trafficking for commercial sex;

      ii. providing a process for escalating human trafficking for commercial sex concerns within the organization;

      iii. requiring employees to attend training related to human trafficking for commercial sex;

      iv. providing new hire orientation on human rights and corporate responsibility;

      v. providing training and education to Embassy Suites®, DoubleTree®, and Hilton Arden West hotels through webinars, seminars, conferences, and online portals;

---

[36] "Mother of Craigslist victim sues Marriott," 4/3/2012, Boston Globe, https://www3.bostonglobe.com/metro/2012/04/13/mother-woman-slain-craigslist-killer-sues-marriott-hotel-chain/LxuP2jZtY59DsxMTZXJ09H/story.html?arc404=true (accessed 12/9/2019).

      vi.  developing and holding ongoing training sessions on human trafficking for commercial sex; or

      vii.  providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking for commercial sex prevention.

g. Hilton was in an actual or apparent agency relationship with Embassy Suites® DoubleTree®, and Hilton Arden West hotels offering public lodging services in these hotels.  This agency relationship was created through Hilton's exercise of an ongoing and systemic right of dominion and control over Embassy Suites® DoubleTree®, and Hilton Arden West hotels by Hilton's operations, including the means and methods of how these hotels conducted daily business through one or more of the following actions:

      i.  hosting online bookings on Hilton's domain;

      ii.  requiring Embassy Suites® hotels to use Hilton's customer rewards program;

      iii.  setting employee wages;

      iv.  making employment decisions;

      v.  advertising for employment;

      vi.  sharing profits;

      vii.  standardized training methods for employees;

      viii.  building and maintaining the facility in a manner specified by the owner;

      ix.  standardized or strict rules of operation;

      x.  regular inspection of the facility and operation by owner;

      xi.  fixing prices; or

      xii.  other actions that deprive Embassy Suites® hotels of independence in business operations.

**SECOND AMENDED COMPLAINT**

h. An actual and/or apparent agency also exists between Hilton and Embassy Suites® DoubleTree®, and Hilton Arden West hotels.  Hilton held these hotels to the public as possessing authority to act on its behalf.

i.  Given Hilton's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its hotels, including Embassy Suites® DoubleTree®, and Hilton Arden West hotels, Hilton breached its duties in the following ways:

   i.  Failed (altogether or adequately) to distribute information to assist employees in identifying human trafficking for commercial sex;

   ii.  Failed (altogether or adequately) to provide a process for escalating human trafficking for commercial sex concerns within the organization;

   iii.  Failed (altogether or adequately) to mandate managers, employees, or owners attend training related to human trafficking for commercial sex;

   iv.  Failed (altogether or adequately) to provide new hire orientation on human rights and corporate responsibility;

   v.  Failed (altogether or adequately) to provide training and education on human trafficking for commercial sex through webinars, seminars, conferences, and online portals;

   vi.  Failed (altogether or adequately) to develop and hold or require ongoing training sessions on human trafficking for commercial sex; or

   vii.  Failed (altogether or adequately) to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking for commercial sex prevention.

j.  For years, Hilton has failed to address the rampant culture of sex trafficking

**SECOND AMENDED COMPLAINT**

which tragically occurs throughout its Embassy Suites® hotels across the country.  This entrenched apathy to the real risk of sex trafficking and pervasive willful blindness to the role Embassy Suites® hotels play in sex trafficking facilitated the sex trafficking of J.C. at Embassy Suites® hotels that forms the basis of this Complaint.

### D. THE SEX TRAFFICKING OF J.C.

110.   The facts alleged herein stem from a human trafficking for commercial sex and prostitution ring operated in California.  While victimized by her traffickers J.C. was subject to repeated instances of rape, physical abuse, verbal abuse, exploitation, psychological torment, kidnapping, and false imprisonment at Defendants' brand hotels from 2008 through 2019.

111.   In 2008, J.C. stopped at a gas station near Kaplan College, in Sacramento, CA, where she was student, and saw her trafficker who was there often. One day he offered to take her on a drive to speak with him.  She agreed, leaving her car at the gas station and going with him.  They drove around the area, and then J.C. noticed him turn onto the freeway.  He Drove her to San Francisco and told her, "You're going to make me a lot of money".

