Tiffany R. Ellis (*Pro hac vice*)
**WEITZ & LUXENBERG, P.C.**
3100 W. Grand Blvd.
24th Floor
Detroit, MI 48202
(313) 315-3151
tellis@weitzlux.com

Melinda Davis Nokes, (SBN 167787)
**WEITZ & LUXENBERG, P.C.**
1880 Century Park East, Suite 700
Los Angeles, CA 90067
Telephone: (949) 338-4303
Facsimile: (310) 786-9927
mnokes@weitzlux.com

Jennie Lee Anderson (SBN 203586)
Lori E. Andrus (SBN 205816)
**ANDRUS ANDERSON LLP**
155 Montgomery Street, Suite 900
San Francisco, CA 94104
Telephone: (415) 986-1400
Facsimile:  (415) 986-1474
jennie@andrusanderson.com
lori@andrusanderson.com

*Attorneys for Plaintiff*
J.C. proceeding under pseudonym

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.C., an individual, | ) Case No.:3:20-cv-00155-WHO |
| | ) |
| Plaintiff, | ) |
| vs. | ) **THIRD AMENDED COMPLAINT FOR** |
| | ) **DAMAGES:** |
| Choice Hotels International, Inc.; Hilton | ) |
| Worldwide Holdings, Inc.; Marriott | )    1.  **18 U.S.C. §1595** |
| International, Inc.; | )    2.  **CAL. CIV. CODE §52.5** |
| | ) |
| Defendants. | ) |
| | ) |
| | ) **DEMAND FOR JURY TRIAL** |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

**COMPLAINT**

COMES NOW Plaintiff J.C., by and through the undersigned counsel, and respectfully submits her third amended complaint for damages and makes the following averments.

**INTRODUCTION**

1.     For years, commercial sex trafficking ventures have brazenly operated in and out of Defendants' branded hotel properties throughout this country while Defendants continue earning substantial profits at the expense of human life, human rights, and human dignity.

2.     Choice Hotels International, Inc. (hereinafter "Choice"), Hilton Worldwide Holdings, Inc., (hereinafter "Hilton"), and Marriott International, Inc. (hereinafter "Marriott") (collectively "Defendants"), knew and have known for more than a decade that sex trafficking repeatedly occurs under their brand flags.

3.     Rather than taking timely and effective measures to thwart this growing epidemic, Defendants have instead chosen to ignore the open and obvious signs and presence of commercial sex trafficking in their brand hotels, benefitting from the profit created by rooms rented for this explicit and apparent purpose.

4.     This action for damages is brought by Plaintiff, a survivor of sex trafficking, hereinafter identified by her initials J.C., under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA").

5.     J.C. first became familiar with her trafficker because she would often see him at a gas station near her school in Sacramento, CA.  He was friendly, would flirt with her, and sometimes give her gifts. One day in 2008, he kidnapped J.C. under the guise of going for a friendly drive.  As he drove her to San Francisco, he told her, "You're going to make me a lot of money."  For the next 11 years, J.C. was required to sexually service paying strangers while enduring brutal physical assaults, psychological torment, verbal abuse, and false imprisonment at Defendants' hotels.

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

6.     Plaintiff now brings this action for damages against Defendants.  Each Defendant, in violation of 18 U.S.C. § 1595, knowingly benefited from participation in a venture that it knew, or at the very least should have known, to be engaging in sex trafficking in violation of 18 U.S.C. § 1591(a).

7.     J.C. was forced against her will, physically tortured and sexually exploited under such duress at hotels in Santa Cruz and Fremont, California and Alexandria, Virginia, including the Comfort Inn, Marriott, Embassy Suites by Hilton, DoubleTree by Hilton, and the Hilton Sacramento Arden West.

8.     As a direct and proximate result of Defendants' consistent refusals to identify and prevent commercial sex trafficking in their brand hotel properties, J.C. was trafficked, sexually exploited, and repeatedly victimized at the Comfort Inn, Marriott, Embassy Suites by Hilton, DoubleTree by Hilton, and the Hilton Sacramento Arden West .

9.     Plaintiff brings this action pursuant to the TVPRA, 18 U.S.C. § 1595, against the Defendants who enabled, harbored, held, facilitated, and financially benefited from a sex trafficking venture in which J.C. was trafficked for the purpose of commercial sex, sexually exploited, and brutally victimized in violation of 18 U.S.C. § 1591 (a).

## PARTIES

10.    Plaintiff, having moved to proceed anonymously,[1] and, herein, identified by her initials J.C., was sold for sex throughout California and Virginia for eleven (11) years. Plaintiff is a victim of trafficking pursuant to 22 U.S.C. § 7102(15) and 18 U.S.C. § 1950, and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C § 7102(14).  Plaintiff currently resides in Idaho.

11.    Defendant Choice is a Delaware corporation with its principal place of business in Rockville, Maryland.  Choice is a hospitality company that, at the time of the incidents alleged herein, directly

---

[1] Contemporaneously with the Complaint, ECF No. 1, Plaintiff J.C. filed, pursuant to a Motion to Permit Plaintiff to Proceed Anonymously, ECF No. 2, as J.C. based upon the nature of the allegations in the instant Complaint, which are of an inherently intimate and personal nature.  The Motion is pending. Undersigned Counsel will provide her identity to Counsel for the Defendants upon proper entry of a Protective Order. Plaintiff will also seek an additional protective order prohibiting disclosure of Plaintiff's identity or whereabouts to her traffickers or any of their likely associates and other measures that will help ensure her safety throughout this litigation.

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

and through its agents, affiliates, and subsidiaries, offered public lodging services at the Comfort Inn located at 110 Plymouth Street, in Santa Cruz, California under its Comfort Inn® brand:

    a.  Comfort Inn is a Choice brand hotel.

    b.  As a hotel operator brand, Choice controls the training, procedures and policies for its brand hotels, including the Comfort Inn® hotel where J.C. was trafficked.

    c.  Choice maintains that it considers guest safety and security important, and requires the hotels in its portfolio to comply with Choice brand standards and all local, state, and federal laws.[2]

    d.  Through its franchise agreement and relationship with the Comfort Inn hotel where J.C. was trafficked, Choice knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known to engage in sex trafficking through the room rentals J.C. was victimized in.

    e.  Choice receives a percentage of the gross room revenue from the money generated by the operations of all Comfort Inn hotels, including a percentage of the rate charged on the rate charged for the rooms in which J.C. was trafficked.

    f.  Choice owns, supervises, and/or operates the Comfort Inn located at 110 Plymouth Street, in Santa Cruz, California under its Comfort Inn® brand.

    g.  Choice is subject to the jurisdiction of this Court because it regularly transacts business in California, operates dozens of hotels in California including the Comfort Inn® contracts to supply services in California, caused indivisible injuries to Plaintiff in California, and knowingly profited from an illegal sex trafficking venture at the Comfort Inn Santa Cruz located at 110 Plymouth Street, in Santa Cruz, California.

12.   Defendant Hilton is a Delaware corporation with its principal place of business located in McClean, Virginia.  Hilton is a hospitality company that, at the time of the incidents alleged herein,

---

[2] https://www.choicehotels.com/about/responsibility/human-rights-policy.

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

directly and through its agents, affiliates, and subsidiaries, offered public lodging services at their Hilton Sacramento Arden West located at 2200 Harvard St, Sacramento, California under its Hilton brand, at their Embassy Suites by Hilton Alexandria Old Town located at 1900 Diagonal Road, in Alexandria, Virginia under its Embassy Suites by Hilton brand and offered public lodging services at the DoubleTree located at 2001 Point W Way, Sacramento, California under its DoubleTree by Hilton brand

a.  Embassy Suites, DoubleTree and Hilton Sacramento Arden West are all Hilton brand hotels.

b.  As a hotel operator brand, Hilton controls the training, procedures and policies for its brand hotels including the hotels where J.C. was trafficked.

c.  Hilton maintains that it considers guest safety and security important, and requires the brand hotels in its portfolio to comply with Hilton brand standards and all local, state, and federal laws.[3]

d.  Through its relationship with the hotels where J.C. was trafficked at, Hilton knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known to engage in sex trafficking through the room rentals J.C. was victimized in.

e.  Hilton receives a percentage of the gross room revenue from the money generated by the operations of their brand hotels, including a percentage of the rate charged for the rooms in which Plaintiff was trafficked.

f.  Hilton owns, supervises, and/or operates the Embassy Suites by Hilton Alexandria Old Town located at 1900 Diagonal Road, in Alexandria, Virginia.

g.  Hilton owns, supervises, and/or operates the DoubleTree by Hilton located at 2001 Point W Way, Sacramento, CA 95815.

---

[3]   https://ir.hilton.com/~/media/Files/H/Hilton-Worldwide-IR-V3/committee-composition/slavery-and-trafficking-statement-2018.pdf.

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

h. Hilton owns, supervised and/or operates the Hilton Sacramento Arden West located at 2200 Harvard St. Sacramento, CA 95815.

i. Hilton is subject to the jurisdiction of this Court because it regularly transacts business in California, operates dozens of hotels in California including Embassy Suites, DoubleTree and Hilton Hotels and contracts to supply services in California, caused indivisible injuries to Plaintiff in a common course of conduct arising in California.

13.     Defendant Marriott International, Inc. is a Delaware corporation with its principal place of business located in Bethesda, Maryland.  Marriott is a hospitality company that, at the time of the incidents alleged herein, directly and through its agents, affiliates, and subsidiaries, offered public lodging services at the Fremont Marriott Silicon Valley located at 46100 Landing Parkway in Fremont, California under its Marriott brand:

a. Marriott is a Marriott brand hotel.

b. As a hotel operator brand, Marriott controls the training, procedures and policies for its hotels including the Marriott hotel where J.C. was trafficked.

c. Marriott maintains that it considers guest safety and security important, and requires the hotels in its portfolio to comply with Marriott brand standards and all local, state, and federal laws.[4]

d. Through its relationship with the Marriott hotel where J.C. was trafficked at, Marriott knowingly benefited or received something of value from its harboring, facilitation of, or participation in a venture which it knew or should have known to engage in sex trafficking through the room rentals J.C. was victimized in.

---

[4]  Marriott International Inc., Human Rights Policy Statement (July 2017) available at https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsStatement.pdf (last visited Nov. 20, 2019).

**6**

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

e. Marriott receives a percentage of the gross room revenue from the money generated by the operations of all Marriott hotels, including a percentage of the rate charged for the rooms in which Plaintiff was trafficked.

f. Marriott owns, supervises, and/or operates the Fremont Marriott Silicon Valley located at 46100 Landing Parkway in Fremont, California under its Marriott brand.

g. Marriott is subject to the jurisdiction of this Court because it regularly transacts business in California, operates dozens of hotels in California including the Fremont Marriott Silicon Valley, contracts to supply services in California, caused indivisible injuries to Plaintiff in California, and knowingly profited from an illegal sex trafficking venture at the Fremont Marriott Silicon Valley located at 46100 Landing Parkway in Fremont, California under its Marriott brand.

14.   Whenever reference is made in this Complaint to any act, deed or conduct of the Defendants, the allegation is that the Defendants engaged in the act(s), deed(s), or conduct by or through one or more of their officers, directors, agents, employees, and/or representatives who was/were actively engaged in the management, direction, control, and/or transaction of the ordinary business and affairs of the Defendants.

## JURISDICTION AND VENUE

15.    This Honorable Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States.

16.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendants' misconduct and omissions, occurred in the judicial district where this action is brought.

## SEX TRAFFICKING UNDER FEDERAL LAW

17.    Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes

of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion." This definition combines the three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

18.     To best understand the mechanism by which sex trafficking ventures are prohibited by federal criminal law, it's best to address these elements in the reverse.  Sex trafficking is slavery for the *purpose* of commercial sex, a lens on the already existing crimes prohibited by 18 U.S.C. § 1589 and § 1590.  The crime of slavery can then be divided into the two (2) elements remaining: the act and the means.  The *act* is the "harboring, transporting, providing, or obtaining," of forced labor, codified as a violation of 18 U.S.C. § 1590, while the *means* is labor "obtained or provided by force, fraud or coercion" and is codified as a violation of 18 U.S.C. §1589.

19.     Thus, while the complete definition of 'sex trafficking' is found in the TVPRA under 22 U.S.C. § 7102, and it is specifically prohibited under 18 U.S.C. § 1591, it is nevertheless a long-recognized and familiar atrocity.

20.     Pursuant to 18 U.S.C. § 1591(a), all who knowingly provide *or* obtain commercial sex that was provided or obtained through force, fraud, and coercion are guilty of sex trafficking.  This includes, at a minimum, __**both**__ the 'traffickers' who recruit, harbor, transport, and provide individuals for forced commercial sex work ***and*** the 'Johns' or 'buyers' who obtain, solicit, or patronize forced commercial sex work.[5]

21.     The TVPRA is a remedial statute and should be liberally construed. It is a cardinal principle of statutory construction that a statute should, on the whole, be construed so that no clause, sentence, or word shall be considered superfluous, void, or insignificant.

22.     The requirements for direct (or indirect liability) under § 1595(a) based on a beneficiary theory has been stated as follows: (1) the entity must knowingly benefit, financially or by receiving

---

[5] While the 'pimps' or 'providers' are often referred to as the 'traffickers' and the purchasers are referenced as the 'Johns', 'tricks', or 'buyers' [and such nomenclature is used herein], under federal law ***both*** categories are 'traffickers'.

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

anything of value; (2) from participation in a venture; and (3) that the entity knew or should have known engaged in sex trafficking.