112. Her trafficker picked up another girl, then drove around to network at hotels with other sex traffickers.  He then took them both the Comfort Suites in Santa Cruz where another girl helped her get dressed and ready for customers.  The girl did her hair, makeup, fixed her clothes and went over expectations for how to conduct a sex exchange.

113. J.C was made to walk outside the Comfort Inn in Santa Cruz and instruct potential customers to meet her at the Comfort Inn where she was kept.  She would service multiple clients in a day.  Some days she was given a quota to meet, depending on traffic and her trafficker's mood.  J.C.'s trafficker would come to the hotel to take all of the money J.C. and other victims had been paid.

114. Her trafficker raped her frequently and forcibly causing her to become pregnant twice by him. J.C. was forced by her trafficker to terminate both pregnancies, one after the second trimester.

**SECOND AMENDED COMPLAINT**

115. J.C.'s trafficker took her identification from her when he first kidnapped her and threatened her family if she ran.  Her trafficker would allow her visit her parents on rare occasions but only for an hour.  He would sit in the car outside her family home and wait for her, telling her that if she didn't come out in time he'd come in.

116. J.C. was able to escape her trafficker in August of 2010, by running out of the hotel room with just a basic bag of her belongings and hiding in bushes behind the hotel they were staying in.  She watched him come out of the hotel and look for her, then drive off to find her.  When he pulled away, she ran back into the hotel and asked the front desk to use their phone to contact her parents.  They let her hide in their unoccupied breakfast room until her parents showed up.

117. Her trafficker later found her again and manipulated her into moving to Las Vegas, NV.  By this time J.C. had a child.  While she originally planned to move to Vegas with her child and two friends to get a stable job, her trafficker soon began controlling her again. He would force her to work when he wanted her to and fly her places, leaving her son in the care of her friends.

118. On one occasion her trafficker forced J.C. to get on a plane to go on a call against her will and without her son.  While she was gone, her trafficker took J.C.'s child from the care of her friends and had the baby at his home where the child died.  Doctors said the child drowned in the home pool and was pronounced brain dead at eight months old.  Her trafficker is currently in prison.

119. Between 2008 and early 2019, J.C.'s traffickers routinely harbored her at hotels throughout California, including the Comfort Inn® in Santa Cruz, Embassy Suites® by Hilton in Alexandria Virginia, the DoubleTree® Sacramento, Hilton Arden West, and the Fremont Marriot in Fremont California.  J.C. would sometimes be held in the rooms for weeks at a time servicing a constant stream of incoming buyers.

120. J.C. stayed at these hotels over a long period of time, her trafficker always renting the room for a number of weeks, paying in smaller increments, and requesting an inordinate amount of towels.  For weeks J.C. was held up in the room, unable to leave and visibly deteriorating.  Then her trafficker

**SECOND AMENDED COMPLAINT**

would up and leave and the same would happen at another of the hotels. J.C's trafficker returned to these hotels numerous times.

121. J.C.'s trafficker would harbor her and other victims at the Comfort Inn in Santa Cruz, CA for up to two weeks at a time.  On one occasion at the hotel J.C. was attacked by another victim and suffered a bloody lip.  J.C. went to hotel security staff for help but the police were never called. While J.C. was housed at the Comfort Inn, a steady stream of men, who were not registered hotel guests, would enter and leave the hotel.

122. J.C.'s trafficker would also force them into sexual exchanges at the DoubleTree® Sacramento, and Hilton Arden West several times from 2009 to early 2010. While J.C. was housed at the DoubleTree® Sacramento, and Hilton Arden West Comfort Inn, a steady stream of men, who were not registered hotel guests, would enter and leave the hotel.

123. J.C.'s trafficker would also force them into sexual exchanges at the Freemont Marriott. J.C. and other victims were housed at this hotel frequently for 3-4 days a week every two weeks.   On at least one occasion, there were altercations between victims in public areas of the hotel that should have alerted hotel staff to the nature of their activity.  While at the Freemont Marriott traffickers, who were not registered guests at the hotel, would regularly enter and leave the hotel.