23.     Receipt of a percentage of the room rentals from the rooms J.C. was victimized in is sufficient for establishing a knowing financial benefit as well as licensing and other fees paid from room rentals under § 1595(a).

24.     Actual knowledge or a common business purpose is not necessary to establish "participation" under § 1595(a); to do so would render the "should have known" language in Section 1595 completely meaningless.

25.     Plaintiff need not prove an underlying criminal offense under Section 1591 in order to establish liability under the TVPRA.

26.     An overt acts in furtherance of the venture is not necessary to establish "participation" under § 1595(a).

27.     Under the TVPRA, in the absence of a direct association with a sex trafficking venture, it is sufficient to show a continuous business relationship between a trafficker and local hotels through the rental of rooms so that it would appear that the trafficker and the hotels have established a pattern of conduct or could have been said to have or have had a tacit agreement.

28.     Constructive knowledge akin to a negligence standard is sufficient for establishing what Defendants "should have known" under § 1595(a)

29.     Being on notice of the prevalence of commercial sex trafficking generally and at hotels under Defendants' brands are sufficient constructive notice.

## **FACTUAL ALLEGATIONS**

### A.  THE SEX TRAFFICKING OF J.C.

30.     The facts alleged herein stem from a human trafficking for commercial sex and prostitution ring operated in California.  While victimized by her traffickers J.C. was subject to repeated instances

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

of rape, physical abuse, verbal abuse, exploitation, psychological torment, kidnapping, and false imprisonment at Defendants' brand hotels from 2008 through 2019.

31.     In 2008, J.C. stopped at a gas station near her school in Sacramento, CA, and saw her trafficker who was there often. One day he offered to take her on a drive to speak with him.  She agreed, leaving her car at the gas station and going with him.  They drove around the area, and then J.C. noticed him turn onto the freeway.  He drove her to San Francisco and told her, "You're going to make me a lot of money."

32.     Her trafficker picked up another girl, then drove around to network at hotels with other sex traffickers.  He then took them both to the Comfort Suites in Santa Cruz where another girl helped her get dressed and "ready" for customers.  The girl did her hair, makeup, fixed her clothes and went over expectations for how to conduct a sex exchange.

33.     J.C was made to walk outside the Comfort Inn in Santa Cruz and instruct potential customers to meet her at the Comfort Inn where she was kept.  She would service multiple clients in a day.  Some days she was given a quota to meet, depending on traffic and her trafficker's mood.  J.C.'s trafficker would come to the hotel to take all of the money J.C. and other victims had been paid.

34.     Her trafficker raped her frequently and forcibly, causing her to become pregnant twice by him.  J.C. was forced by her trafficker to terminate both pregnancies, one after the second trimester.

35.     J.C.'s trafficker took her identification from her when he first kidnapped her and threatened her family if she ran.  Her trafficker would allow her to visit her parents on rare occasions but only for an hour.  He would sit in the car outside her family home and wait for her, telling her that if she didn't come out in time, he'd come in.

36.     J.C. was able to escape her trafficker in August of 2010, by running out of the hotel room with just a basic bag of her belongings and hiding in bushes behind the hotel they were staying in.  She watched him come out of the hotel and look for her, then drive off to find her.  When he pulled away,

1

2

she ran back into the hotel and asked the front desk to use their phone to contact her parents.  They let her hide in their unoccupied breakfast room until her parents showed up.

3

4

5

6

7

37.     Her trafficker later found her again and manipulated her into moving to Las Vegas, NV.  By this time J.C. had a child.  While she originally planned to move to Vegas with her child and two friends to get a stable job, her trafficker soon began controlling her again. He would force her to work when he wanted her to and fly her places, leaving her son in the care of her friends.

8

9

10

11

38.     On one occasion her trafficker forced J.C. to get on a plane to go on a call against her will and without her son.  While she was gone, her trafficker took J.C.'s child from the care of her friends and had the baby at his home where the child died.  Doctors said the child drowned in the home pool and was pronounced brain dead at eight months old.  Her trafficker is currently in prison.

12

13

14

15

16

39.     Between 2008 and early 2019, J.C.'s traffickers routinely harbored her at hotels throughout California, including the Comfort Inn® in Santa Cruz, Embassy Suites® by Hilton in Alexandria Virginia, DoubleTree by Hilton in Sacramento California, Hilton Arden West in Sacramento California, and the Fremont Marriott in Fremont California.  J.C. would sometimes be held in the rooms for weeks at a time servicing a constant stream of incoming buyers.

17

18

19

20

21

22

40.     J.C. stayed at these hotels over extended periods of time, her trafficker always renting the room for a number of weeks, paying in smaller increments, and requesting an inordinate amount of towels.  For weeks J.C. was held up in the room, unable to leave and visibly deteriorating.  Then her trafficker would up and leave and the same would happen at another of the hotels. J.C's trafficker returned to each of these hotels numerous times.

23

24

25

26

27

41.     J.C.'s trafficker would harbor her and other victims at the Comfort Inn in Santa Cruz, CA for up to two weeks at a time.  On one occasion at the hotel J.C. was attacked by another victim and suffered a bloody lip.  J.C. went to hotel security staff for help, but the police were never called. While J.C. was housed at the Comfort Inn, a steady stream of men, who were not registered hotel guests, would enter and leave her room through the hotel.

28

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

42.     J.C.'s trafficker would also force her into sexual exchanges at the Freemont Marriott. J.C. and other victims were housed at this hotel frequently for 3-4 days a week every two weeks.   On at least one occasion, there were altercations between victims in public areas of the hotel that should have alerted hotel staff to the nature of their activity.  While at the Freemont Marriott traffickers, who were not registered guests at the hotel, would regularly enter and leave the hotel.

43.     J.C. was also housed by her trafficker at the Embassy Suites by Hilton in Alexandria, VA. She would perform commercial sex acts there 3-6 days per week over an 8 month period. Men who came to the hotel for the purpose of purchasing sex and who were not registered guests of the hotel would regularly enter and leave the hotel. J.C. and her trafficker were asked to leave the hotel on multiple occasions because of the traffic into the rooms, but police were apparently never called.

44.     Prior to, during, and following the incidents described herein, Defendants had actual and/or constructive notice of drug dealing, prostitution, and/or general safety concerns at their hotels, including, but not limited to, video surveillance of their hotels, as well as oral or written complaints regarding said suspicious activity.  Defendants failed to take any actions to curtail these activities.

45.     Had Defendants been paying attention to the activities being conducted at their hotels and on their properties, and the apparent red flags outlined above, it would have been impossible for them not to notice the victimization of J.C.

**B.  DEFENDANTS' KNOWLEDGE OF THE ROLE OF THEIR BRANDS IN THE SEX TRAFFICKING INDUSTRY**

46.     Human trafficking is the world's fastest growing crime.[6]  While the term "human trafficking" incorporates all forced labor, the sex trafficking industry alone pulls in an estimated $99 billion each year making it the second largest illicit crime industry behind only the sale of ***all*** illegal drugs.[7]

47.     Sex traffickers, or "pimps", use threats, violence, manipulation, lies, debt bondage, and other

---

[6] *Human Trafficking is the World's Fastest Growing Crime*, THE ADVISORY BOARD (May 22, 2017, 9:30 AM), https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking.
[7] *Profits and Poverty: The Economics of Forced Labor*, INTERNATIONAL LABOR ORGANIZATION (May 24, 2014), http://www.ilo.org/global/publications/ilo-bookstore/order-online/books/WCMS_243391/lang--en/index.htm.

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

forms of coercion to compel adults and children to engage in commercial sex acts against their will.

48.     The hospitality industry plays a crucial role in the sex trade.[8]  The trope of the "no-tell motel" is certainly not a new one.  Hotels have long profited from their reputations as havens of privacy and discretion for the offending.  Hotels offer anonymity and non-traceability, making them ideal venues for crime and sex trafficking in particular.

49.     Defendants are active and prominent members of the hotel industry and are, in fact, leaders within it. Consequently, Defendants played and play a crucial role in the sex trafficking industry.[9]

50.     In 2010, the United States government released its Trafficking in Persons Report, which included an assessment of trafficking in the United States. The 2010 Trafficking in Persons Report stated that approximately 12.3 million adults and children were in forced labor, bonded labor, and force prostitution around the world, but that only 4,166 trafficking prosecutions were successful in 2009.[10]

51.     During a speech in New York City in September 2012, President Obama stated that human trafficking "ought to concern every person, because it is a debasement of our common humanity. It ought to concern every community, because it tears at our social fabric. It ought to concern every business, because it distorts markets. It ought to concern every nation, because it endangers public health and fuels violence and organized crime."[11]

52.     Statistics released in 2014 by the International Labor Organization ("ILO") showed that approximately 4.5 million people were victims of forced sexual exploitation globally and that the violation of their human rights yielded an estimated annual profit of $99 billion dollars for sex

---

[8] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[9] *Id.*
[10] CNN Wire Staff, *U.S. human trafficking report includes U.S. cases for first time*, CNN.com (Jun. 14, 2010), available at https://www.cnn.com/2010/US/06/14/human.trafficking/index.html#.
[11] President Barack Obama, Remarks to the Clinton Global Initiative (Sept. 25, 2012), *available at* https://obamawhitehouse.archives.gov/the-press-office/2012/09/25/remarks-president-clinton-globalinitiative.

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

traffickers worldwide.[12] Put another way, the numbers showed that a sex trafficker's annual profit per victim was approximately $22,000.00.[13]

53.    A scholarly article published in 2015 estimated that pimps could earn $25,000.00 to $33,000.00 per week selling in the Atlanta, Georgia area.[14] This volume of and profit from sex trafficking also aligned with internet advertising for the sex trafficking industry occurring in roughly the same time period. For example, in 2015, one advertisement in the Atlanta section of the www.backpage.com website triggered 181 clients, and calls or texts from twenty-seven (27) men expressing interest – in a span of just ninety (90) minutes.[15]

54.    In December 2015, President Obama appointed eleven (11) survivors of human trafficking to the inaugural United States Advisory Council on Human Trafficking to advise and make recommendations on federal anti-trafficking policies to the President's Interagency Task Force to Monitor and Combat Trafficking in Persons.[16]

55.    The United States Department of Justice ("DOJ") brought 248 sex trafficking prosecutions in Fiscal Year 2015 and secured convictions against 291 sex traffickers.[17] In the previous year, DOJ convicted a total of 184 human traffickers (inclusive of labor trafficking) and in the subsequent year, DOJ convicted a total of 439 human traffickers (inclusive of labor trafficking).[18]

56.    Despite efforts of governmental and non-governmental organizations to combat human trafficking, the hospitality industry as a whole, including Defendants, continued to lag behind in its

---

[12] International Labour Office, *Profits and Poverty: The Economics of Forced Labour* (2014), at 13, *available at* https://www.ilo.org/wcmsp5/groups/public/---ed_norm/---declaration/documents/publication/wcms_243391.pdf.

[13] *Id.* at 15.

[14] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 4 (2015).

[15] *Id.* at 15.

[16] U.S. Dep't of State, *2016 Trafficking in Persons Report* (2016), at 41, *available at* https://www.state.gov/documents/organization/258876.pdf.

[17] *Id.* at 389.

[18] Human Rights First, *Fact Sheet 2017* (2017), *available at* http://www.humanrightsfirst.org/sites/default/files/TraffickingbytheNumbers.pdf.

efforts to prevent human trafficking. A 2015 study showed that forty-five percent (45%) of children who suffered sexual exploitation report that the sexual exploitation took place in a hotel.[19]

57.    Even estimates by attorneys *for the* hospitality industry indicate that eight (8) out of ten (10) arrests for human trafficking occur in or around hotels.[20]  The 2016 Trafficking in Persons Report issued by the United States Department of State also confirmed that human trafficking occurs in the hospitality industry in the United States.[21]

58.    While specific to each Defendant, the problem is industry wide.  In the United States, as much as 63% of all trafficking incidents happen in hotels ranging from luxury to economy.[22]  Due to the overall complacency of the hospitality industry on addressing the issue, hotels are *the* venue of choice for sex trafficking.[23]

59.    Traffickers use hotels as the hub of their operations. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex.  This is referred to as an "in call."

60.    Hotels are also the venue of choice for buyers seeking a so-called "out call," wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction.  Unsurprisingly, those on the demand side of this transaction (*i.e.* those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels.

61.    Traffickers and buyers capitalize on the hotel industry's general refusal to adopt and enforce

---

[19] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT*,* 15(15), 3-10 (2015).
[20] Rich Keating, *Human Trafficking: What It Is And How It Impacts The Hospitality Industry*, Presentation
Delivered At AHIA Sprint Conference 2013, Washington, D.C., *available at*
http://www.ahiattorneys.org/aws/AHIA/asset_manager/get_file/92983 (last visited Mar. 1, 2019).
[21] U.S. Dep't of State, *supra* n.31, at 387.
[22] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).
[23] *Hotels Initiative*, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited June 19, 2019).

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

companywide anti-trafficking policies from the corporate to the property level, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for those at the point of sale.

62.     Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation.  Thus, the hospitality industry has the greatest reach to prevent, identify and thwart sexual exploitation where it is most likely to occur.

63.     But aside from their unique position in this epidemic, hotels and motels have the highest obligation to protect their guests from dangers that were known, or should have been known, including sex trafficking and sexual exploitation, and should be held accountable when they fail to comply.  As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."[24]

64.     Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal obligation for the hospitality industry.  The presence of sex trafficking and sexual exploitation in a hotel is frequently an obvious occurrence and, although unutilized, underutilized, or ineffectively utilized, numerous well-researched trainings and toolkits have been published to the hotel industry over the last decade to help hotel staff in every position to identify the signs.[25]

65.     From check-in to check-out there are a number of indicators that traffickers and their victims exhibit during their stay at a hotel.  With proper training and the implementation of reasonable security measures, hospitality companies could prevent regular sex trafficking under their flag.