124. J.C. was also housed by her trafficker at the Embassy Suites by Hilton in Alexandria, VA.  She would perform commercial sex acts there 3-6 days per week for an 8 month period. Men who came to the hotel for the purpose of purchasing sex and who were not registered guests of the hotel would regularly enter and leave the hotel. J.C. and her trafficker were asked to leave the hotel on multiple occasions because of the traffic into the rooms, but police were apparently never called.

125. Prior to, during, and following the incidents described herein, Defendants had actual and/or constructive notice of drug dealing, prostitution, and/or general safety concerns at their hotels, including, but not limited to, video surveillance of their hotels, as well as oral or written complaints regarding said suspicious activity.  Defendants failed to take any actions to curtail these activities.

**SECOND AMENDED COMPLAINT**

126. Had Defendants been paying attention to the activities being conducted at their hotels and on their properties, and the apparent red flags outlined above, it would have been impossible for them not to notice the victimization of J.C.

## E. DEFENDANTS FACILITATED THE TRAFFICKING OF J.C.

127. Choice profited from the sex trafficking of J.C. and knowingly or negligently aided and engaged with her trafficker in his sex trafficking venture. Choice rented rooms to J.C.'s traffickers, when they knew, or should have known, that they were using the room to harbor J.C., physically assault her, and subject her to repeated exploitation as she was forced into sexual servitude.

128. Hilton profited from the sex trafficking of J.C. and knowingly or negligently aided and engaged with her trafficker in his sex trafficking venture. Hilton rented rooms to J.C.'s traffickers, when they knew, or should have known, that they were using the room to harbor J.C., physically assault her, and subject her to repeated exploitation as she was forced into sexual servitude.

129. Marriott profited from the sex trafficking of J.C. and knowingly or negligently aided and engaged with her trafficker in his sex trafficking venture. Marriott rented rooms to J.C.'s traffickers, when they knew, or should have known, that they were using the room to harbor J.C., physically assault her, and subject her to repeated exploitation as she was forced into sexual servitude.

130. Choice knew, or should have known, that J.C. was being trafficked and that Choice knowingly benefitted financially from said exploitation, because J.C.'s traffickers frequented Choice's brand hotels.

131. Hilton knew, or should have known, that J.C. was being trafficked and that Hilton knowingly benefitted financially from said exploitation, because J.C.'s traffickers frequented Hilton's brand hotels.

132. Marriott knew, or should have known, that J.C. was being trafficked and that Marriott knowingly benefitted financially from said exploitation, because J.C.'s traffickers frequented

Marriott's brand hotels.

133. Choice knew, or should have known, that J.C. was being trafficked because J.C. constantly entertained traffic to appease her traffickers' daily quotas, her traffickers would help check her in then not proceed to the room, and she was often the victim of loud altercations while seemingly never allowed to be alone.  All behavior that indicated they were using Choice's brand hotels for a sex trafficking venture.

134. Hilton knew, or should have known, that J.C. was being trafficked because J.C. constantly entertained traffic to appease her traffickers' daily quotas, her traffickers would help check her in then not proceed to the room, and she was often the victim of loud altercations while seemingly never allowed to be alone.  All behavior that indicated they were using Hilton's brand hotels for a sex trafficking venture.

135. Marriott knew, or should have known, that J.C. was being trafficked because J.C. constantly entertained traffic to appease her traffickers' daily quotas, her traffickers would help check her in then not proceed to the room, and she was often the victim of loud altercations while seemingly never allowed to be alone.  All behavior that indicated they were using Marriott's brand hotels for a sex trafficking venture.

136. Choice actively participated in this illegal endeavor by knowingly or negligently providing lodging to J.C.'s traffickers in which to harbor J.C. while they were trafficking her.

137. Hilton actively participated in this illegal endeavor by knowingly or negligently providing lodging to J.C.'s traffickers in which to harbor J.C. while they were trafficking her.