66.     Obvious signs of sex trafficking at a hotel, including Defendants' brand hotels, including the franchise locations at issue in this case, may include: an excess of condoms in rooms, individuals carrying or flashing large amounts of cash, excessive amounts of cash stored in the room, renting two

---

[24] *Supra* at note 12.
[25] DEPARTMENT OF HOMELAND SECURITY, *Blue Campaign Toolkit*, attached as "Exhibit A." Available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

(2) rooms next door to each other, declining room service for several consecutive days, significant foot traffic in and out of room(s), men traveling with multiple women who appear unrelated, women known to be staying in rooms without leaving, women displaying physical injuries or signs of fear and anxiety, guests checking in with little or no luggage, hotel guests who prevent another individual from speaking for themselves, or a guest controlling another's identification documents.[26]

67.     According to Defendant Marriott's *own policies* the following are "examples of the visible and hidden warning signs that Marriott shares with its hotel staff:

     a.  Minimal luggage and clothing

     b.  Multiple men seen being escorted one at a time to a guest room

     c.  Individuals who can't speak freely or seem disoriented

     d.  Guests who insist on little or no housekeeping."[27]

68.     Obviously, hotel staff who have undergone training are more aware of sex trafficking when it happens and are more willing to report it than hotel staff who have not been trained.[28] Thus, hospitality companies are obligated to adopt policies and procedures related to sex trafficking and to enforce these policies and procedures as brand standard through to the property level.

69.     Hospitality companies can and should mandate that **all** staff working at **all** hotels across their brand complete sex trafficking training.[29]

70.     Between 2007 and March 2015, more than 1,400 human trafficking cases have been reported to the National Trafficking Resource Center.[30]

---

[26] *Id. See also*, Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf;)
[27] "Marriott International Has Trained 500,000 Hotel Workers to Recognize the Signs of Human Trafficking," (2019) https://news.marriott.com/news/2019/01/18/marriott-international-has-trained-500-000-hotel-workers-to-recognize-the-signs-of-human-trafficking (last accessed July 2, 2020).
[28] *Supra* at note 12.
[29] *Supra* at note 30.
[30] Polaris, *Human Trafficking and the Hotel Industry* (2015), *available at* https://polarisproject.org/resources/human-trafficking-and-hotel-industry.

71.   "75% of survivors responding to Polaris's survey reported coming into contact with hotels at some point during their exploitation…Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff."[31]

72.   Upon information and belief, reports by the Polaris Project were received and reviewed by the executives, directors, and managers of Defendants Marriott, Choice, and Hilton between 2008 and 2019.

73.   Upon information and belief, other publicly available information regarding trafficking in hotels was received and reviewed by Defendant Marriott between 2008 and 2019.

74.   Upon information and belief, other publicly available information regarding trafficking in hotels was received and reviewed by Defendant Choice between 2008 and 2019.

75.   Upon information and belief, other publicly available information regarding trafficking in hotels was received and reviewed by Defendant Hilton between 2008 and 2019.Defendants have been cognizant of their role and responsibilities in the sex trafficking industry for years.

76.   Upon information and belief, between at least 2008 to 2019, Defendant Marriott participated in meetings through its trade organizations in which sex trafficking in its hotels was discussed.

77.   Upon information and belief, between at least 2008 to 2019, Defendant Choice participated in meetings through its trade organizations in which sex trafficking in its hotels was discussed.

78.   Upon information and belief, between at least 2008 to 2019, Defendant Hilton participated in meetings through its trade organizations in which sex trafficking in its hotels was discussed.

79.   Upon information and belief, Defendants were aware that hotels in areas surrounding large events such as the NFL Superbowl, as theirs were in 2016, are particularly prone to commercial sex trafficking activity.[32]

---

[31] *Recommendations for Hotels and Motels*, THE POLARIS PROJECT, https://polarisproject.org/hotels-motels-recommendations (last visited June 19, 2019).

[32] *See e.g.* https://psmag.com/news/forced-labor-human-trafficking-and-bay-area-football-sports-the-2016-super-bowl-90143; https://www.reuters.com/article/us-football-nfl-superbowl-trafficking-an-idUSKBN1FL6A1.

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

80.     Among the numerous industry associations of which Marriott is a member, Marriott belongs to the International Tourism Partnership[33] which states "[h]uman rights is an issue that affects all industries but human trafficking and fair labour standards are of particular concern to the hotel sector." [34]

81.     Defendant Marriott is, in fact, a leader in this organization, among others. For example, Marriott is featured on the International Tourism Partnership website for the following statement:[35]



"Marriott International recognizes its unique opportunity in the travel and tourism industry to advance human rights. We have a created a robust human rights awareness program, which includes required trafficking awareness training, innovative solutions-based programming, and partnerships with expert nonprofits to educate, advocate for, and respect human rights. We are proud to partner with the International Tourism Partnership and work with our industry peers to take real action on human rights risks and drive meaningful positive change in the hotel industry"
Tu Rinsche, Director, Social Impact & Global Responsibility, Marriott International

82.     Further, nationwide campaigns recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue, and took initiative as early as 1997 with the United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[36]   These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and Defendants. Both campaigns released online resources and toolkits publicly accessible to any entity concerned with human trafficking.[37]

83.     Upon information and belief, Defendants Choice, Hilton, and Marriott were aware of these campaigns.

---

[33] https://www.tourismpartnership.org/about-us/ (last accessed July 1, 2020).
[34] https://www.tourismpartnership.org/human-rights/ (last accessed July 1, 2020).
[35] *Id.*
[36] *DHS Blue Campaign Five Year Milestone*, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.
[37] *Human Trafficking and the Hospitality Industry*, DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited June 19, 2019).

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

84.     Hospitality companies have both the power and responsibility to make sex trafficking difficult for the offenders. Yet, they either repeatedly fail to heed the call or repeatedly failed to execute their own policies.  Instead, each continues to facilitate these crimes at their hotels, content to direct their efforts solely to profit and the bottom line.

## C. DEFENDANTS' KNOWLEDGE OF SEX TRAFFICKING AT THEIR PROPERTIES

### a. For years, Marriott has been aware of sex trafficking at hotels under its brand.

85.     Upon information and belief, between at least 2006 and 2016, Defendant Marriott held meetings among its executives, directors, and managers at which sex trafficking in its hotels was discussed.

86.     Upon information and belief, at those meetings Marriott employees discussed, developed, and implemented uniform policies and procedures to identify, prevent and mitigate the risk of human trafficking occurring at Marriott properties, including the Fremont Marriott Silicon Valley.

87.     Marriott claims it amended its Human Rights Policy as early as 2006 to reflect growing concerns regarding human trafficking and reviews the policy annually. To date the policy merely states  "Marriott supports the elimination of all forms of forced, bonded or compulsory labor and provides associate training on human trafficking awareness and prevention." [38]

88.     In 2012, an anti-trafficking coalition alerted Defendants Marriott of the likelihood of sex trafficking during the London Olympics, and inquired about the company's anti-trafficking policies, while urging immediate action regarding trafficking.[39]

89.     Marriott claims it has supported the anti-trafficking group Polaris since 2010 and, in a

---

[38] Our Commitment to Human Rights, MARRIOTT INTERNATIONAL INC. available at https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsCommitment.pdf (last visited Nov. 20, 2019) citing Marriott International, Inc.'s Human Rights Policy Statement available at https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsStatement.pdf (last visited Nov. 20, 2019).

[39] *Corporate Strategy to Address Human Trafficking: Investor Recommendations for London Olympic Sponsors and Hospitality Companies, Christian Brothers Investment Services*, CBIS, http://cbisonline.com/us/wp-content/uploads/sites/2/2012/09/FINAL_OlympicsReport_9_28.pdf (last visited June 19, 2019).

partnership with ECPAT (End Child Prostitution, Pornography and Trafficking of Children for Sexual Purposes), developed a training module in 2010 or 2011 for hotel management and staff.[40]

90.   Yet, for years, including the years between 2006 and 2016 when Plaintiff was sold for commercial sex at Marriott properties, Defendant Marriott has failed to address the rampant culture of sex trafficking which tragically occurs throughout its hotels across the country. This entrenched apathy to the real risk of sex trafficking and pervasive willful blindness to the role Marriott and other brand hotels play in sex trafficking facilitated the sex trafficking of Plaintiff J.C. that forms the basis of this complaint.

    a. In February 2009, five women were arrested at the Boston Marriot Long Wharf hotel in connection with a massive child prostitution sting operation.[41]

    b. In 2015, a Wichita woman was charged with sex trafficking of a 17-year old girl at a Springfield Suites by Marriott hotel.[42]

    c. In October 2013, a couple from Michigan were arrested and charged with sex trafficking when they brought two underage girls from Michigan to the Marriott Hotel in Kendall Square in Cambridge, Massachusetts.  The girls were forced to work at prostitutes.[43]

    d. In June 2018, police arrested a couple for sex trafficking at a Marriott hotel in Hartford, Connecticut.  The victim had called 911 from the hotel and explained that she was being held against her will and her captors intended to force her to serve as a prostitute.[44]

    e. In 2017, The JW Marriott hotel in Houston was ranked as the hotel in Houston with the

---

[40] *Human Rights Policy*, MARRIOTT, https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited June 6, 2019); *See also* "ECPAT-USA and Marriott International Announce New Partnership to Protect Children from Trafficking," https://www.ecpatusa.org/blog/2018/1/29/ecpat-usa-and-marriott-international-announce-new-partnership (last accessed July 2, 2020).

[41] http://archive.boston.com/news/local/massachusetts/articles/2009/02/21/5_arrested_in_us_sting_at_marriott/

[42] https://www.justice.gov/usao-ks/pr/wichita-woman-charged-sex-trafficking-17-year-old-girl

[43] http://www.cambridgeday.com/2013/10/29/two-from-michigan-face-charges-as-pimps-for-girls-brought-to-two-cambridge-hotels/.

[44] https://www.courant.com/news/connecticut/hc-windsor-jerome-edison-human-trafficking-guilty-0430-20190429-fjxzbwybvnbkdfngxneaheb7wq-story.html.

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

second-highest arrest rate for prostitution, with 83 arrests.[45]

f.  In January 2014, ahead of the Super Bowl, police arrested three high-end prostitutes at a Brooklyn Marriott hotel. The prostitutes were part of an internet ring that solicited prostitutes for up to $1,000 per hour.[46]

a.  In December 1996, a member of the Philadelphia Eagles football organization allegedly raped a woman at a Westin by Marriott near the San Francisco Airport. A conflicting claim stated that the woman was a prostitute and she filed the charges over a price dispute.[47]

b.  In April 2006, a California defense contractor was alleged to have arranged for Congressman Randy "Duke" Cunningham to receive services from prostitutes at The Westin Grand, a Marriott hotel, in Washington, D.C.[48]

c.  In February 2010, the police arrested a 27-year-old woman from California for prostitution at the Westin Copley Place in Boston.[49]

d.  In December of 2018, a man was arrested after following a woman into the Marriott Westin Hotel elevator in downtown Seattle. He followed the victim into the elevator and got off the 14th floor, the victim sensed something was wrong and didn't go into her room immediately. He proceeded to follow and attacked her, struggling to take her pants off in the hallway, a hotel guest was able to free her from the suspect and call

---

[45] https://www.chron.com/news/houston-texas/houston/article/Houston-s-most-popular-hotels-for-prostitution-11744958.php.

[46] https://www.nbcnewyork.com/news/local/sex-trafficking-super-bowl-arrests-brooklyn-marriot-sources/785750/.

[47] FOOTBALL TEAM EMPLOYEE ACCUSED OF SEX ASSAULT, San Francisco Chronicle, 1997 WLNR 3715896 (January 1, 1997).

[48] Feds probe prostitution link in pol's bribery case, The Washington Post, 2006 WLNR 7469139 (April 29, 2006).

[49] Hub cops follow prostitution trail via Craigslist ad, Boston Herald, 2010 WLNR 2915914 (February 11, 2010); Notably, victims of commercial sex trafficking are often misidentified by law enforcement as prostitutes.

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

police. [50]

e. In July of 2015, a Texas couple were arrested for forcing a woman into prostitution at locations across the Midwest, including the Marriott Westin Hotel in downtown St. Louis. They were charged with one count of trafficking for the purpose of sexual exploitation and promoting prostitution.[51]

f. In April of 2009, a Boston University medical student, was arrested in Walpole and charged with the murder of Julissa Brisman as well as an April 10 armed robbery and kidnapping at the Marriott Westin® Hotel in Boston. The first reported attack came on April 10 at the nearby Marriott Westin Copley Place hotel after a woman was bound and robbed. Both women had advertised massage services on Craigslist, an online classified service, and both were guests at luxury Marriott branded hotels.[52]

91.     Upon information and belief, Defendant Marriott monitored criminal activity occurring at hotels under its brand across the country and would, at any time criminal activity occurred at a Marriott branded property, be aware of activity indicating commercial sex trafficking or related crimes both under its brand and at particular locations, including the Fremont Marriott Silicon Valley hotel where J.C. was trafficked.

92.     Upon information and belief, Defendant Marriott regularly reviews and monitors customer reviews of its properties posted on various online review websites such as yelp.com or Travelocity, including the the Fremont Marriott Silicon Valley hotel where J.C. was trafficked.