138. Marriott actively participated in this illegal endeavor by knowingly or negligently providing lodging to J.C.'s traffickers in which to harbor J.C. while they were trafficking her.

139. Choice profited from the sex trafficking of J.C. and knowingly or negligently aided and participated with J.C.'s traffickers in their criminal venture.  Choice took no action as J.C. repeatedly visited the hotel, often with different guests, without any luggage, avoiding all eye contact, and often

**SECOND AMENDED COMPLAINT**

displaying prominent bruising all over her person while in the constant presence of her trafficker.

140. Hilton profited from the sex trafficking of J.C. and knowingly or negligently aided and participated with J.C.'s traffickers in their criminal venture. Hilton took no action as J.C. repeatedly visited the hotel, often with different guests, without any luggage, avoiding all eye contact, and often displaying prominent bruising all over her person while in the constant presence of her trafficker.

141. Marriott profited from the sex trafficking of J.C. and knowingly or negligently aided and participated with J.C.'s traffickers in their criminal venture. Marriott took no action as J.C. repeatedly visited the hotel, often with different guests, without any luggage, avoiding all eye contact, and often displaying prominent bruising all over her person while in the constant presence of her trafficker.

142. Choice actively participated in this illegal endeavor by knowingly or negligently providing lodging to those who purchased sex from J.C. in which to harbor J.C. while she was being trafficked.

143. Hilton actively participated in this illegal endeavor by knowingly or negligently providing lodging to those who purchased sex from J.C. in which to harbor J.C. while she was being trafficked.

144. Marriott actively participated in this illegal endeavor by knowingly or negligently providing lodging to those who purchased sex from J.C. in which to harbor J.C. while she was being trafficked.

145. Choice had the opportunity to stop J.C.'s traffickers and offenders like them from victimizing J.C. and others like her. Instead, Choice failed to take reasonable measures to stop sex trafficking from occurring in their hotels.

146. Hilton had the opportunity to stop J.C.'s traffickers and offenders like them from victimizing J.C. and others like her. Instead, Hilton failed to take reasonable measures to stop sex trafficking from occurring in their hotels.

147. Marriott had the opportunity to stop J.C.'s traffickers and offenders like them from victimizing J.C. and others like her. Instead, Marriott failed to take reasonable measures to stop sex trafficking from occurring in their hotels.

148. Choice financially benefited from the sex trafficking of J.C., and other victims like her, and

developed and maintained business models that attract and foster the commercial sex market for traffickers (including buyers.)

149.  Hilton financially benefited from the sex trafficking of J.C., and other victims like her, and developed and maintained business models that attract and foster the commercial sex market for traffickers (including buyers.)

150.  Marriott financially benefited from the sex trafficking of J.C., and other victims like her, and developed and maintained business models that attract and foster the commercial sex market for traffickers (including buyers.)

151.  Choice enjoys the steady stream of income that sex traffickers bring to their airport hotels from room rentals, such as the Comfort Inn® Santa Cruz.

152.  Hilton enjoys the steady stream of income that sex traffickers bring to their airport hotels from room rentals, such as the Embassy Suites® by Hilton Alexandria Old Town, the DoubleTree® Sacramento, and Hilton Arden West .

153. Marriott enjoys the steady stream of income that sex traffickers bring to their airport hotels from room rentals, such as the Fremont Marriott® Silicon Valley.

154.  Choice financially benefits from its ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

155. Hilton financially benefits from its ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

156. Marriott financially benefits from its ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

157.  Choice failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on their brand hotels.

158.  Hilton failed to take any steps to alert the authorities, properly intervene in the situation, or

take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on their brand hotels.

159. Marriott failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on their brand hotels.

160.   Defendants maintained their deficiencies to maximize profits by:

     a.   Reducing the cost of training employees and managers of how to spot the signs of human trafficking for commercial sex and sexual exploitation, and what steps to take;

     b.   Not refusing room rentals, or reporting guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers; and/or

     c.   Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers to actively combat human trafficking for commercial sex and sexual exploitation.