93.     According to ECPAT-USA, in 2018 Defendant Marriott signed the organization's Child-Protection Code of Conduct ("The Code"), which the organization describes as "an industry-driven responsible tourism initiative with a mission to provide awareness, tools, and support to the travel and

---

[50] https://www.kiro7.com/news/local/man-charged-with-assault-after-following-woman-into-westin-elevator/884123607.

[51] https://www.stltoday.com/news/local/crime-and-courts/two-suspects-from-texas-arrested-for-human-trafficking-in-st/article_db93f47a-5a5a-5457-8f26-8d0ed7bcad03.html.

[52] https://www.enterprisenews.com/x1484624275/Quincy-man-arrested-in-Craigslist-killing-case.

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

hospitality industry in order to prevent the sexual exploitation of children."[53]

94.     Despite Marriott's 2006 public statements and 2010 agreement with ECPAT-USA to develop training programs for hotel staff, Marriott did not make its training program mandatory under January 2017.  Notably, as Marriott is aware, when implemented, the mandatory human trafficking awareness training program was mandatory for "on-property staff in both managed and franchised properties."[54]

**b. For years, Choice has been aware of sex trafficking at hotels under its brand – including the Comfort Inn where Plaintiff was trafficked.**

95.     Upon information and belief, between at least 2008 and 2019, Defendant Choice held meetings among its executives, directors, and managers at which sex trafficking in its hotels was discussed.

96.     Defendants knew or should have known that traffickers using the "call-in" method (where multiple men per day would visit the victim in her hotel room) were likely to seek out hotels where the rooms had external doors and would seek rooms overlooking the parking lot or not within view of the front desk.[55]

97.     Upon information and belief, Defendant Choice monitored criminal activity occurring at hotels under its brand across the country and would, at any time criminal activity occurred at a G6 branded property, be aware of activity indicating commercial sex trafficking both under its brand and at particular locations.

---

[53] "ECPAT-USA and Marriott International Announce New Partnership…"

[54] "Marriott International Has Trained 500,000 Hotel Workers to Recognize the Signs of Human Trafficking," (2019) https://news.marriott.com/news/2019/01/18/marriott-international-has-trained-500-000-hotel-workers-to-recognize-the-signs-of-human-trafficking (last accessed July 2, 2020).

[55] See, e.g. Polaris Project, On-Ramps, Intersections and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking: Hotels and Motels (July 2018) at 20 (available on line at https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Hotels-and-Motels.pdf) (last viewed July 2, 2020) ("request[ing] room overlooking parking lot or not within view of front desk" is "[t]trafficking indicator" in hotels and motels); The BEST (Business Ending Slavery and Trafficking) Trafficking Indicators for Lodging Establishments lists "A person reserving a room and requesting a suspicious location (next to an exit, on the hall alone, etc.)" as a potential indicator of sex trafficking in lodging establishments.   http://www.bestalliance.org/uploads/5/0/0/4/50047795/indicators_-_labor_and_sex.4.nn.pdf (last viewed June 2, 2020).

24

98.     There are countless examples across place and time of Choice's knowledge of sex trafficking at its brand hotels and its continued, total inattention to preventing and remedying the blight of human trafficking. For years, Choice has failed to adequately address the rampant sex trafficking which tragically occurs throughout its brand hotels across the country, and as a result has facilitated the sex trafficking of Plaintiff J.C. at the Comfort Inn which forms the basis of this complaint.

    a. In November 2009, a man and a woman were charged with crimes related to sex trafficking a 5 year old girl at a Comfort Inn in Fayetteville, North Carolina.[56]

    b. In March 2010, 6 people involved in sex trafficking were arrested at a Comfort Inn in Silver Spring, Maryland after kidnapping a 15 year-old girl in New York and bringing her there.[57]

    c. In January 2014, a man and a woman were arrested for sex trafficking at a Comfort Inn in Miami Springs, Florida, they were discovered when the woman that they held against her will was able to send a text to her mother.[58]

    d. In August, 2014 a man was arrested for trafficking a 17 year-old girl at a Comfort Inn in Beaverton, Oregon.[59]

    e. In January 2014, a man plead guilty to human trafficking and prostitution charges for using backpage.com to sell sex with a woman from Ohio at a Comfort Inn in Jessup, Maryland.[60]

    f. In February 2016, two men were arrested for kidnapping a woman in Oakland, California, the two men told the woman they planned to force her into prostitution at a

---

[56] https://www.cbsnews.com/news/shaniya-davis-missing-5-year-old-seen-in-horrifying-hotel-video/
[57] https://www.nbcwashington.com/news/local/police-cease-and-desist-the-business-of-human-trafficking/2094914/
[58] https://miami.cbslocal.com/2014/01/09/man-woman-arrested-for-alleged-sex-trafficking-kidnapping/
[59] https://www.oregonlive.com/beaverton/2014/08/teen_was_victim_of_sex_traffic.html
[60] https://www.baltimoresun.com/maryland/howard/columbia/ph-human-trafficking-sentencing-20140114-story.html

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

local Comfort Inn, but were arrested prior to any forced acts.[61]

g.  In January 2015, a man was indicted for forcing a woman to commit prostitution at a Comfort Inn in Brentwood, Massachusetts.[62]

h.  In January 2015, a man was arrested for trafficking a 17 year-old girl at a Comfort Inn in Bensalem, Pennsylvania.[63]

i.  In October 2014, two women were arrested for trafficking a 16 year-old girl at a Comfort Inn in Nashville, Tennessee after the girl was able to be alone and call her mother.[64]

99.     In 2015, Choice launched an online training module entitled "Combatting Human Trafficking in Your Hotel" for its management and staff.[65] According to Choice, to date, the training program has been completed nearly 30,000 times and is directed at local hotels in order to "educate management and staff at…franchised hotels."[66]

100.    Choice also makes the Blue Campaign Toolkit available to management and staff of franchised properties.[67]

101.    In addition to the training Choice is in ongoing communication with its local hotels by including articles about human trafficking in newsletters, announcements at annual conferences, and alerts to hotels in high risk areas or in proximity to high-risk events.[68]

102.    Choice even brags that it has "field-based associates" who visit hotels specifically to discuss human trafficking and commercial sex trafficking.[69]

---

[61] https://www.times-standard.com/2016/02/10/oakland-two-brothers-guilty-of-kidnappinghuman-trafficking/
[62] https://www.fosters.com/article/20150116/GJNEWS_01/150119506/0/FOSnews01
[63] https://www.buckscountycouriertimes.com/f4e8652b-86b9-515d-956b-b8f539945dcd.html
[64] https://www.tennessean.com/story/news/crime/2014/10/17/cops-women-brought-teen-nashville-prostitution/17434139/
[65] https://www.choicehotels.com/about/responsibility/human-rights-policy
[66] *Id.*
[67] *Id.*
[68] https://www.choicehotels.com/about/responsibility/human-rights-policy
[69] *Id.*

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

103.    However, the inadequacy of those efforts, including lacking policies and enforcement of such policies, is demonstrated by the continuation of sex trafficking at Comfort Inn hotels since 2015:

    a.  In November 2019, a man and a woman were arrested for trafficking at a Comfort Inn & Suites in Ventura, Ca when a 17 year-old girl alerted the front desk manager that she was being held against her will.[70]

    b.  In March 2017, a man was arrested for sex trafficking of a child in Fort Collins, Colorado when the FBI notified the local sheriff's office of a child forced to prostitute herself at the Comfort Inn in Fort Collins, Colorado.[71]

    c.  In June 2016, a man was arrested at a Comfort Inn & Suites in Macon, Georgia for transporting a sex trafficking victim to that hotel.[72]

    d.  In December 2018, two Chinese nationals were arrested for their sex trafficking venture in Maine, New Hampshire, and Vermont. The traffickers recruited women from China to serve as prostitutes in hotels in the three states, including a Comfort Inn in South Portland, Maine. The traffickers confiscated all personal items from the women and advertised their services on backpage.com.[73]

104.    Upon information and belief, Defendant Choice regularly reviews and monitors customer reviews of its properties posted on various online review websites such as yelp.com or Travelocity.

105.    Through such review and monitoring Defendant Choice has been aware of sex trafficking occurring at Comfort Inn hotels across its brand as well as the pervasiveness of customer reported sex trafficking at Comfort Inn hotels and the local hotel's inattentiveness to such trafficking. For example:

---

[70] https://www.vcstar.com/story/news/local/communities/ventura/2019/11/22/girl-forced-into-prostitution-helped-hotel-desk-ventura/4273164002/
[71] https://www.coloradoan.com/story/news/2017/03/10/investigators-looked-at-more-than-400-text-messages-during-the-investigation/99030766/
[72] https://www.macon.com/news/local/crime/article85806907.html
[73] https://www.pressherald.com/2018/12/15/chinese-nationals-charged-with-sex-trafficking-in-maine-new-hampshire-and-vermont-2/

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

a. Regarding an October 2018, stay at a Comfort Inn in Baltimore, Maryland a customer wrote: "A lot of channels don't come in on the TV. And there are sketchy characters. Prostitutes? . . . Been her for 2 hours and already heard sirens twice."[74]

**c. For years, Hilton has been aware of sex trafficking at hotels under its brand.**

106.   Upon information and belief, between at least 2006 and 2016, Defendant Hilton held meetings among its executives, directors, and managers at which sex trafficking in its hotels was discussed.

107.   Upon information and belief, at those meetings Hilton employees discussed, developed, and implemented uniform policies and procedures to identify, prevent and mitigate the risk of human trafficking occurring at Hilton properties, including the Embassy Suites by Hilton Alexandria Old Town, the Hilton Arden West in Sacramento, California and the DoubleTree in Sacramento, California.

108.   Hilton released its Human Rights Policy Statement in May 2016.[75] To date the policy states "Hilton Worldwide is fully committed, in each and every one of the markets in which we operate, to protecting individuals from all forms of abuse and exploitation."[76]

109.   With respect to sex trafficking specifically, Hilton's Human Rights Policy states, "[s]ex trafficking and sexual tourism is a large and growing problem worldwide, and Hilton Worldwide must never allow any Hilton properties, products, or services to be used in any manner that supports or enables any form of abuse and exploitation."[77]

110.   In 2012, an anti-trafficking coalition alerted Defendants Hilton of the likelihood of sex trafficking during the London Olympics, and inquired about the company's anti-trafficking policies,

---

[74] https://www.yelp.com/biz/comfort-inn-and-suites-bwi-airport-baltimore?hrid=wIJperS3a_wxllD0S_iPxQ&utm_campaign=www_review_share_popup&utm_medium=copy_link&utm_source=(direct)
[75] Hilton Worldwide Human Rights Policy Statement, HILTON WORLDWIDE HOLDINGS, INC., available at https://ir.hilton.com/~/media/Files/H/Hilton-Worldwide-IR-V2/committee-composition/human-rights-policy-statement.pdf (last visited July 6, 2020).
[76] *Id.*
[77] *Id.*

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

while urging immediate action regarding trafficking.[78]

111.    Hilton signed the ECPAT Code of Conduct to combat sexual exploitation in the travel industry in 2011 and it claims that it has been "providing training on human trafficking risks to all our hotels ever since."[79]

112.    Hilton claims it has partnered with various anti-sex trafficking groups, including Vital Voices since 2012, as well as co-founded the Global Freedom Exchange (GFE) program to support women leaders at the forefront of global efforts to prevent and respond to human trafficking.[80]

113.    Yet, for years, including the years between 2006 and 2016 when Plaintiff was sold for commercial sex at Hilton properties, Defendant Hilton has failed to address the rampant culture of sex trafficking which tragically occurs throughout its hotels across the country. This entrenched apathy to the real risk of sex trafficking and pervasive willful blindness to the role their local  hotels play in sex trafficking facilitated the sex trafficking of Plaintiff J.C. that forms the basis of this complaint.

   b.  In July 2017, a convicted felon was arrested for prostituting a woman at an Embassy
       Suites® in Birmingham, Alabama.  Her trafficker repeatedly beat the victim when she
       tried to stop working for him.  Over the course of several months, the man beat the
       victim with his fists, bit her on the face, struck her with a handgun and pushed her down
       stairs.  Physical violence and verbal threats were routinely used to force the woman to
       comply with his wishes, and to punish her when she did not.[81]

   c.  In March 2011, a pimp was arrested at an Embassy Suites® in Lombard, Illinois for
       prostituting 3 women.[82]

---

[78] *Corporate Strategy to Address Human Trafficking: Investor Recommendations for London Olympic Sponsors and Hospitality Companies, Christian Brothers Investment Services*, CBIS, http://cbisonline.com/us/wp-content/uploads/sites/2/2012/09/FINAL_OlympicsReport_9_28.pdf (last visited June 19, 2019).
[79] Hilton Slavery and Human Trafficking Statement, HILTON WORLDWIDE, INC., https://ir.hilton.com/~/media/Files/H/Hilton-Worldwide-IR-V3/committee-composition/hilton-slavery-and-trafficking-statement-2019.pdf (last visited July 6, 2020).
[80] *Id.*
[81] https://www.al.com/news/birmingham/2016/09/man_beat_bit_girlfriend_for_11.html.
[82] https://www.dailyherald.com/article/20110317/news/703179820/.