161.   As a direct and proximate result of these egregious practices on the part of Defendants, J.C. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## CAUSES OF ACTION

### A.  COUNT ONE – 18 U.S.C § 1595 ("TVPRA")
### (As against Choice Hotels International, Inc.)

162.   Plaintiff J.C. incorporates each foregoing allegation.

163.   J.C. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

164.   Choice's acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595.  Specifically, Choice had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage in violations of 18 U.S.C.

**SECOND AMENDED COMPLAINT**

§1591(a).  At all relevant times, Choice breached this duty by participating in, and facilitating, the harboring and providing of J.C. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

165.  Choice has financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade.  Moreover, Choice directly benefitted from the trafficking of J.C. on each occasion they received payment for rooms that she was being kept in at Defendants' hotels. The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of J.C.'s injuries and damages.

166. J.C. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Choice's hotels and properties in violation of 18 U.S.C. §1591(a).

### B.  COUNT TWO – 18 U.S.C § 1595 ("TVPRA")
### (As against Hilton Worldwide Holdings, Inc.)

167.  Plaintiff J.C. incorporates each foregoing allegation.

168.  J.C. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

169.  Hilton's acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595.  Specifically, Hilton had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage in violations of 18 U.S.C. §1591(a).  At all relevant times, Hilton breached this duty by participating in, and facilitating, the harboring and providing of J.C. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

170.  Hilton has financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade.  Moreover, Hilton directly benefitted from the trafficking of J.C. on each occasion they received payment for rooms that she was being kept in at Defendants' hotels.  The

**SECOND AMENDED COMPLAINT**

actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of J.C.'s injuries and damages.

171. J.C. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Hilton's hotels and properties in violation of 18 U.S.C. §1591 (a).

### C.   COUNT THREE – 18 U.S.C § 1595 ("TVPRA")
### (As against Marriott International, Inc.)

172.   Plaintiff J.C. incorporates each foregoing allegation.

173.   J.C. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

174.   Marriott's acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, Marriott had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage in violations of 18 U.S.C. §1591(a).   At all relevant times, Marriott breached this duty by participating in, and facilitating, the harboring and providing of J.C. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

175.   Marriott has financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade.   Moreover, Marriott directly benefitted from the trafficking of J.C. on each occasion they received payment for rooms that she was being kept in at Defendants' hotels. The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of J.C.'s injuries and damages.

176. J.C. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Marriott's hotels and properties in violation of 18 U.S.C. §1591 (a).

### D.  COUNT FOUR – CAL. CIV. CODE § 52.5
### (As against Choice Hotels International, Inc.)

177.   Plaintiff J.C. incorporates each foregoing allegation.

**SECOND AMENDED COMPLAINT**

178.   J.C. is a victim of sex trafficking within the meaning of California Penal Code § 236.1 and is therefore entitled to bring a civil action under Cal. Civ. Code § 52.5.

179.   Choice's acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of Cal. Civ. Code § 52.5. At all relevant times, Choice breached their duties by participating in, and facilitating, the harboring and providing of J.C. for the purposes of commercial sex induced by malice, oppression, force, fraud, duress, and/or coercion, by their acts, omissions, and commissions.

180.   Choice financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade.  Moreover, Choice directly benefitted from the trafficking of J.C. on each occasion they received payment for rooms that she was being kept in at Choice's hotels.  The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of J.C.'s injuries and damages.

181. J.C. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Choice's hotels and properties in violation of Cal. Civ. Code § 52.5.

182. J.C. is also entitled to punitive damages under Cal. Civ. Code § 52.5.

### E.   COUNT FIVE – CAL. CIV. CODE § 52.5
### (As against Hilton Worldwide Holdings, Inc.)

183.   Plaintiff J.C. incorporates each foregoing allegation.

184.   J.C. is a victim of sex trafficking within the meaning of California Penal Code § 236.1 and is therefore entitled to bring a civil action under Cal. Civ. Code § 52.5.