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

d.  In September 2016, a man was arrested on charges of human trafficking after a domestic violence call was made to the Embassy Suites located on Highway 150 in Hoover, Alabama.[83]  The victim informed police that she had been assaulted and was being forced to work as a prostitute.

e.  In June 2019, as part of a massive human trafficking sting operation in Hillsborough County, Florida, Police arrested and charged a 40 year-old man in Tampa for sex trafficking at the Embassy Suites hotel in Tampa at 10220 Palm River Road.  The victim was a 24-year old woman who told police she had been forced into prostitution.[84]

f.  In July 2016, police arrested a 23-year-old woman for prostitution at the Embassy Suites hotel located in Parsippany, New Jersey.[85]

g.  In March 2011, five people were arrested in connection with a prostitution sting operated out of the Embassy Suites located at 707 E. Butterfield Road in Lombard, Illinois.[86]

h.  In February 2016, an undercover police officer arrested a man for promoting prostitution when the man brought a woman to an Embassy Suites in Fayetteville, North Carolina to have sex with the undercover police officer.[87]

i.  A man was arrested outside of a Little Rock, Arkansas Embassy Suites hotel for promoting prostitution when he dropped off a woman to serve as a prostitute there.[88]

114.  Upon information and belief, Defendant Hilton monitored criminal activity occurring at hotels under its brand across the country and would, at any time criminal activity occurred at a Hilton branded property, be aware of activity indicating commercial sex trafficking ore related crimes both under its brand and at particular locations, including the hotels where J.C. was trafficked.

115.  Upon information and belief, Defendant Hilton regularly reviews and monitors customer

[83] https://www.cbs42.com/news/crime/adamsville-man-charged-with-human-trafficking/.
[84] https://www.tampabay.com/breaking-news/hillsborough-sheriffs-office-sweep-results-in-more-than-80-arrests-one-human-trafficking-charge-20190624/.
[85] https://www.dailyrecord.com/story/news/local/morris-county/2016/07/13/parsippany-police-prostitution-embassy-suites-howard-johnson/87045446/.
[86] https://www.mysuburbanlife.com/2011/03/17/five-people-arrested-in-lombard-prostitution-sting/z62jtyd/.
[87] https://www.fayobserver.com/1a731cf9-cae0-52d0-bbae-bda197c60bdb.html.
[88] https://www.arkansasonline.com/news/2016/apr/01/memphian-held-on-pimp-gun-charges-20160/

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

reviews of its properties posted on various online review websites such as yelp.com or Travelocity, including the Embassy Suites® by Hilton Alexandria Old Town hotel, the DoubleTree in Sacramento, California and the Hilton Arden West in Sacramento, California where J.C. was trafficked.[89]

116.    According to ECPAT-USA, Defendant Hilton signed the organization's Child-Protection Code of Conduct ("The Code"),[90] and was recognized in 2017 as one of ECPAT-USA's "Top Member Companies", meaning it agreed to comply with all six voluntary guidelines.[91]

117.    ECPAT-USA describes The Code as "a set of six voluntary guidelines that travel and tourism companies implement to comprehensively and proactively combat the commercial sexual exploitation of children."[92]

118.  Despite Hilton's 2011 agreement with ECPAT-USA to develop training programs for hotel staff, Hilton did not make its training program mandatory until, at earliest, December 2017.[93]

> **d. Each Defendant has been uniquely aware of trafficking at hotels across their brands because of their internet policies.**

119.    Defendants each understand the importance that internet access can have to facilitate human trafficking.

120.    Defendants each signed on to ECPAT publicly committing to participate in the programs shown to assist in identifying and preventing human trafficking inside their branded hotels including following the ECPAT checklist.

---

[89] An online review of an Embassy Suites location in Cleveland Rockside states that "staff lets hotel party's (sic) go on and lets hookers in the front door."  https://www.tripadvisor.com/ShowUserReviews-g50470-d224582-r164638382-Embassy_Suites_by_Hilton_Cleveland_Rockside-Independence_Ohio.html (last visited July 6, 2020).

[90] Hilton Worldwide Signs Tourism Code of Conduct, Joins ECPAT-USA in Fight Against Child Trafficking in the Travel Sector, https://newsroom.hilton.com/corporate/news/hilton-worldwide-signs-tourism-code-of-conduct-joins-ecpatusa-in-fight-against-child-trafficking-in-the-travel-sector (last accessed July 6, 2020).

[91] "ECPAT-USA and The Code Announce 2017 US Top Members", https://www.ecpatusa.org/blog/2018/1/3/ecpat-usa-and-the-code-announce-2017-us-top-members (last accessed July 6, 2020).

[92] Id.

[93] https://ir.hilton.com/~/media/Files/H/Hilton-Worldwide-IR-V3/committee-composition/slavery-and-trafficking-statement-2018.pdf ("We announced in December 2017 that antitrafficking training would be mandatory for all hotels globally as part of our required Brand Training.")

121. The ECPAT checklist specifically indicates that Wi-Fi passwords should be changed often and access to websites like Backpage and Craigslist Erotic services from their hotels should be monitored.

122. Defendant Choice is the face and a signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking in their hotel properties.

123. Defendant Marriott is the face and a signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking in their hotel properties.

124. Defendant Hilton is the face and a signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking in their hotel properties.

125. Defendant Choice publicly committed to educating their hotel properties on human trafficking and should have created brand standards for implementation, mandates, and operations.

126. Defendant Marriott publicly committed to educating their hotel properties on human trafficking and should have created brand standards for implementation, mandates, and operations.

127. Defendant Hilton publicly committed to educating their hotel properties on human trafficking and should have created brand standards for implementation, mandates, and operations.

128. Defendants Choice, Hilton, and Marriott recognize the value of offering free internet service to their customers.

129. Defendants Choice, Hilton, and Marriott require each hotel property to offer free internet service.

130. Defendants Choice, Hilton, and Marriott require hotel properties to use brand approved internet providers, who are sufficiently knowledgeable, to provide cybersecurity and prevent illegal activity from occurring at their hotels.

131. Defendants Choice, Hilton, and Marriott's hotels are provided access to internet access data which they know will help enhance customer service or otherwise permits the brand to exploit by other means.

132. Internet access at their brand hotel properties is through two means:

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

a. First, Defendants provide internet access to guests through wireless internet accessible in their guest rooms;

b. Second, Defendants provide internet access through publically accessible wireless networks accessible in the lobby and other common areas of their brand hotels.

133.   Defendants collect data on internet usage through the wireless internet services that Defendants provide, such data includes:

a. The IP address, and other identifying information, for all devices that access the internet through Defendants' wireless networks;

b. The identity of websites accessed by those devices, through the IP addresses of the servers that host those websites; and

c. Information about the user accessing the internet including through Defendants' wireless networks, including the users' room number, a user-provided name, and other identifying information.

134.   Marriott's Property Internet Terms of Use provides that Marriott does "record the room number of the user for billing purposes. The record of a specific name associated with that room number is stored in a separate database to protect the privacy of the user. A log of all usage activity relating to this Service is maintained."[94]

135.   Defendants' internet access policies each purportedly prohibit the use of the internet access that they provide for unlawful purposes.

[Continued on next page]

---

[94] Marriot – Property Internet Terms of Use, available https://www.marriott.com/marriott/internet-access/termsofuse.mi, last accessed July 2, 2020.

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

136.     Marriott's policy provides, "You agree not to use this Service to: (a) transmit any material that is unlawful, threatening, abusive . . . (b) harm, or attempt to harm, minors in any way."[95]

137.  Marriott's policy further provides,[96]

## No Editorial Control

The Companies do not review nor exercise any editorial control over the content or materials made available over the Internet by third parties, including without limitation any electronic mail transmissions, newsgroups, or the like. However, We may remove, block, filter, or restrict by any other means any materials that, in the Companies' sole discretion, may be illegal, may subject the Companies to liability, or may violate these Terms of Use. The Companies may cooperate with legal authorities and/or third parties in the investigation of any suspected or alleged crime or civil wrong. Any violation of these Terms of Use may result in the suspension or termination of your access to this Service.

138.     In violation of their federal statutory obligations under the TVPRA, Defendants failed to monitor internet use at hotels across their brands, including the local hotels at issue in this case, in order to identify signs and perpetrators of commercial sex trafficking operating within their walls.

139.     Defendants knew or should have known of the prevalent use of websites like Backpage.com, Craigslist.com, and other similar websites by traffickers to post advertisements for sex from within their properties.

140.     Despite that knowledge Defendants made no effort to flag or block the use of such websites by traffickers, instead Defendants exercised willful blindness to the use of their wireless networks to further human trafficking in their hotels, including the hotels where Plaintiff was trafficked.

141.     Defendants' blindness facilitated trafficking at their hotels by allowing traffickers to post unlawful advertisements through Defendants' own wireless networks in violation of Defendants' own policies on the use of those networks.

### D. DEFENDANTS ARE DIRECTLY LIABLE UNDER SECTION 1595 FOR THEIR INACTION AND FAILURES RESULTING IN COMMERCIAL SEX TRAFFICKING OCCURING AT THEIR BRAND PROPERTIES

142.     Defendants Choice, Hilton, and Marriott have been on notice of repeated incidences of sex trafficking occurring at their brand hotels since as early as 2006 yet these brand managers failed, and

---

[95] *Id.*
[96] *Id.*

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

persist in failing, to fulfill their statutory responsibility resulting in commercial sex trafficking occurring on their brand properties.

### a. Marriott is directly liable under the TVPRA.

143.    Marriott owns, supervises, and/or operates the Fremont Marriott Silicon Valley located at 46100 Landing Parkway in Fremont, California.

144.    Marriott failed to train, implement and enforce any of its own anti-trafficking policy or policies to protect Plaintiff from being sex trafficked.

145.    Marriott failed to monitor and audit the Marriott hotel and all of its franchise locations for incidences of commercial sex trafficking.

146.    Marriott could and should have exercised control over its brand hotels, including the Fremont Marriott Silicon Valley by:

a. distributing information to assist employees in identifying human trafficking for commercial sex;

b. providing a process for escalating human trafficking for commercial sex concerns within the Marriott organization;

c. requiring regular reports of suspicious or criminal activity that indicates commercial sex trafficking to a centralized database for audit and analysis;

d. requiring employees to attend training related to human trafficking for commercial sex;

e. providing new hire orientation on human rights and corporate responsibility;

f. providing training and education to Westin® hotels through webinars, seminars, conferences, and online portals;

g. developing and holding ongoing training sessions on human trafficking; or

h. providing anti-trafficking checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

147.   Despite having actual and/or constructive knowledge of the extensive commercial sex trafficking occurring at its brand hotels, including the Fremont Marriott Silicon Valley, Marriott has repeatedly failed to stop or adequately address sex trafficking at its hotels, including the Fremont Marriott Silicon Valley.

**b.   Choice is directly liable under the TVPRA.**

148.   Choice owns, supervises, and/or operates the Comfort Inn located at 110 Plymouth Street, in Santa Cruz, California.

149.   Choice failed to train, implement and enforce any of its own anti-trafficking policy or policies to protect Plaintiff from being sex trafficked.

150.   Choice failed to monitor and audit the Comfort Inn hotel at 110 Plymouth Street and all of its franchise locations for incidences of commercial sex trafficking.

151.   Choice could and should have exercised control over its brand hotels, including the Comfort Inn at 110 Plymouth Street by:

   a. distributing information to assist employees in identifying human trafficking for commercial sex;

   b. providing a process for escalating human trafficking for commercial sex concerns within the Choice organization;

   c. requiring regular reports of suspicious or criminal activity that indicates commercial sex trafficking to a centralized database for audit and analysis;

   d. requiring employees to attend training related to human trafficking for commercial sex;

   e. providing new hire orientation on human rights and corporate responsibility;

   f. providing training and education to Comfort Inn hotels through webinars, seminars, conferences, and online portals;

   g. developing and holding ongoing training sessions on human trafficking; or

   h. providing anti-trafficking checklists, escalation protocols and information to property

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

management staff; or tracking performance indicators and key metrics on human trafficking prevention.

152. Despite having actual and/or constructive knowledge of the extensive commercial sex trafficking occurring at its brand hotels, including the Comfort Inn at 110 Plymouth Street, Choice has repeatedly failed to stop or adequately address sex trafficking at it hotels, including the Comfort Inn at 110 Plymouth Street.

**c.   Hilton is directly liable under the TVPRA.**

153.  Hilton owns, supervises, and/or operates the Embassy Suites® by Hilton Alexandria Old Town located at 1900 Diagonal Rd, Alexandria, VA 22314.

154.  Hilton owns, supervises and/or operates the DoubleTree® by Hilton, located at 2001 Point W. Way, Sacramento, CA 95815.

155.  Hilton owns, supervises and/or operates the Hilton Sacramento Arden West, located at 2200 Harvard St., Sacramento, CA 95815.

156.  Hilton failed to train, implement and enforce any of its own anti-trafficking policy or policies to protect Plaintiff from being sex trafficked.

157.  Hilton failed to monitor and audit these local hotels and all of its franchise locations for incidences of commercial sex trafficking.

158.  Hilton could and should have exercised control over its brand hotels, including the hotels where J.C. was trafficked by:

     a. distributing information to assist employees in identifying human trafficking for commercial sex;

     b. providing a process for escalating human trafficking for commercial sex concerns within the Hilton organization;

     c. requiring regular reports of suspicious or criminal activity that indicates commercial sex trafficking to a centralized database for audit and analysis;

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

d. requiring employees to attend training related to human trafficking for commercial sex;

e. providing new hire orientation on human rights and corporate responsibility;

f. providing training and education to their local brand hotels through webinars, seminars, conferences, and online portals;

g. developing and holding ongoing training sessions on human trafficking; or

h. providing anti-trafficking checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

159. Despite having actual and/or constructive knowledge of the extensive commercial sex trafficking occurring at its brand hotels. Hilton has repeatedly failed to stop or adequately address sex trafficking at it hotels, including the local hotels where J.C. was trafficked.