185.   Hilton's acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of Cal. Civ. Code § 52.5. At all relevant times, Hilton breached their duties by participating in, and facilitating, the harboring and providing of J.C. for the purposes of commercial sex induced by malice, oppression, force, fraud, duress, and/or coercion, by their acts, omissions, and commissions.

**SECOND AMENDED COMPLAINT**

186.  Hilton financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade.  Moreover, Hilton directly benefitted from the trafficking of J.C. on each occasion they received payment for rooms that she was being kept in at Hilton's hotels.  The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of J.C.'s injuries and damages.

187. J.C. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Hilton's hotels and properties in violation of Cal. Civ. Code § 52.5.

188. J.C. is also entitled to punitive damages under Cal. Civ. Code § 52.5.

### F.   COUNT SIX– CAL. CIV. CODE § 52.5
### (As against Marriott International, Inc.)

189.  Plaintiff J.C. incorporates each foregoing allegation.

190.  J.C. is a victim of sex trafficking within the meaning of California Penal Code § 236.1 and is therefore entitled to bring a civil action under Cal. Civ. Code § 52.5.

191.  Marriott's acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of Cal. Civ. Code § 52.5. At all relevant times, Marriott breached their duties by participating in, and facilitating, the harboring and providing of J.C. for the purposes of commercial sex induced by malice, oppression, force, fraud, duress, and/or coercion, by their acts, omissions, and commissions.

192.  Marriott financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade.  Moreover, Marriott directly benefitted from the trafficking of J.C. on each occasion they received payment for rooms that she was being kept in at Marriott's hotels.  The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of J.C.'s injuries and damages.

193. J.C. has suffered substantial physical and psychological injuries as the result of being trafficked

**SECOND AMENDED COMPLAINT**

and sexually exploited at Marriott's hotels and properties in violation of Cal. Civ. Code § 52.5.

194. J.C. is also entitled to punitive damages under Cal. Civ. Code § 52.5.

## **PRAYER FOR RELIEF**

WHEREFORE, based on the forgoing, Plaintiff seeks injunctive relief in the form of a judgement requiring Defendants to institute sufficient audits, policies, rules, and requirements of their employees, agents, franchisees, contractors, and/or all others operating under their flag, logo, trademark, or advertising umbrella to insure that the actions and activities outlined above no longer occur and may not serve in the future to jeopardize the health and safety of individuals similarly situated  to Plaintiff herein.

AND WHEREFORE, on the basis of the foregoing, Plaintiff requests that a jury be selected to hear this case and render a verdict for Plaintiff, and against Defendants, and that the jury selected award damages to Plaintiff in an amount which will effectively prevent other similarly caused acts and adequately reflects the enormity of Defendants' wrongs and injuries to Plaintiff due to Defendants' faulty conduct, including but not limited to:

    a)  All available compensatory damages for the described losses with respect to each cause of action;

    b)  past and future medical expenses, as well as the costs associated with past and future life care;

    c)  past and future lost wages and loss of earning capacity;

    d)  past and future emotional distress;

    e)  consequential and/or special damages;

    f)  all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

    g)  punitive damages with respect to each cause of action;

    h)  reasonable and recoverable attorneys' fees;

    i)  costs of this action; and

**SECOND AMENDED COMPLAINT**

j)   pre-judgment and all other interest recoverable.

Further, Plaintiff requests that the Court enter judgment consistent with the jury's verdict, and prays for any other damages and equitable relief the Court or jury deems appropriate under the circumstances.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable in this civil action.

Dated:  May 21, 2020

Respectfully submitted,

Plaintiff, by her Attorneys

/s/ *Melinda Davis Nokes*
Melinda Davis Nokes Bar No.: 167787
mnokes@weitzlux.com
**WEITZ & LUXENBERG, P.C.**
*Attorneys for Plaintiff*
1880 Century Park East, Suite No. 700
Los Angeles, CA 90067
Telephone: (949) 338-4303
Facsimile: (310) 786-9927

/s/ *Lori E. Andrus*
Lori E. Andrus, Bar No.: 205816
lori@andrusanderson.com
**ANDRUS ANDERSON LLP**
155 Montgomery Street, Suite 900
San Francisco, CA 94104
Telephone: (415) 986-1400
Facsimile: (415) 986-1474

# EXHIBIT A



## Who We Are

The Blue Campaign is the unified voice for the U.S. Department of Homeland Security's (DHS) efforts to combat human trafficking. Working with law enforcement, government, and non-governmental and private organizations, the Blue Campaign strives to protect the basic right of freedom and bring those who exploit human lives to justice.