### E. DEFENDANTS ARE VICARIOUSLY LIABLE FOR THE CONDUCT OF THE LOCAL OPERATING HOTELS WHO ARE BOTH THEIR FRANCHISE PARTNERS AND AGENTS DUE TO THEIR LEVEL OF CONTROL

160. *In addition to and apart* from Defendant's direct liability, Plaintiff alleges Defendants are vicariously liable for the conduct of the local hotels.

161. Hotel brands or flags lend their name and likeness to third party owners, while the building and operations are run by a franchisee or third-party management company under the brands' control. In return, the parent brand exchanges the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a contract or franchise agreement and still profits from putting heads in beds.

162. The average consumer, including Plaintiff and her traffickers, does not see this relationship. The parent brand gives the property its identity.  It provides signage on and in front of the building that assures customers that if they check into that hotel they can expect the standards consistent with the parent hotel brand.  The same brand emblazoned on everything in the hotel from the pens in the bedside tables to the staff uniforms at the front desk.

163.   In addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, the brand provides the local hotel with access to its brand wide central reservation system, 800 number, revenue management tools, world-class loyalty programs and a website.   Thus, booking and room reservations are controlled by the corporate parent brand.[97] The corporate brand parents, and Defendants, can see booking and reservation trends, including for those hotels where Plaintiff was trafficked.[98]

164.   The local hotel typically pays around 10% of their total revenue back to the parent hotel brand and is required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreement.

165.   Per the contract or franchise agreement, the parent brand may enforce these standards through periodic inspections and even termination of the agreement if the local hotel is found to be inadequate.   The right of the parent hotel brand to enforce their brand standards is also their responsibility.

### i.  Marriott is indirectly and vicariously liable under the TVPRA as a principal for the failures of its agent West San Francisco Airport.

166.   Defendant Marriott owns, supervises, and/or operates the Fremont Marriott Silicon Valley located at 46100 Landing Parkway in Fremont, California.

167.   Defendant Marriott has and exercised control over the local hotel with respect to many issues regarding the day to day operation of the property, but also specifically with regard to the local hotel's policy on human trafficking.

168.   Defendant Marriott is aware that human trafficking occurs at its local hotels and of how their local hotels have dealt with it.   Since 2006, defendant Marriott has issued and published policies to

---

[97] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (April 10, 2018) https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/.

[98] Where a brand hotel allows cash to be accepted for payment monitoring and auditing these trends can become important to identifying locations where criminal activity and commercial sex trafficking may be occurring.

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

address the problem.  By doing so, it has exercised control over its local hotels specifically with respect to how to identify and handle human trafficking at the local hotels. "At Marriott, our commitment to human rights is governed by Marriott's Human Rights Council. Marriott implements a human rights due diligence and risk management process to identify, prevent and mitigate relevant risks."                                                                                                      (See https://www.marriott.com/marriottassets/Multimedia/PDF/Corporate/HumanRightsStatement.pdf) Such due diligence cannot be accomplished without Marriott having uniform control over its local hotel properties with regards to their policies and procedures regarding traffickers and victims.

169.    Marriott failed develop effective policies and/or failed to implement and enforce its own policy or policies and protect Plaintiff from being sex trafficked.

170.    Marriott knew or should have known that the Fremont Marriott Silicon Valley hotel where Plaintiff was trafficked was an area known for high incidence of crime and prone to sex trafficking activity.[99]

171.    Despite having actual and/or constructive knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, including the Fremont Marriott Silicon Valley Hotel, Defendant Marriott has repeatedly failed to prevent or adequately address commercial sex trafficking at it hotels, and particularly the trafficking of Plaintiff.

172.    Marriott exercises actual control over its franchisees, including the Fremont Marriott Silicon Valley Hotel, through control over the brand standards which are reflected through the franchise agreements entered into with each franchisee subsidiary or operating hotel.[100]

173.    Marriott exerts dominion and control over its franchisees, and has control over the day-to-day operations in a number of areas:

---

[99] *See* https://www.mercurynews.com/2016/02/10/modern-day-slavery-even-happens-in-silicon-valley/
[100] *See* https://www.sec.gov/Archives/edgar/data/1329011/000119312506153824/dex1023.htm (last visited July 2, 2020).

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

a. Sales Managers and Reservation Managers are required to devote their full time to the management and operation of the Hotel, and cannot be employed in any other capacity by the Franchisee or its Affiliates without Marriot's express written consent;

b. Franchisees are required to keep restaurants and lounges open and in normal operation for such minimum hours and days stipulated by Marriott;

c. Franchisees are required to  maintain in sufficient supply, and use at all times, certain food and beverage products and ingredients, supplies, paper goods, dinnerware and furnishings;

d. Franchisees are prohibited from installing vending machines or video games on the premises.[101]

174.    Marriott also has control over the existence of the franchisor-franchisee relationship and has the ability to terminate the franchise:

a. "Franchisor may, at its option, terminate this Agreement and all rights granted hereunder without affording Franchisee any opportunity to cure the default" for material defaults of the franchise agreement."[102]

175.    Defendant Marriott may exercise or could have exercised control over the local hotel by:

a. distributing information to assist employees in identifying human trafficking;

b. providing a process for escalating human trafficking concerns within the organization;

c. requiring employees to attend training related to human trafficking;

d. providing new hire orientation on human rights and corporate responsibility;

e. providing training and education to the local hotel through webinars, seminars, conferences, and online portals;

f. developing and holding ongoing training sessions on human trafficking; or

---

[101] *See* https://www.sec.gov/Archives/edgar/data/1329011/000119312506153824/dex1023.htm at pp. 7, 8, 9, (last visited July 2, 2020).

[102] *See* https://www.sec.gov/Archives/edgar/data/1329011/000119312506153824/dex1023.htm at p. 28 (last visited July 2, 2020)

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

g. providing checklists, escalation protocols and information to property management staff;

or tracking performance indicators and key metrics on human trafficking prevention.

176.    The Marriott hotel where J.C. was trafficked was and is the actual and apparent agent of Marriott and together they offer, or offered, public lodging services in the hotel. This agency relationship was created through Defendant Marriott's exercise of an ongoing and systemic right of control over its hotels, beyond that which is necessary to maintain brand standards, by Defendant Marriott's operations, including the means and methods of how  its hotels conducted daily business through one or more of the following actions:

a. hosting online bookings on Defendant Marriott's domain;

b. requiring Marriott hotels to use Defendant Marriott's customer rewards program;

c. setting employee wages;

d. making employment decisions;

e. advertising for employment;

f. sharing profits;

g. standardized training methods for employees;

h. building and maintaining the facility in a manner specified by the owner;

i. standardized or strict rules of operation;

j. regular inspection of the facility and operation by owner;

k. fixing prices; or

l. developing uniform and consistent policies regarding the prevention of commercial sex trafficking at brand properties, including a risk management process to identify, prevent, and mitigate risks for commercial sex trafficking[103]; and

m. other actions that deprive Marriott hotels of independence in business operations.

177.    An apparent agency also existed/exists between Defendant Marriott and the local Marriott

---

[103] *Supra* at ¶84.

hotel where Plaintiff was trafficked. Defendant Marriott holds Marriott hotels to the public as possessing authority to act on its behalf.

178.     As alleged herein, the employees of the Marriott observed and were aware of Plaintiffs plight, yet the policies and procedures from Defendant Marriott to address this victimization were either inadequate to prevent her trafficking or were not properly implemented due to lack of training, education and or enforcement by the Marriott.

179.     As alleged herein and upon information and belief, the employees of the Marriott hotel were aware of Plaintiff's trafficking and pursuant to corporate-wide policies reported such activity directly to defendant Marriott, including illegal website use, booking and reservation history, payment by cash for several rooms at a time and visits from multiple men throughout the day.

180.     Marriott was aware not only aware of Plaintiff's plight but also the failures of its own policies and procedures to protect her and prevent trafficking at the Marriott hotel where Plaintiff was trafficked.

181.     Given Defendant Marriott's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its hotels, including the Fremont Marriott Silicon Valley,  Defendant Marriott breached its duties in the following ways:

> a. Failed (altogether or adequately) to distribute information to assist employees in identifying human trafficking;
>
> b. Failed (altogether or adequately) to provide a process for escalating human trafficking concerns within the organization;
>
> c. Failed (altogether or adequately) to mandate managers, employees, or owners attend training related to human trafficking;
>
> d. Failed (altogether or adequately) to provide new hire orientation on human rights and corporate responsibility;
>
> e. Failed (altogether or adequately) to provide training and education on human trafficking

through webinars, seminars, conferences, and online portals;

f. Failed (altogether or adequately) to develop and hold or require ongoing training sessions on human trafficking; and/or

g. Failed (altogether or adequately) to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

182.   Marriott brands may kick delinquent hotels out of its system, including the Marriott hotel where Plaintiff was trafficked, since it is at the expense of terminating their royalty payments, it is seldom done. Nevertheless this consequence is what provides Marriott the actual control over the Fremont Marriott Silicon Valley including control over how it confronts and deals with known traffickers and trafficking victims such as Plaintiff.

183.   Marriott accepted the profits from J.C.'s trafficker even though the signs of her trafficking were open and obvious and receipt of those profits was, based on information and belief, in direct violation of their own policies and procedures regarding the frequent repeat business they had with J.C.'s trafficker.

184.   Marriott knew or should have known that such profits were derived from sex trafficker's illegal and tortious activities.

185.   If defendant Marriott had ensured that the local hotel was following their policies on identifying victims of trafficking and undertaking actions to prevent the rental of rooms to known traffickers rooms would not have been made available to J.C.'s trafficker and no profits would have been gained.

186.   Acceptance of these profits was Marriott's affirmation of the Marriott hotel's total inaction with regard to J.C.'s trafficker and her victimization.

b.    **Choice is indirectly and vicariously liable under the TVPRA as a principal for the failures of its agent Comfort Inn.**

187.   Defendant Choice owns, supervises, and/or operates the Comfort Inn located at 110 Plymouth Street, Santa Cruz, California.

188.   Defendant Choice has and exercised control over the local hotel with respect to many issues regarding the day to day operation of the property, but also specifically with regard to the local hotel's policy on human trafficking.

189.   Defendant Choice is aware that human trafficking occurs at its local hotels and of how their local hotels have dealt with it.   Since 2006, defendant Choice has issued and published policies to address the problem.   By doing so, it has exercised control over its local hotels specifically with respect to how to identify and handle human trafficking at the local hotels. "Choice Hotels has adopted comprehensive ethics and related policies applicable to its employees that require its business be conducted with honesty and integrity, and in compliance with all applicable laws. Choice's policies establish clear ethical standards and guidelines for how we do business and establish accountability. All company associates are required to obey the law and comply with specific standards relating to legal obligations, ethics, and business conduct. The Company has clear accountability mechanisms in place to monitor and report on compliance with these directives." (See https://www.choicehotels.com/about/diversity/human-rights). Such monitoring and reporting cannot be accomplished without Choice having uniform control over its local hotel properties with regards to their policies and procedures regarding ethics and conduct.

190.   Choice failed develop effective policies and/or failed to implement and enforce its own policy or policies and protect Plaintiff from being sex trafficked.

191.   Despite having actual and/or constructive knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, including the Comfort Inn at 110 Plymouth Street, Defendant Choice has repeatedly failed to prevent or adequately address commercial sex trafficking at it hotels, and particularly the trafficking of Plaintiff.

192.  Choice exercises actual control over its franchisees, including the Comfort Inn at 110 Plymouth Street, through control over the brand standards which are reflected through the franchise agreements entered into with each franchisee subsidiary or operating hotel.

193.  Choice exerts dominion and control over its franchisees, and has control over the day-to-day operations in a number of areas, beyond that which is necessary to maintain brand standards. Including that its brand hotels provide a continental breakfast each day along with the specific food and drink to be provided.[104]

194.  Defendant Choice may exercise or could have exercised control over Westin hotels by:

    a.  distributing information to assist employees in identifying human trafficking;

    b.  providing a process for escalating human trafficking concerns within the organization;

    c.  requiring employees to attend training related to human trafficking;

    d.  providing new hire orientation on human rights and corporate responsibility;

    e.  providing training and education to Westin® hotels through webinars, seminars, conferences, and online portals;

    f.  developing and holding ongoing training sessions on human trafficking; or

    g.  providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

195.  The Comfort Inn at 110 Plymouth Street where J.C. was trafficked was and is the actual and apparent agent of Choice and together they offer, or offered, public lodging services in the hotel. This agency relationship was created through Defendant Choice's exercise of an ongoing and systemic right of control over Comfort Inns by Defendant Choice's operations, beyond that which is necessary to maintain brand standards, including the means and methods of how Comfort Inn hotels conducted daily business through one or more of the following actions:

    a.  hosting online bookings on Defendant Choice's domain;

---

[104] *See Choice Hotels International, Inc. v. Patel et. al.,*, No. 06:12-cv-00023, ECF No. 1, Attachment #29 (S.D. Tex. November 18, 2011).

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

b. requiring Westin® hotels to use Defendant Choice's customer rewards program;

c. setting employee wages;

d. making employment decisions;

e. advertising for employment;

f. sharing profits;

g. standardized training methods for employees;

h. building and maintaining the facility in a manner specified by the owner;

i. standardized or strict rules of operation;

j. regular inspection of the facility and operation by owner;

k. fixing prices; or

l. developing uniform and consistent policies regarding the prevention of commercial sex trafficking at brand properties, including a risk management process to identify, prevent, and mitigate risks for commercial sex trafficking[105]; and

m. other actions that deprive Comfort Inn hotels of independence in business operations.