## What's Inside?

This **toolkit** offers tips and resources that can help you inform and educate your employees about human trafficking.

It includes posters of human trafficking warning signs for four groups of employee:

- Hotel and Motel Staff
- Housekeeping, Maintenance and Room Staff
- Concierge, Bellman, Front Desk, Security and Valet Staff
- Food and Beverage Staff

These posters can be displayed in common areas of your business where employees congregate (such as staff break, laundry and maintenance rooms).

www.dhs.gov/bluecampaign

**SECOND AMENDED COMPLAINT**



# What is Human Trafficking?

Human trafficking is modern-day slavery and involves the use of force, fraud or coercion to obtain labor or commercial sex. Every year, millions of men, women and children are trafficked in countries around the world, including the United States.

There are different types of human trafficking:

- **Sex Trafficking**
  Victims of sex trafficking are manipulated or forced to engage in sex acts for someone else's commercial gain. Sex trafficking is not prostitution.

  Anyone under the age of 18 engaging in commercial sex is considered to be a victim of human trafficking. **No exceptions.**

- **Forced Labor**
  Victims of forced labor are compelled to work for little or no pay, often manufacturing or growing the products we use and consume every day.

- **Domestic Servitude**
  Victims of domestic servitude are forced to work in isolation and are hidden in plain sight as nannies, housekeepers or domestic help.

### Human trafficking and the hospitality industry

Traffickers often take advantage of the privacy and anonymity offered by the hospitality industry. They can operate discreetly because staff and guests may not know the signs of human trafficking.

You may have employees who are victims of forced labor. If a third party applied for a position on behalf of an individual or if employees are not receiving their own paychecks, these could be signs of human trafficking.

Hotels and motels are also major locations where traffickers force sex trafficking victims to provide commercial sex to paying customers. Victims may be forced to stay at a hotel or motel where customers come to them, or they are required to go to rooms rented out by the customers.

### What actions can I take at my business to help stop human trafficking?

You play a significant role in helping to stop this terrible crime by:

- Knowing the signs of human trafficking.
- Designing a plan of action to respond to reports of human trafficking in your business.
- Partnering with agencies that provide services to victims of human trafficking. In the case of lodging, consider offering vouchers to victims. Immediate housing for victims plays a vital role in beginning a victim's healing process.
- Providing employee training to help them understand and identify signs of human trafficking.
- Distributing and posting the fact sheets in this kit to your employees.

Information on additional resources, literature, materials, and training offered by the Blue Campaign can be found at www.dhs.gov/bluecampaign.

**SECOND AMENDED COMPLAINT**





For **Hotel** and **Motel** Staff

Hotel and motel employees are often in the best position to see potential signs of human trafficking, especially since your duties give you access to different areas of the properties. You may also have direct or indirect contact with both traffickers and victims.

**GENERAL INDICATORS**

- Individuals show signs of fear, anxiety, tension, submission, and/or nervousness.
- Individuals show signs of physical abuse, restraint, and/or confinement.
- Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way.
- Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior.
- Individuals lack freedom of movement or are constantly monitored.
- Individuals avoid eye contact and interaction with others.

- Individuals have no control over or possession of money or ID.
- Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party.
- Individuals have few or no personal items—such as no luggage or other bags.
- Individuals appear to be with a significantly older "boyfriend" or in the company of older males.
- A group of girls appears to be traveling with an older female or male.
- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker.

*Each indicator alone may not necessarily mean a person is being trafficked.*

**WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING**

- Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.

- Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.

- Follow your corporate protocol, such as by notifying management and security.

- Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.