196. An apparent agency also existed/exists between Defendant Choice and the Comfort Inn at 110 Plymouth Street. Defendant Choice holds Comfort Inn hotels to the public as possessing authority to act on its behalf.

197. As alleged herein, the employees the Comfort Inn at 110 Plymouth Street observed and were aware of Plaintiff's plight, yet the policies and procedures from Defendant Choice to address this victimization were either inadequate to prevent her trafficking or were not properly implemented due to lack of training, education and or enforcement by the Choice.

198. As alleged herein and upon information and belief, the employees of the Comfort Inn at 110 Plymouth Street were aware of Plaintiff's trafficking and pursuant to corporate-wide policies reported such activity directly to defendant Choice, including illegal website use, booking and reservation

---

[105] *Supra* at ¶97.

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

history, payment by cash for several rooms at a time and visits from multiple men throughout the day.

199.  Choice was aware not only aware of Plaintiff's plight but also the failures of its own policies and procedures to protect her and prevent trafficking at the Comfort Inn at 110 Plymouth Street.

200.  Given Defendant Choice's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its hotels, including Comfort Inn hotels, and the particular hotel at issue in this case, Defendant Choice breached its duties in the following ways:

> a.  Failed (altogether or adequately) to distribute information to assist employees in identifying human trafficking;
>
> b.  Failed (altogether or adequately) to provide a process for escalating human trafficking concerns within the organization;
>
> c.  Failed (altogether or adequately) to mandate managers, employees, or owners attend training related to human trafficking;
>
> d.  Failed (altogether or adequately) to provide new hire orientation on human rights and corporate responsibility;
>
> e.  Failed (altogether or adequately) to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;
>
> f.  Failed (altogether or adequately) to develop and hold or require ongoing training sessions on human trafficking; and/or
>
> g.  Failed (altogether or adequately) to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

201.   Choice brands may kick delinquent hotels out of its system, including the Comfort Inn at 110 Plymouth Street, however, since it is at the expense of terminating their royalty payments, it is seldom done. Nevertheless this consequence is what provides Choice the actual control over the Comfort Inn at 110 Plymouth Street including control over how it confronts and deals with known traffickers and

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

trafficking victims such as Plaintiff.

202.   Choice accepted the profits from J.C.'s trafficker even though the signs of her trafficking were open and obvious and receipt of those profits was, based on information and belief, in direct violation of their own policies and procedures regarding the frequent repeat business they had with J.C.'s trafficker.

203.   Choice knew or should have known that such profits were derived from sex trafficker's illegal and tortious activities.

204.   If defendant Choice had ensured that the local hotel was following their policies on identifying victims of trafficking and undertaking actions to prevent the rental of rooms to known traffickers rooms would not have been made available to J.C.'s trafficker and no profits would have been gained. Acceptance of these profits was Choice's affirmation of the Comfort Inn at 110 Plymouth Street hotel's total inaction with regard to J.C.'s trafficker and her victimization.

### c.   Hilton is indirectly and vicariously liable under the TVPRA as a principal for the failures of the local hotels, its agents.

205.  Hilton owns, supervises, or operates the Embassy Suites by Hilton Alexandria Old Town located at 1900 Diagonal Road, in Alexandria, Virginia as well as the DoubleTree by Hilton, located at 2001 Point W. Way, Sacramento, CA 95815 and the Hilton Sacramento Arden West, located at 2200 Harvard St., Sacramento, CA 95815.  Hilton failed to implement and enforce any of its own policy or policies and protect Plaintiff J.C. from being sex trafficked.

206.  Defendant Hilton has and exercised control over the local hotel with respect to many issues regarding the day to day operation of the property, but also specifically with regard to the local hotel's policy on human trafficking.

207.  Defendant Hilton is aware that human trafficking occurs at its local hotels and of how their local hotels have dealt with it.  Defendant Hilton has issued and published policies to address the problem. By doing so, it has exercised control over its local hotels specifically with respect to how to identify and handle human trafficking at the local hotels. Such due diligence cannot be accomplished without

Hilton having uniform control over its local hotel properties with regards to their policies and procedures regarding traffickers and victims.

208. Hilton failed to develop effective policies and/or failed to implement and enforce its own policy or policies and protect Plaintiff J.C. from being sex trafficked.

209. Plaintiff and her traffickers understood when she stayed at Defendants' branded locations, that individuals working at the location were agents, representatives, and or employees of Defendant Hilton and were authorized to transact business on behalf of Defendant Hilton. Plaintiff understood that the money paid to book her room went to Defendant Hilton and their branded property.

210. All of the documents signed, electronically and in paper form, to book a room, and advertisements of the Defendants' property established that those individuals working at the property were working on behalf of Defendant Hilton (that owns the brand property).

211. Hilton knew or should have known that the hotels where Plaintiff J.C. was trafficked were in areas known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff J.C. was trafficked.

212. Despite having actual and/or constructive knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant Hilton has repeatedly failed to stop or adequately address sex trafficking at its hotels.

213. Defendant Hilton may exercise or could have exercised control over its local brand hotels by:

    a. distributing information to assist employees in identifying human trafficking;

    b. providing a process for escalating human trafficking concerns within the organization;

    c. requiring employees to attend training related to human trafficking;

    d. providing new hire orientation on human rights and corporate responsibility;

    e. providing training and education to its local hotels through webinars, seminars, conferences, and/or online portals;

    f. developing and holding ongoing training sessions on human trafficking; or

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

   g. providing checklists, escalation protocols and information to property management staff;

    or tracking performance indicators and key metrics on human trafficking prevention.

214. Hilton exercises actual control over its franchisees through control over the brand standards which are reflected through the franchise agreements entered into with each franchisee subsidiary or operating hotel.[106]

215. Hilton exerts dominion and control over its franchisees, beyond that which is necessary to maintain brand standards, and has control over the day-to-day operations in a number of areas:

   a. Franchisee may be required to produce specific products and services, including furniture, fixtures, equipment, food, operating supplies, consumable inventories, merchandise for resale to be used at, and/or sold from, the Hotel, in-room entertainment, computer networking, and any and all other items used in the operation of the Hotel, including a Required Brand specified by Hilton;

   b. Franchisees are required to operate their hotels twenty-four hours a day, every day, unless otherwise approved in writing by Hilton;

   c. Franchisees are prohibited from increasing or decreasing the number of rooms at each hotel without express written authority by Hilton;

   d. Hilton retains the authority to designate a single supplier of certain goods which the Franchisee must purchase.[107]

216. Hilton also has control over the existence of the franchisor-franchisee relationship and has the ability to terminate the franchise:

   a. Hilton has "the right to terminate this Agreement immediately upon notice to [Franchisee] if [Franchisee] fails to cure an Event of Default."[108]

---

[106] https://www.sec.gov/Archives/edgar/data/1500217/000119312510232122/dex1042.htm (last visited July 6, 2020).
[107] https://www.sec.gov/Archives/edgar/data/1500217/000119312510232122/dex1042.htm at pp. 5, 6, 8, 9 (last visited July 6, 2020).

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

217. Hilton was in an actual or apparent agency relationship with their local brand hotels offering public lodging services in the hotel. This agency relationship was created through Defendant Hilton's exercise of an ongoing and systemic right of control over the local hotels by Defendant Hilton's operations, beyond that which is necessary to maintain brand standards, including the means and methods of how the local hotels conducted daily business through one or more of the following actions:

    a.  hosting online bookings on Defendant Hilton's domain;

    b.  requiring their local brand hotels to use Defendant Hilton's customer rewards program;

    c.  setting employee wages;

    d.  making employment decisions;

    e.  advertising for employment;

    f.  sharing profits;

    g.  standardized training methods for employees;

    h.  building and maintaining the facility in a manner specified by the owner;

    i.  standardized or strict rules of operation;

    j.  regular inspection of the facility and operation by owner;

    k.  fixing prices; or

    l.  other actions that deprive the local brand hotels of independence in business operations.

218. An apparent agency also exists between Defendant Hilton and their local hotels. Defendant Hilton held out the local brand hotels to the public as possessing authority to act on its behalf.

219. Given Defendant Hilton's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its hotels, including the hotels where J.C. was trafficked, Defendant Hilton breached its duties in the following ways:

    a.  Failed (altogether or adequately) to distribute information to assist employees in

---

[108] https://www.sec.gov/Archives/edgar/data/1500217/000119312510232122/dex1042.htm at p. 18 (last visited July 6, 2020).

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

identifying human trafficking;

b. Failed (altogether or adequately) to provide a process for escalating human trafficking concerns within the organization;

c. Failed (altogether or adequately) to mandate managers, employees, or owners attend training related to human trafficking;

d. Failed (altogether or adequately) to provide new hire orientation on human rights and corporate responsibility;

e. Failed (altogether or adequately) to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

f. Failed (altogether or adequately) to develop and hold or require ongoing training sessions on human trafficking; or

g. Failed (altogether or adequately) to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

220.    Hilton may kick delinquent hotels out of its system, including any of the hotels where J.C. was trafficked, but because it is at the expense of terminating their royalty payments, it is seldom done.

221.    Hilton accepted the profits from J.C.'s trafficker even though the signs of her trafficking were open and obvious and receipt of those profits was, based on information and belief, in direct violation of their own policies and procedures regarding the frequent repeat business they had with J.C.'s trafficker.

222.    Hilton knew or should have known that such profits were derived from sex trafficker's illegal and tortious activities.

223.    If defendant Hilton had ensured that the local hotel was following their policies on identifying victims of trafficking and undertaking actions to prevent the rental of rooms to known traffickers rooms would not have been made available to J.C.'s trafficker and no profits would have been gained.

224.    Acceptance of these profits was Hilton's affirmation of the local brand hotel's total inaction with regard to J.C.'s trafficker and her victimization.

### F.  DEFENDANTS' LIABLITY UNDER THE TVPRA

#### a.  Defendants knowingly benefited financially from the sex trafficking at their local hotels

225.    Aside from their unique position in this growing epidemic, Defendants have the highest obligation and statutory duty to protect their guests from known dangers, including sex trafficking and sexual exploitation, and should be held accountable when they fail to comply. As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."[109]

226.    Choice, Hilton, and Marriott profited from the sex trafficking of J.C. and knowingly or negligently aided and engaged with her trafficker in his sex trafficking venture.

227.    Choice, Hilton, and Marriott rented rooms to J.C.'s traffickers knowing, or should have known, that they were using the room to harbor sex trafficking victims, physically assault them, and subject them to repeated exploitation as they was forced into sexual servitude.

228.    Choice, Hilton, and Marriott knew, or should have known, that sex trafficking victims were being trafficked at Defendants' brand hotels and that the Defendants were knowingly benefiting financially from said exploitation, because J.C.'s traffickers frequented the Defendants' hotels and paid for the room rentals.

229.    Choice, Hilton, and Marriott profited from the sex trafficking of J.C. and knowingly or negligently aided and participated with J.C.'s traffickers in their criminal venture. The Defendants took no action as J.C. repeatedly visited the hotel, often with different guests, without any luggage, avoiding all eye contact, and often displaying prominent bruising all over her person while in the constant presence of her trafficker.

---

[109] *See* Michele Sarkisian, *supra* at note 22.

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

230.   Defendants deliberately disregarded the implementation of best known anti-trafficking policies, practices, and procedures to maintain profit.

231.   Defendants knew that their expenses would increase if they hired more security personnel and funded more training programs. Additionally, Defendants would lose revenue by preventing human traffickers from renting rooms. The combination of increased expenses and lost revenue meant less profit. In fact, profits were the driving force of their hollow "No Room for Trafficking" campaigns, as they improved Defendants image without any real impact on operations.

232.   The Defendants all financially benefited from the sex trafficking of J.C., and other victims like her, and developed and maintained business models that attract and foster the commercial sex market for traffickers (including buyers.)

233.   Choice, Hilton, and Marriott enjoy the steady stream of income that sex traffickers bring to their budget level hotels, such as Comfort Inn, Marriott, Hilton, DoubleTree and Embassy Suites.

234.   Choice, Hilton, and Marriott financially benefit from their ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

235.   The Defendants maintained their deficiencies to maximize profits by:

   a.   Reducing the cost of training employees and managers of how to spot the signs of human trafficking and sexual exploitation and what steps to take;

   b.   Not refusing room rentals, or reporting guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers; and/or

   c.   Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers to actively combat human trafficking and sexual exploitation.

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

### b. Defendants participated in a sex trafficking venture at and through their local hotels

236.    There was a continuous business relationship through the rental of rooms between Plaintiff's traffickers, Defendants Choice, Hilton, and Marriott, and the local hotels.

237.    Defendants Choice, Hilton, and Marriott actively participated in this illegal endeavor by knowingly or negligently providing lodging to J.C.'s traffickers in which to harbor J.C. while they were trafficking her.

238.    Defendants Choice, Hilton, and Marriott actively participated in this illegal endeavor by knowingly or negligently providing lodging to those who purchased sex from J.C. in which to harbor J.C. while she was being trafficked.

239.     The Defendants all had the opportunity to stop J.C.'s traffickers and offenders like them from victimizing J.C. and others like her.  Instead, every Defendant failed to take reasonable measures to stop sex trafficking from occurring in their hotels.

240.    The Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on their hotels.

241.    Even though Defendants were aware of the best policies, practices, and procedures necessary to fight human trafficking and despite Defendants' part in formulating, assessing, and promoting the best policies, practices and procedures together, Defendants failed to implement them by, among other acts, omissions and commissions described in this complaint:

      a. Reducing the costs of training employees and managers how to spot signs of human trafficking.

      b. Failing to refuse room rentals or report guests to law enforcement; and

      c. Lowering a number of security costs and measures that could have combatted sexual trafficking and exploitation.