- To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign





For **Housekeeping, Maintenance,** and **Room Service** Staff

Housekeeping, maintenance, and room service staff typically have the most access to guest rooms where signs of human trafficking may be apparent. By being conscious of human trafficking indicators, you can help identify possible human trafficking activities and victims.

## GENERAL INDICATORS

- "Do Not Disturb" sign used constantly.
- Requests room or housekeeping services (additional towels, new linens, etc.), but denies hotel/motel staff entry into room.
- Refusal of cleaning services for multiple days.
- Excessive amounts of cash in a room.
- Smell of bodily fluids and musk.
- Presence of multiple computers, cell phones, pagers, credit card swipes, or other technology.
- The same person reserving multiple rooms.
- Individuals leaving room infrequently, not at all, or at odd hours.
- Children's items or clothing are present but no child registered with the room.

- Individuals loitering in hallways or appearing to monitor the area.
- Excessive amounts of alcohol or illegal drugs in rooms.
- Evidence of pornography.
- Minors left alone in room for long periods of time.
- Excessive number of people staying in a room.
- Extended stay with few or no personal possessions.
- Provocative clothing and shoes.
- Constant flow of men into a room at all hours.
- Excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.).
- Rooms stocked with merchandise, luggage, mail packages, and purses/wallets with different names.

*Each indicator alone may not necessarily mean a person is being trafficked.*

## WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING

- Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.
- Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.
- Follow your corporate protocol, such as by notifying management and security.
- Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.
- To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign

**SECOND AMENDED COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





For **Concierge, Bellman, Front Desk, Security,** and **Valet** Staff

Concierge, bellman, front desk, security, and valet staff are typically the first to see guests when they enter the hotel. When checking in or requesting hotel amenities, a guest may exhibit behavior indicating human trafficking.

**GENERAL INDICATORS**

- Patrons checking into room appear distressed or injured.
- The same person reserving multiple rooms.
- Few or no personal items when checking in.
- Room paid for with cash or pre-loaded credit card.
- Excessive use of hotel computers for adult oriented or sexually explicit websites.
- Patrons not forthcoming about full names, home address or vehicle information when registering.
- Minor taking on adult roles or behaving older than actual age (paying bills, requesting services).
- Patron appears with a minor that he or she did not come with originally.
- Rentals of pornography when children are staying in the room.
- Individuals dropped off at the hotel or visit repeatedly over a period of time.

- Individuals leaving room infrequently, not at all, or at odd hours.
- Minor with a patron late night or during school hours (and not on vacation).
- Individuals checking into room have no identification.
- Room is rented hourly, less than a day, or for long-term stay that does not appear normal.
- Patrons request information or access to adult services or sex industry.
- Room rented has fewer beds than patrons.
- Individuals selling items to or begging from patrons or staff.
- Individuals enter/exit through the side or rear entrances, instead of the lobby.
- Car in parking lot regularly parked backward, so the license plate is not visible.

*Each indicator alone may not necessarily mean a person is being trafficked.*

**WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING**

- Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.
- Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.
- Follow your corporate protocol, such as by notifying management and security.
- Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.
- To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign

**SECOND AMENDED COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





## SIGNS OF HUMAN TRAFFICKING
### For **Food** and **Beverage** Staff

Food and beverage staff may have access to a guest's room or see them using the hotel restaurant or bar. Be conscious of these signs indicating a guest may be a victim of human trafficking.

**GENERAL INDICATORS**

- Patron entertaining a minor at the bar or restaurant that he/she did not come in with originally.
- Patron claims to be an adult although appearance suggests he/she is a minor.
- Individuals loitering and soliciting male patrons.
- Individuals waiting at a table or bar and picked up by a male (trafficker or customer).
- Individuals asking staff or patrons for food or money.
- Individuals taking cash or receipts left on tables.

*Each indicator alone may not necessarily mean a person is being trafficked.*

**WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING**

- Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.
- Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.
- Follow your corporate protocol, such as by notifying management and security.
- Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.
- To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign

**SECOND AMENDED COMPLAINT**