242.    To date, Hotel Defendants have failed to train all of their employees to look for signs of

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

trafficking.

243.    The failure to implement best policies, practices, and procedures was not an oversight by Defendants Choice, Hilton, and Marriott.

### c. Defendants knew or should have known sex trafficking venture were operating out of their hotels

244.    Due to Defendants' failures to enact anti-trafficking policies and procedures to comply with the TVPRA, Defendants, in essence, turned a blind eye to human trafficking. Therefore, the Defendants' failure to investigate and monitor human trafficking is sufficient to establish Defendants knew or should have known of human trafficking for commercial sex occurring at their brand properties, including the locations where Plaintiff was trafficked.

245.    Choice, Hilton, and Marriott knew, or should have known, that sex trafficking victims were being trafficked because they constantly entertained foot traffic at the rented room to appease the traffickers' daily quotas, the traffickers would help check her in then not proceed to the room, and the victim often displayed visible injury while seemingly never allowed to be alone. These behaviors indicated that sex traffickers were using the Defendants' hotels for a sex trafficking venture.

246.    As a direct and proximate result of these egregious practices on the part of the Defendants, J.C. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

### CAUSES OF ACTION

### A.  COUNT ONE – 18 U.S.C § 1595 ("TVPRA")

247.    The Plaintiff J.C. incorporates each foregoing allegation.

248.     J.C. is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. § 1595.

249.     The Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, the Defendants had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

in violations of 18 U.S.C. § 1591 (a).  At all relevant times, the Defendants breached this duty by participating in, and facilitating, the harboring and providing of J.C. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

250.    The Defendants have financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade.  Moreover, the Defendants directly benefitted from the trafficking of J.C. on each occasion they received payment for rooms that she was being kept in at the Defendants' hotels. The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of J.C.'s injuries and damages.

251.    J.C. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' hotels and properties in violation of 18 U.S.C. § 1591 (a).

## B.  COUNT TWO - CAL. CIV. CODE §52.5

252.    The Plaintiff J.C. incorporates each foregoing allegation.

253.    J.C. is a victim of sex trafficking within the meaning of California Penal Code §236.1 and is therefore entitled to bring a civil action under Cal. Civ. Code §52.5.

254.    The Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of Cal. Civ. Code §52.5. At all relevant times, the Defendants breached their duties by participating in, and facilitating, the harboring and providing of J.C. for the purposes of commercial sex induced by malice, oppression, force, fraud, duress, and/or coercion, by their acts, omissions, and commissions.

255.    The Defendants have financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade.  Moreover, the Defendants directly benefitted from the trafficking of J.C. on each occasion they received payment for rooms that she was being kept

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

in at the Defendants' hotels. The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of J.C.'s injuries and damages.

256.  J.C. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' hotels and properties in violation of Cal. Civ. Code §52.5.

257.  J.C. is also entitled to punitive damages under Cal. Civ. Code §52.5.

## PRAYER FOR RELIEF

WHEREFORE based on the forgoing the Plaintiff seeks injunctive relief in the form of a judgement requiring the Defendants to institute sufficient audits, policies, rules, and requirements of their employees, agents, franchisees, contractors, and/or all others operating under their flag, logo, trademark, or advertising  umbrella to insure that the actions and activities outlined above no longer occur and may not serve in the future to jeopardize the health and safety of individuals similarly situated  to the Plaintiff herein.

AND WHEREFORE on the basis of the foregoing, the Plaintiff requests that a jury be selected to hear this case and render a verdict for the Plaintiff, and against the Defendant, and that the jury selected award damages to the Plaintiff in an amount which will effectively prevent other similarly caused acts and adequately reflects the enormity of the Defendant's wrongs and injuries to the Plaintiff due to the Defendant's faulty conduct, including but not limited to:

    a.  All available compensatory damages for the described losses with respect to each cause of action;

    b.  past and future medical expenses, as well as the costs associated with past and future life care;

    c.  past and future lost wages and loss of earning capacity;

    d.  past and future emotional distress;

    e.  consequential and/or special damages;

f.   all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

g.   punitive damages with respect to each cause of action;

h.   reasonable and recoverable attorneys' fees;

i.   costs of this action; and

j.   pre-judgment and all other interest recoverable

Further, the Plaintiff requests that the Court enter judgment consistent with the jury's verdict, and prays for any other damages and equitable relief the Court or jury deems appropriate under the circumstances.

## **DEMAND FOR JURY TRIAL**

The Plaintiff demands a trial by jury on all issues so triable in this civil action.

Dated:  July 6, 2020

**RESPECTFULLY SUBMITTED,
PLAINTIFF, by Her Attorneys,**

*/s/ Tiffany R. Ellis*
Tiffany R. Ellis (*Pro Hac Vice*)
**WEITZ & LUXENBERG, P.C.**
3100 W. Grand Blvd.
24th Floor
Detroit, MI 48202
(313) 315-3151
tellis@weitzlux.com

Melinda Davis Nokes (SBN 167787)
**WEITZ & LUXENBERG, P.C.**
*Attorneys for Plaintiff*
1880 Century Park East, Suite 700
Los Angeles, CA 90067
Telephone: (949) 338-4303
Facsimile: (310) 786-9927
mnokes@weitzlux.com

*and*

Jennie Lee Anderson (SBN 203586)
Lori E. Andrus (SBN 205816)
Audrey Siegel (SBN 286771)
**ANDRUS ANDERSON LLP**

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

*Attorneys for Plaintiff*
155 Montgomery Street, Suite 900
San Francisco, CA 94104
Telephone: (415) 986-1400
Facsimile:  (415) 986-1474
jennie@andrusanderson.com
lori@andrusanderson.com
audrey.siegel@andrusanderson.com

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

# EXHIBIT A

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



## Who We Are

The Blue Campaign is the unified voice for the U.S. Department of Homeland Security's (DHS) efforts to combat human trafficking. Working with law enforcement, government, and non-governmental and private organizations, the Blue Campaign strives to protect the basic right of freedom and bring those who exploit human lives to justice.

## What's Inside?

This **toolkit** offers tips and resources that can help you inform and educate your employees about human trafficking.

It includes **posters** of human trafficking warning signs for four groups of employee:

- Hotel and Motel Staff
- Housekeeping, Maintenance and Room Staff
- Concierge, Bellman, Front Desk, Security and Valet Staff
- Food and Beverage Staff

These posters can be displayed in common areas of your business where employees congregate (such as staff break, laundry and maintenance rooms).

www.dhs.gov/bluecampaign

16
17
18
19
20
21
22
23
24
25
26
27
28

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO

# What is Human Trafficking?

Human trafficking is modern-day slavery and involves the use of force, fraud or coercion to obtain labor or commercial sex. Every year, millions of men, women and children are trafficked in countries around the world, including the United States.

There are different types of human trafficking:

- **Sex Trafficking**
  Victims of sex trafficking are manipulated or forced to engage in sex acts for someone else's commercial gain. Sex trafficking is not prostitution.

  Anyone under the age of 18 engaging in commercial sex is considered to be a victim of human trafficking. **No exceptions.**

- **Forced Labor**
  Victims of forced labor are compelled to work for little or no pay, often manufacturing or growing the products we use and consume every day.

- **Domestic Servitude**
  Victims of domestic servitude are forced to work in isolation and are hidden in plain sight as nannies, housekeepers or domestic help.

## Human trafficking and the hospitality industry

Traffickers often take advantage of the privacy and anonymity offered by the hospitality industry. They can operate discreetly because staff and guests may not know the signs of human trafficking.

You may have employees who are victims of forced labor. If a third party applied for a position on behalf of an individual or if employees are not receiving their own paychecks, these could be signs of human trafficking.

Hotels and motels are also major locations where traffickers force sex trafficking victims to provide commercial sex to paying customers. Victims may be forced to stay at a hotel or motel where customers come to them, or they are required to go to rooms rented out by the customers.

## What actions can I take at my business to help stop human trafficking?

You play a significant role in helping to stop this terrible crime by:

- Knowing the signs of human trafficking.
- Designing a plan of action to respond to reports of human trafficking in your business.
- Partnering with agencies that provide services to victims of human trafficking. In the case of lodging, consider offering vouchers to victims. Immediate housing for victims plays a vital role in beginning a victim's healing process.
- Providing employee training to help them understand and identify signs of human trafficking.
- Distributing and posting the fact sheets in this kit to your employees.

Information on additional resources, literature, materials, and training offered by the Blue Campaign can be found at www.dhs.gov/bluecampaign.

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO





# SIGNS OF HUMAN TRAFFICKING

## For **Hotel** and **Motel** Staff

Hotel and motel employees are often in the best position to see potential signs of human trafficking, especially since your duties give you access to different areas of the properties. You may also have direct or indirect contact with both traffickers and victims.

## GENERAL INDICATORS

- Individuals show signs of fear, anxiety, tension, submission, and/or nervousness.

- Individuals show signs of physical abuse, restraint, and/or confinement.

- Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way.

- Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior.

- Individuals lack freedom of movement or are constantly monitored.

- Individuals avoid eye contact and interaction with others.

- Individuals have no control over or possession of money or ID.

- Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party.

- Individuals have few or no personal items—such as no luggage or other bags.

- Individuals appear to be with a significantly older "boyfriend" or in the company of older males.

- A group of girls appears to be traveling with an older female or male.

- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker.

*Each indicator alone may not necessarily mean a person is being trafficked.*

## WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING

- Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.

- Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.

- Follow your corporate protocol, such as by notifying management and security.

- Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.

- To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign





For **Housekeeping, Maintenance,** and **Room Service** Staff

Housekeeping, maintenance, and room service staff typically have the most access to guest rooms where signs of human trafficking may be apparent. By being conscious of human trafficking indicators, you can help identify possible human trafficking activities and victims.

**GENERAL INDICATORS**

- "Do Not Disturb" sign used constantly.
- Requests room or housekeeping services (additional towels, new linens, etc.), but denies hotel/motel staff entry into room.
- Refusal of cleaning services for multiple days.
- Excessive amounts of cash in a room.
- Smell of bodily fluids and musk.
- Presence of multiple computers, cell phones, pagers, credit card swipes, or other technology.
- The same person reserving multiple rooms.
- Individuals leaving room infrequently, not at all, or at odd hours.
- Children's items or clothing are present but no child registered with the room.

- Individuals loitering in hallways or appearing to monitor the area.
- Excessive amounts of alcohol or illegal drugs in rooms.
- Evidence of pornography.
- Minors left alone in room for long periods of time.
- Excessive number of people staying in a room.
- Extended stay with few or no personal possessions.
- Provocative clothing and shoes.
- Constant flow of men into a room at all hours.
- Excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.).
- Rooms stocked with merchandise, luggage, mail packages, and purses/wallets with different names.

*Each indicator alone may not necessarily mean a person is being trafficked.*

**WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING**

Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.

Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.

Follow your corporate protocol, such as by notifying management and security.

Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.

To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO





## SIGNS OF HUMAN TRAFFICKING

For **Concierge, Bellman, Front Desk, Security,** and **Valet** Staff

Concierge, bellman, front desk, security, and valet staff are typically the first to see guests when they enter the hotel. When checking in or requesting hotel amenities, a guest may exhibit behavior indicating human trafficking.

### GENERAL INDICATORS

- Patrons checking into room appear distressed or injured.
- The same person reserving multiple rooms.
- Few or no personal items when checking in.
- Room paid for with cash or pre-loaded credit card.
- Excessive use of hotel computers for adult oriented or sexually explicit websites.
- Patrons not forthcoming about full names, home address or vehicle information when registering.
- Minor taking on adult roles or behaving older than actual age (paying bills, requesting services).
- Patron appears with a minor that he or she did not come with originally.
- Rentals of pornography when children are staying in the room.
- Individuals dropped off at the hotel or visit repeatedly over a period of time.

- Individuals leaving room infrequently, not at all, or at odd hours.
- Minor with a patron late night or during school hours (and not on vacation).
- Individuals checking into room have no identification.
- Room is rented hourly, less than a day, or for long-term stay that does not appear normal.
- Patrons request information or access to adult services or sex industry.
- Room rented has fewer beds than patrons.
- Individuals selling items to or begging from patrons or staff.
- Individuals enter/exit through the side or rear entrances, instead of the lobby.
- Car in parking lot regularly parked backward, so the license plate is not visible.

*Each indicator alone may not necessarily mean a person is being trafficked.*

### WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING

- Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.
- Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.
- Follow your corporate protocol, such as by notifying management and security.
- Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.
- To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO





## SIGNS OF HUMAN TRAFFICKING
### For **Food** and **Beverage** Staff

Food and beverage staff may have access to a guest's room or see them using the hotel restaurant or bar. Be conscious of these signs indicating a guest may be a victim of human trafficking.

### GENERAL INDICATORS

- Patron entertaining a minor at the bar or restaurant that he/she did not come in with originally.
- Patron claims to be an adult although appearance suggests he/she is a minor.
- Individuals loitering and soliciting male patrons.
- Individuals waiting at a table or bar and picked up by a male (trafficker or customer).
- Individuals asking staff or patrons for food or money.
- Individuals taking cash or receipts left on tables.

*Each indicator alone may not necessarily mean a person is being trafficked.*

### WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING

- Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.
- Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.
- Follow your corporate protocol, such as by notifying management and security.
- Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.
- To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign

THIRD AMENDED COMPLAINT FOR DAMAGES
Case No.:3:20-cv-00155-WHO